*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528



May 3, 2011

MEMORANDUM FOR:    Alan Bersin
Commissioner
U.S. Customs and Border Protection

Alfonso Robles
Chief Counsel
U.S. Customs and Border Protection

FROM:    Margo Schlanger
Officer for Civil Rights and Civil Liberties

Audrey J. Anderson
Associate General Counsel (Legal Counsel)
Office of the General Counsel

SUBJECT:    Complaint No. 10-10-CBP-0137 (b) (6)
Complaint No. 11-06-CBP-0167 (b) (6)
Complaint No. 11-06-CBP-0168 (b) (6)
Complaint No. 11-06-CBP-0169 (b) (6)
Complaint No. 11-05-CBP-0162 (b) (6)
Complaint No. 11-06-CBP-0160 (b) (6)
Complaint No. 11-03-CBP-0163 (b) (6)
Complaint No. 11-06-CBP-0150 (b) (6)
Complaint No. 11-06-CBP-0161 (b) (6)
Complaint No. 11-03-CBP-0164 (b) (6)
Complaint No. 11-06-CBP-0151 (b) (6)
Complaint No. 11-06-CBP-0152 (Anonymous (b) (6) Citizen)
Complaint No. 11-06-CBP-0153 (b) (6)
Complaint No. 11-06-CBP-0154 (b) (6)
Complaint No. 11-06-CBP-0155 (Anonymous Muslim Female)
Complaint No. 11-06-CBP-0156 (b) (6)
Complaint No. 11-06-CBP-0157 (b) (6)
Complaint No. 11-06-CBP-0158 (b) (6)
Complaint No. 11-06-CBP-0159 (b) (6)
Complaint No. 11-03-CBP-0165 (b) (6)
Complaint No. 11-03-CBP-0166 (b) (6)
Complaint No. 11-05-CBP-0136 (b) (6)

*Protected by Attorney-Client and Deliberative Process Privileges*
*Law Enforcement Sensitive*

Complaint No. 11-05-CBP-0171 (b) (6)

The Office for Civil Rights and Civil Liberties (CRCL) has received numerous accounts from American citizens, legal permanent residents, and visitors who are Arab and/or Muslim, alleging that officials from U.S. Customs and Border Protection (CBP) repeatedly question them and other members of their communities about their religious practices or other First Amendment protected activities, in violation of their civil rights or civil liberties, or otherwise target them for extra scrutiny, questioning, or inappropriate comment based on their ethnicity or apparent religion. The purpose of this memorandum is to notify you of the complaints and describe the allegations, inform you that CRCL will retain these complaints for investigation, and explain how CRCL will work with CBP during our investigation.

ALLEGATIONS

The complainants allege they have been questioned about their religious practices and other inappropriate topics at land and air ports of entry. Allegations were received from a variety of sources, including correspondence directed to the Department by the ACLU and Muslim Advocates; a recent story that aired on National Public Radio (NPR); individually filed complaints; and a set of complaints filed on March 31 by the Council on American-Islamic Relations Michigan (CAIR-MI). Due to the number of complaints, the allegations are organized by Field Office and port of entry.

**_Boston Field Office_**
*Boston Logan International Airport (BOS)*
CRCL's Community Engagement Section conducts outreach and engagement events in the Boston-metro area. During that engagement, Muslim community members have expressed concerns about questions they are asked when returning to the United States. These questions include: what religion do you belong to? How religious are you? How often do you pray? Where do you pray? What mosque do you attend? and Why do you wear a beard?

1) More particularly, CRCL received a complaint from (b) (6) a U.S. citizen, who alleges (by his counsel, the ACLU) that since 2004, he has been subject to repeated delays by CBP when he presents himself for admission at U.S. ports of entry. (b) (6) lives in the Boston area, and travels frequently though Logan airport. (b) (6) alleges that his questioning during secondary inspections have been highly inappropriate. He alleges he has been asked: what mosque he prays at; how often he prays; and whether any of his family members are strictly religious. (b) (6) alleges his religion and national origin are the basis for his repeated referrals and subsequent inappropriate questioning. In April 2010, (b) (6) alleges that his computer, cell phone, and iPod were taken from him for three hours; and when he arose from his seat to ask about his status, an officer yelled at him to sit down. (b) (5)

2) (b) (6) has complained via our engagement meetings that he has been asked at Logan how often he prays and what mosque he attends. (b) (6) also alleges that during a four hour inspection on November 17, 2009, he was denied the use of a restroom and his electronic media were confiscated.

*Protected by Attorney-Client and Deliberative Process Privileges*
*Law Enforcement Sensitive*

2

PRIV 11-0292 - 000017

BQ_000017

3) (b) (6) has complained via our engagement meetings that in August 2009 he was asked what mosque he attends and how often he prays.

4) (b) (6) has complained via our engagement meetings that on September 5, 2009, she was detained with her children for four hours. She alleges that her son was asked if the number on his basketball jersey was a reference to the Quran, that CBP did not allow her to respond to her daughter's cries, and that she was not provided with an interpreter, even though her English proficiency is low. (b) (6) alleges she was asked why she purchased clothing in Egypt, why she did not marry overseas like other Somali women, and why she was not fasting on a particular day.

## Buffalo Field Office
*Rainbow Bridge Port of Entry*

5) A letter to the DHS Office of Inspector General from the ACLU and Muslim Advocates (since referred to CRCL) and the referenced NPR story both allege that on February 21, 2010, (b) (6) was referred to a secondary inspection which lasted over four hours. During his inspection, (b) (6) alleges he was asked a series of inappropriate questions, including: When did you convert? When did you become a Muslim? Which mosques do you attend? and How often do you attend the mosque?

6) According to the same NPR story, (b) (6) presented her passport to the CBP officer in primary earlier this year, and was subjected to discriminatory treatment based on her perceived status as a Muslim. For example, when her traveling companion (who wore a head covering) stated that she was in Canada to work on a story of a notorious religiously-motivated murder of a Muslim woman, the CBP officer asked (b) (6) if she was related to the murderer.

*Service Port - Champlain*

7) According to the ACLU/Muslim Advocates letter, on August 6, 2009, (b) (6) a U.S. citizen, arrived at the "Champlain border crossing." He was referred to secondary inspection for one hour. During his inspection officers allegedly asked: Do you go to the mosque? Why? How often? What mosque? Are you an Imam at the mosque? and Are you Shi'a or Sunni?

*Lewiston Bridge Complex*

8) In a complaint forwarded to CRCL by CAIR-MI, (b) (6) a U.S. citizen, states that in January 2010, after attending a conference on "Reviving the Spirit in Islam," he was asked a series of demographic questions. After an hour, a plain clothed officer asked him: Are you Muslim? Do you pray five times a day, in the mosque? Are there any extremists in our mosques? and Do you know any extremists? An hour later, two FBI agents arrived and questioned him because the "underwear guy from Nigeria had just tried to blow up a plane." The FBI agents asked him all of the questions listed above, as well as questioning him about his stay in Saudi Arabia and if that was where he converted to Islam. He states he was subject to similar questions in Miami in April 2010, however, when he was stopped at the Port Huron Port of Entry in January 2011, he was not asked religious questions.

## Miami Field Office
*Fort Lauderdale Airport (FLL)*

9) According to the NPR story, (b) (6) a professor of Middle Eastern studies at Georgetown University, was referred to secondary inspection allegedly due to his "location of birth."

*Protected by Attorney-Client and Deliberative Process Privileges*  
*Law Enforcement Sensitive*

3

PRIV 11-0292 - 000018

BQ_000018

While his account of his questioning is not entirely clear, (b) (6) implies that his American loyalty was questioned due to his perceived religion or ethnicity.

### Seattle Field Office
*Pacific Highway Crossing*

10) According to the ACLU/ Muslim Advocates letter, on July 8, 2010, (b) (6) a U.S. citizen, was handcuffed when he presented himself for admission with his wife and one-year-old daughter. An FBI agent questioned (b) (6) during his inspection, and allegedly asked: What mosque do you attend? How often do you attend the mosque? So you don't consider yourself a religious person? Does anybody [at the mosque] talk about going back to the motherland? Do you give donations? Don't you have to pay a certain amount of your money religiously? Who do you give [charity] to? and Do you belong to any organizations?

### Detroit Field Office

On March 24, 2011, CAIR-MI forwarded to CRCL a number of complaints on this topic, and alleged more generally that American Muslims crossing the U.S.-(b) (6) border are subject to extensive questions about their religion and religious practices. CAIR-MI alleges that the following questions are most common: Do you pray five times a day? Which mosque do you pray at? Do you pray your morning prayer at the mosque? Who is the Imam at your mosque? Who else prays at your mosque? Which Muslim charities have you donated to? Which Muslim countries have you traveled to? During your travels to these countries, have you been approached by anyone suspicious? What do you think of Anwar al-Awlaki? Which Muslim organizations are you affiliated with? Are you affiliated with any terrorist organizations? Do you know any terrorists? and Are there terrorists in our mosques? The complaints connected to the Detroit Field Office listed below were all forwarded to us by CAIR-MI.

*Unknown POE*

11) (b) (6) and a traveling companion, (b) (6) allege that they were surrounded by officers with drawn guns after presenting their passports. After being handcuffed and taken to the secondary inspection area, (b) (6) was asked, inter alia whether id he attended Islamic schools, and what he thinks about Anwar Al Awlaki.

*Ambassador Bridge Passenger Facility*

12) An anonymous (b) (6) citizen of Somali origin alleges that on May 25, 2010, she was subjected to an intensive and humiliating personal search by a female officer, because of her national origin. She alleges the only question CBP asked her was where she was headed. Several Somalis mentioned that they heard CBP Officers in the booths ask each other "are we still pulling over the Somalis?"

13) (b) (6) a U.S. citizen, states that he is a truck driver who crossed the border frequently with a "FAST Express Card." (b) (6) alleges that repeated referrals to secondary inspection based on his ethnicity while he was driving his commercial vehicle forced him to drive less lucrative routes. He has filed a redress request with DHS TRIP (Redress number 2104553).

14) (b) (6) a U.S. citizen, alleges that he has been subjected to repeated intensive inspections at the border. He is repeatedly taken to the secondary inspection area in handcuffs, where he has stayed for hours, unable to place a phone call or use the restroom in private. He alleges that he has been asked many times about, "relations, relatives, work, . . . associations, organization


memberships, and other questions." (b) (6) ▓▓▓▓ states that he has filed multiple DHS TRIP requests, but continues to be referred for additional inspection. Again, (b) (6) ▓▓▓▓ alleges that it is his ethnicity that is provoking extra scrutiny.

*Detroit-Windsor Tunnel*

15) An "Anonymous Muslim female of Somali origin," of unknown citizenship, alleges that during border screening, after she was processed through US-VISIT, she was subjected to an intensive personal search that was "rough" and "humiliating." She alleges that the CBP Officer asked her to remove her hijab, but she refused.

*Detroit Metropolitan Airport (DTW)*

16) (b) (6) ▓▓▓▓ a U.S. citizen, alleges that when he presented himself for admission on July 17, 2010, he was asked: What mosques he attended; if he was involved in any Islamic organizations; if he knew any terrorists or people involved in terrorism; the names and birthdates for a number of his family members, both those who live in the United States and overseas. He believes officers "googled" his name and asked him if he was involved in organizing a mosque-cleaning project several years ago. (b) (6) ▓▓▓▓ states his questioning was four or five hours in duration, only ending when he fell asleep in his chair.

17) (b) (6) ▓▓▓▓ states that he always has difficulties upon returning to the U.S., but that it is worst at the Detroit Metropolitan Airport. Questions include: which (b) (6) he is an imam at; what kinds of duties he performs; his roles in the Islamic organizations he affiliates with; how much money he brought to his community. In July 2010, he missed a connecting flight as a result of a four hour inspection.

*Port Huron Port of Entry*

18) (b) (6) ▓▓▓▓ citizenship unknown, states that he been stopped repeatedly by CBP, and each inspection is of increasing duration. At one such stop, an FBI agent allegedly asked about his place of worship and how many times he attended per week; his address in Lebanon; who he sees in Lebanon; whether he is affiliated with any terrorist organizations in Lebanon; and if his relatives have criminal records. In January 2011, he was met at the aircraft door by CBP at JFK and asked about his trip to Kuwait.

19) (b) (6) ▓▓▓▓ alleges that he has been "racially profiled, mocked, harassed, and threatened by officers at the border crossing and was searched, handcuffed, put into a room to stand while handcuffed and interrogated, all of which took 2 hours and twenty five minutes." A CBP officer, upon recognizing the complainant asked, "Is this conference you went to just a 'religious' thing?"

### Atlanta Field Office
*Atlanta Hartsfield/Jackson International Airport (ATL)*

20) Included in the ACLU/Muslim Advocates letter is a complaint about (b) (6) ▓▓▓▓ a U.S. citizen, who alleges that he has been questioned by CBP about protected beliefs, practices and associations on a number of occasions. Most recently, in early August 2009, (b) (6) ▓▓▓▓ was questioned by CBP for three hours about his involvement with a Muslim student association.

### New York Field Office
*John F. Kennedy International Airport (JFK)*

21) The same ACLU/Muslim Advocates letter alleges that on August 18, 2010, (b) (6) a U.S. citizen, was asked about holy sites he visited on his trip abroad and also asked the following questions: Do you visit any Islamist extremist websites? Are you part of any Islamic tribes? Have you ever been to a madrassa or studied Islam full-time? and Do you attend a particular mosque?

22) In a complaint sent to CRCL by the CBP INFO Center, (b) (6) was referred to secondary inspection and asked the origin of his last name. He feels that his extensive questioning was discriminatory based on his ethnicity.

*Unspecified Offices*
23) (b) (6) recently wrote the Deputy Secretary, by counsel, to complain that he was on February 26, 2010 subjected to questioning about whether he was Sunni or Shi'ite, and told that he should expect to face similar questioning again. The letter was forwarded to CRCL for response.

In short, CRCL has received numerous complaints on this topic, with certain obvious commonalities among them. We should note that we have every expectation that at least some of the complainants are the subject of look-outs or watchlisting. Our investigation will be sensitive to the security needs served by border questioning of such individuals.

CRCL

*CRCL Mission.* CRCL supports the Department's mission to secure the Nation while preserving individual liberty, fairness, and equality under the law. CRCL integrates civil rights and civil liberties into all the Department's activities:

- Promoting respect for civil rights and civil liberties in policy creation and implementation by advising Department leadership and personnel, and state and local partners;

- Communicating with individuals and communities whose civil rights and civil liberties may be affected by Department activities, informing them about policies and avenues of redress, and promoting appropriate attention within the Department to their experiences and concerns;

- Investigating and resolving civil rights and civil liberties complaints filed by the public regarding Department policies or activities, or actions taken by Department personnel;

- Leading the Department's equal employment opportunity programs and promoting workforce diversity and merit system principles.

*CRCL authorities.* Under 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1, CRCL is charged with investigating and assessing complaints against DHS employees and officials of abuses of civil rights, civil liberties, and profiling on the basis of race, ethnicity, or religion. The procedures for our investigations and the recommendations they may generate are outlined in DHS Management Directive 3500.

*Access to information.* More particularly, 42 U.S.C. § 2000ee-1(d) grants this Office access to the "information, material, and resources necessary to fulfill the functions" of the office, including the complaint investigation function; Management Directive 3500 further authorizes CRCL to:

- "Notify[] the relevant DHS component(s) involved of the matter and its acceptance by CRCL, and whether the matter will be handled by CRCL or by the component organization";
- "Interview[] persons and obtain[] other information deemed by CRCL to be relevant and require[] cooperation by all agency employees"; and
- "Access[] documents and files that may have information deemed by CRCL to be relevant."

*Reprisals forbidden.* In addition, 42 U.S.C. § 2000ee-1(e) forbids any Federal employee to subject a complainant or witness to any "action constituting a reprisal, or threat of reprisal, for making a complaint or for disclosing information to" CRCL in the course of this investigation.

This memorandum and its accompanying request for information are pursuant to these authorities.

*Privilege and required transparency.* Our communications with CBP personnel and documents generated during this review, particularly the final report, will be protected to the maximum extent possible by attorney-client and deliberative process privileges. Under 6 U.S.C. § 345(b), however, we submit an annual report to Congress—also posted on CRCL's Web site—that is required to detail "any allegations of [civil rights] abuses . . . and any actions taken by the Department in response to such allegations."

We look forward to working with your staff on this matter and will report back to you our findings and any recommendations.

SCOPE OF REVIEW



QUESTIONS PRESENTED

This investigation will cover the following issues:



*Protected by Attorney-Client and Deliberative Process Privileges*
*Law Enforcement Sensitive*

7

PRIV 11-0292 - 000022

It is possible that our investigation will reveal other matters of concern; if this occurs, we will inform you.

INITIATING THE INVESTIGATION

We request an initial discussion with your agency about this complaint and our plans for reviewing the matter. (b) (6) will be staffing this review, and I will remain closely involved. As you and your staff are aware, I have already conducted three meetings on these and related questions (though not examining particular cases), at airport ports of entry in Detroit, Boston, and Washington Dulles. I am also due to meet soon with staff from the CBP's National Targeting Center and CBP's Office of Intelligence and Operations Coordination on this as well as related topics.

Given the reach and number of these complaints and the sensitivity of this matter, it seems most appropriate to open this investigation with an "entrance meeting," involving appropriate CBP and CRCL personnel. For CRCL, the participants will include at least myself, Jeff Blumberg (the Director of CRCL's Compliance Branch), (b) (6) and OGC Counsel. I imagine both OFO, CBP Counsel, and your front office may wish to attend. Please have someone inform (b) (6) who at CBP should be included.

We look forward to working together to determine all the facts surrounding this matter and if appropriate, the best way forward. If you have any questions, please do not hesitate to contact me; your staff can also reach out to (b) (6) by phone at (b) (6) 866-644-8361 (TTY) or by email at (b) (6)

Copies to:

Thomas S. Winkowski
Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection
(b) (6)

(b) (6)
Executive Director
Office of Diversity and Civil Rights
U.S. Customs and Border Protection
(b) (6)

Nena Morgan
Director, Human Capital Division
Office of Field Operations
(b) (6)

(b) (6)
Joint Intake Center
U.S. Customs and Border Protection
(b) (6)

Andrew Farrelly
(A)Chief of Staff
Office of Field Operations
(b) (6)