# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| ABDULRAHMAN CHERRI, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) Case No. 2:12-cv-11656 |
| v. | ) District Judge: AVERN COHN ) Magistrate: LAURIE J. MICHAELSON |
| | ) |
| ROBERT S. MUELLER, III, Director, Federal Bureau of Investigation, *et al.*, | ) ) ) ) |
| Defendants. | ) ) |

## MOTION TO DISMISS AMENDED COMPLAINT
## BY OFFICIAL-CAPACITY DEFENDANTS

Defendants Robert S. Mueller, III, David V. Aguilar, and Janet Napolitano, in their official capacities, move this Court for entry of an order dismissing the claims against them in the amended complaint in this case for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(1), (b)(6). Plaintiffs have failed to establish Article III standing to seek prospective injunctive relief, and they fail to allege sufficient factual matter to demonstrate a plausible entitlement to relief against these defendants on either the constitutional claims or those under the Religious Freedom Restoration Act. Accordingly, the amended complaint should be dismissed for failure to state a claim. The attached brief sets forth the grounds for this motion with more specificity.

Pursuant to Local Rule 7.1(a), the undersigned contacted counsel for plaintiffs by email on January 16, 2013 and requested concurrence in this motion. Plaintiffs' counsel opposes the relief sought in this motion.

Respectfully submitted.

Dated: January 18, 2013

STUART F. DELERY
 Principal Deputy Assistant Attorney General

BARBARA L. MCQUADE
 United States Attorney

DIANE KELLEHER
 Assistant Branch Director

*/s/ Judson O. Littleton*
JUDSON O. LITTLETON
 TX Bar 24065635
 Trial Attorney
 United States Department of Justice
 Civil Division, Federal Programs Branch
 20 Massachusetts Ave., N.W.
 Washington, DC  20530
 Email:  judson.o.littleton@usdoj.gov
 Tel:   (202) 305-8714
 Fax:  (202) 616-8470

*Counsel for Official-Capacity Defendants*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | | |
|---|---|---|
| ABDULRAHMAN CHERRI, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:12-cv-11656 |
| v. | ) ) | District Judge: AVERN COHN |
| | ) | Magistrate: LAURIE J. MICHAELSON |
| ROBERT S. MUELLER, III, Director, Federal Bureau of Investigation, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**BRIEF IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
BY OFFICIAL-CAPACITY DEFENDANTS**

**ISSUES PRESENTED**

Plaintiffs, four Muslim Americans, allege that they have entered the United States at ports of entry on several occasions after traveling abroad, and that on each such occasion, federal officers asked them a series of substantially similar questions about their religious beliefs and practices. Based on these allegations, plaintiffs allege that the defendant agencies have adopted a policy or authorized a course of conduct in which all Muslim-American travelers are asked questions about their religious beliefs and practices at ports of entry. The issues presented are:

(1) Have plaintiffs alleged a sufficiently real and imminent threat of future injury to justify prospective equitable relief consistent with Article III when substantial time has passed since their most recent alleged incidents, plaintiffs allege no future travel plans, and they provide no plausible factual basis to suggest that they will be subjected to similar alleged treatment in the future?

(2) Have plaintiffs pleaded sufficient factual matter to plausibly suggest that they are entitled to relief under the First or Fifth Amendments to the U.S. Constitution, or under the Religious Freedom Restoration Act, solely as a result of allegedly being asked religion-based questions at U.S. ports of entry?

## PRINCIPAL CONTROLLING AUTHORITIES

1.   *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)

2.   *Rahman v. Chertoff*, 530 F.3d 622 (7th Cir. 2008), *remanded to* 2010 WL 1335434 (N.D. Ill. Mar. 31, 2010)

3.   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

4.   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

5.   *Locke v. Davey*, 540 U.S. 712 (2004)

6.   *Church of Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520 (1993)

7.   *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011)

## TABLE OF CONTENTS

ISSUES PRESENTED ...................................................................................i

PRINCIPAL CONTROLLING AUTHORITIES ...................................................ii

INTRODUCTION ......................................................................................1

BACKGROUND ........................................................................................2

I. Statutory and Regulatory Framework .........................................................2

    A. U.S. Customs and Border Protection .......................................................2

    B. Federal Bureau of Investigation ...........................................................3

II. Plaintiffs' Amended Complaint ...............................................................4

ARGUMENT ..........................................................................................7

I. Legal Background .................................................................................7

    A. Standard of review................................................................................7

    B. The Government's authority at the border ...............................................8

II. Plaintiffs' Claims Are Nonjusticiable. ...................................................10

    A. Plaintiffs lack standing to seek prospective equitable relief because
       they fail to allege a "real and immediate threat" of future injury. ...........10

    B. Plaintiffs do not plausibly allege the existence of an explicit policy
       or authorized course of conduct of questioning all Muslim-
       American travelers about their religious beliefs and practices.................13

    C. The relief plaintiffs seek impermissibly intrudes into Executive
       authority at the border.........................................................................16

III. Plaintiffs Fail To State A Claim Under The Constitution Or RFRA ...............17

    1. Plaintiffs have not stated a claim for violation of their free exercise
       rights under the First Amendment or RFRA. .......................................18

a.  Plaintiffs do not sufficiently allege that defendants have infringed upon or substantially burdened the exercise of their religion. ............................................................ 18

i.  Applicable standards. ...................................................... 18

ii.  Plaintiffs' insufficient showing of burden or infringement on religious conduct. ........................................................................ 21

b. Plaintiffs' First Amendment retaliation claim also fails. ......................................................................................... 23

2.  Plaintiffs fail to state a claim under the Fifth Amendment. ...................... 27

CONCLUSION ................................................................................ 29

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Ah Sin v. Wittman,*
   198 U.S. 500 (1905) ............................................................................. 28

*Allen v. Inranon,*
   283 F.3d 1070 (9th Cir. 2002) ............................................................ 26

*Alliance to End Repression v. Chicago,*
   742 F.2d 1007 (7th Cir. 1984) ........................................................ 16-17

*Ariz. Christian Sch. Tuition Org. v. Winn,*
   131 S. Ct. 1436 (2011) ......................................................... 10, 11, 17

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................... passim

*Beattie v. Madison Cnty. Sch. Dist.,*
   254 F.3d 595 (5th Cir. 2001) ............................................................. 26

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................ 7-8, 13, 24

*Bell v. Johnson,*
   308 F.3d 594 (6th Cir. 2002) ............................................................. 24

*Bennett v. City of Eastpointe,*
   410 F.3d 810 (6th Cir. 2005) ............................................................. 27

*Bowen v. Roy,*
   476 U.S. 693 (1986) ........................................................................... 22

*Campbell v. Johns,*
   1997 WL 259396 (6th Cir. May 16, 1997) ....................................... 26

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeh,*
   508 U.S. 520 (1993) ................................................................. 18-19, 20

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ....................................................................... passim

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano,*
   648 F.3d 365 (6th Cir. 2011) ....................................................... passim

*Cutter v. Wilkinson,*
   544 U.S. 709 (2005) ........................................................................... 26

*Dep't of Navy v. Egan,*
   484 U.S. 518 (1988) ........................................................................... 17

*Ernst v. Rising,*
   427 F.3d 351 (6th Cir. 2005) ............................................................... 7

v

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill,*
    617 F.3d 402 (6th Cir. 2012) ............................................................................ 19

*Kaemmerling v. Lappin,*
    553 F.3d 669 (D.C. Cir. 2008) .................................................................20, 22

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ........................................................................................ 26

*Locke v. Davey,*
    540 U.S. 712 (2004) .................................................................................19, 20

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................................11, 13

*Mozert v. Hawkins County Bd. of Educ.,*
    827 F.2d 1058 (6th Cir. 1987) ......................................................................... 20

*Nali v. Ekman,*
    355 Fed. Appx. 909 (6th Cir. 2009) ............................................................... 28

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) ..................................................................19, 20

*Paige v. Coyner,*
    614 F.3d 273 (6th Cir. 2010) ......................................................................... 25

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)…………………………………………………….......28

*Rahman v. Chertoff,*
    530 F.3d 622 (7th Cir. 2008) ......................................................................17, 18

*Rahman v. Chertoff,*
    2010 WL 1335434 (N.D. Ill. Mar. 31, 2010).............................................9, 25, 28

*Raines v. Byrd,*
    521 U.S. 811 (1997) ....................................................................................... 11

*Scarborough v. Morgan Cnty. Bd. of Educ.,*
    470 F.3d 250 (6th Cir. 2006) ......................................................................... 27

*Shearson v. Holder,*
    865 F. Supp. 2d 850 (N.D. Ohio 2011).......................................................26, 28

*Siggers-El v. Barlow,*
    412 F.3d 693 (6th Cir. 2005) ......................................................................... 24

*Spencer v. Bailey,*
    465 F.2d 797 (6th Cir. 1972) ......................................................................... 20

*Tabbaa v. Chertoff,*
    509 F.3d 89 (2d Cir. 2007) ......................................................................9, 16, 25

*United States v. Armstrong,*
    517 U.S. 456 (1996) ....................................................................................... 28

vi

*United States v. Flores-Montano,*
    541 U.S. 149 (2004) ..................................................................... 9

*United States v. Lawson,*
    461 F.3d 697, 700 (6th Cir. 2006) ......................................... 9, 25

*United States v. Montoya de Hernandez,*
    473 U.S. 531 (1985) ............................................................. 8-9, 28

*United States v. Nichols,*
    512 F.3d 789 (6th Cir. 2008) ..................................................... 28

*United States v. Ramsey,*
    431 U.S. 606 (1977) .............................................................. 9, 10

*United States v. Seljan,*
    547 F.3d 993 (9th Cir. 2008) ..................................................... 17

*United States v. Yang,*
    286 F.3d 940 (7th Cir. 2002) ..................................................... 10

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ................................................................... 10

*Wayte v. United States,*
    470 U.S. 598 (1985) ................................................................... 27

*White v. United States,*
    601 F.3d 545 (6th Cir. 2010) ..................................................... 12

*Wurzelbacher v. Jones-Kelley,*
    675 F.3d 580 (6th Cir. 2012) ..................................................... 24

## <u>Statutes</u>

6 U.S.C. §§ 202, 111, 215, 251 ....................................................... 3

8 U.S.C. §§ 1225, 1225(a)(3), 1357 ................................................ 3

18 U.S.C. § 351 .............................................................................. 4

19 U.S.C. §§ 1433(b), 1459(a) ....................................................... 3

19 U.S.C. §§ 482, 1461, 1496, 1499, 1581, 1582 ......................... 3

28 U.S.C. § 533 .............................................................................. 4

42 U.S.C. § 2000bb-1 ............................................................. 18, 19

50 U.S.C. §§ 1801 et seq. .............................................................. 4

50 U.S.C. §§ 401 et seq. ................................................................ 4

**Rules**

Fed. R. Civ. P. 12(b)(1), 12(b)(6).................................................................7, 8, 10

**Regulations**

8 C.F.R. § 235.1(a)..........................................................................................3
8 C.F.R. § 287 ................................................................................................3
19 C.F.R. § 148.11 ..........................................................................................3
19 C.F.R. pt. 162 .............................................................................................3
46 Fed. Reg. 59,941 (Dec. 4, 1981)..............................................................4

**Order**

Executive Order 12,333 ..................................................................................4

**INTRODUCTION**

Plaintiffs identify themselves as four Muslim-American citizens who, after traveling abroad on several occasions, have reentered the United States at various ports of entry along the United States-Canada border or international airports. They allege that each time they arrived at a port of entry, they were stopped for a period of time and asked a substantially similar set of questions about their religious beliefs and practices. Based on these alleged personal experiences, plaintiffs assert that the defendant government agencies have adopted a policy or course of conduct that involves asking Muslim Americans—and only Muslim Americans—impermissible questions about their religious beliefs and practices each time they seek to enter the United States. Plaintiffs filed this suit claiming this alleged policy or course of conduct violates their rights under the Religion Clauses of the First Amendment, the Equal Protection Clause of the Fifth Amendment, and the Religious Freedom Restoration Act ("RFRA"). They seek a declaration that such questioning violates these rights, as well as an injunction prohibiting defendants from asking religion-based questions in the future. Plaintiffs' amended complaint should be dismissed for lack of jurisdiction and for failure to state a claim.

First, plaintiffs fail to establish their standing to seek prospective equitable relief. They put forth only conclusory allegations regarding their alleged injury, and even if such allegations are credited, they occurred solely in the past. And plaintiffs do not allege a sufficiently imminent likelihood that they will be injured again in the future. It is no more than mere conjecture that they will cross the border again and be subjected to the same alleged treatment in the future—in fact, they expressly state that they have stopped crossing the border altogether. Such conjecture does not suffice for Article III standing to seek prospective equitable relief. Moreover, even if

1

plaintiffs otherwise had standing, the Court should still decline to entertain plaintiffs'
request because such relief would impermissibly and unjustifiably intrude on the
Executive Branch's broad authority to detain, inspect, and question all persons
seeking to enter the United States, irrespective of any individualized suspicion.

In addition, plaintiffs' amended complaint fails to state cognizable claims under
the Constitution or RFRA. Plaintiffs have not adequately pleaded that the alleged
policy infringes upon religious conduct or otherwise imposes a substantial burden on
the exercise of their religion. They fail to allege sufficient factual matter to make out
the elements of an unlawful retaliation claim under the First Amendment, and they
have not even suggested facts that could constitute an Establishment Clause
violation. At most, plaintiffs contend that defendants' alleged policy infringes upon
their ability to cross the border quickly, not their ability to exercise their religion.
Their First Amendment and RFRA claims must therefore fail. Plaintiffs also fail to
plausibly allege that they have suffered from disparate treatment as a result of
defendants' alleged policy of asking religious-based questions at the border, and they
have made no non-conclusory allegation of any discriminatory purpose. Plaintiffs
thus cannot state an equal protection claim under the Fifth Amendment. This Court
should dismiss all of the claims against the official-capacity defendants.

## BACKGROUND

### I. Statutory and Regulatory Framework

#### A. U.S. Customs and Border Protection

U.S. Customs and Border Protection ("CBP"), a component of the U.S.
Department of Homeland Security ("DHS"), serves as the nation's unified border
protection agency. CBP's responsibilities include, among other things, preventing the
entry of terrorists and instruments of terrorism into the United States; securing the

borders; carrying out immigration enforcement functions; and enforcing customs and agricultural laws, all while "ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce." 6 U.S.C. § 202; *see* 6 U.S.C. §§ 111, 215, 251.[1] To facilitate these functions, numerous statutes and regulations authorize CBP to inspect and search all persons, baggage, conveyances, and merchandise arriving in and departing from the United States. *See, e.g.*, 8 U.S.C. §§ 1225, 1357; 19 U.S.C. §§ 482, 1461, 1496, 1499, 1581, 1582; 8 C.F.R. § 287; 19 C.F.R. pt. 162.

All travelers seeking to enter the United States must present themselves for inspection at the border. 19 U.S.C. §§ 1433(b), 1459(a); 8 U.S.C. § 1225(a)(3); 19 C.F.R. § 148.11; 8 C.F.R. § 235.1(a). CBP officers conduct this inspection. The initial inspection that occurs when a traveler first presents himself to a CBP officer is referred to as a "primary inspection." Every traveler must undergo primary inspection, but some travelers may also be referred for a more detailed "secondary" inspection. Such referrals may occur for a number of reasons, including verification of a traveler's identity or immigration status, performance of an agricultural or customs inspection, existence of prior criminal history or an outstanding warrant, or an alert in CBP's computer system indicating additional scrutiny is needed. Secondary inspections are also performed at random. *See* http://www.cbp.gov/xp/cgov/travel/admissibility/random_exams.xml.

### B. Federal Bureau of Investigation

The Federal Bureau of Investigation ("FBI") is the federal government's principal domestic national security and law enforcement organization. FBI has statutory and

---

[1] *See generally* Summary of Laws and Regulations Enforced by CBP (2005), *available at* http://www.cbp.gov/xp/cgov/trade/legal/summary_laws_enforced.

other authority to protect and defend the United States against terrorist and foreign

intelligence threats, to uphold and enforce the criminal laws of the United States, and

to cooperate with other federal, state, municipal, and international agencies and

partners. Among various statutes providing specific authority to the FBI (*e.g.*, 18

U.S.C. § 351), 28 U.S.C. § 533 provides the FBI with authority to investigate all

federal crime not assigned exclusively to another federal agency. In addition, the FBI

has authority to investigate threats to the national security pursuant to presidential

executive orders, Attorney General authorities, and various statutory sources. *See,*

*e.g.*, 50 U.S.C. §§ 401 *et seq.*; 50 U.S.C. §§ 1801 *et seq.*; Executive Order 12,333, § 1.14,

46 Fed. Reg. 59,941, 59,949 (Dec. 4, 1981).

## II. Plaintiffs' Amended Complaint

Plaintiffs state that they are four Muslim U.S. Citizens who reside in this judicial

district. Am. Compl. [Dkt. 21] ¶¶ 1–4. Each plaintiff alleges that, upon entering the

United States at ports of entry after traveling abroad,[2] he has been stopped for an

extended time and asked a series of questions about his religion and religious

practices, and that he "continues to be subjected to the same prolonged detentions

and religious questioning…each time he crosses the United States-Canada border."

*See id.* ¶¶ 23 (Mr. Cherri), 31 (Mr. Charafeddine), 43 (Mr. Bouzid); *see also id.* ¶ 36

(alleging that Mr. Ali was subjected to such treatment at the United States–Canada

---

[2] Mr. Cherri alleges that he was first subjected to such treatment in March 2010, and that it occurred "more than six times" thereafter. Am. Compl. ¶¶ 15, 17. Mr. Charafeddine alleges that more than six such incidents occurred between November 2008 and December 2010. *Id.* ¶¶ 26, 28. Mr. Bouzid alleges "more than four" such incidents between August 2008 and July 2010. *Id.* ¶¶ 39, 41. Mr. Ali does not provide any date of the first occurrence or the number of alleged occurrences, but alleges only that it happened "as recent as December, 2011." *Id.* ¶ 37.

border and at other ports of entry).[3] Based on these allegations, plaintiffs assert that the official-capacity defendants "either began implementing a policy or encouraged, permitted, or tolerated a course of conduct or pattern of practice under which CBP Agents and FBI Agents ask Muslim-American travelers attempting to reenter the United States through the United States–Canada border and at multiple international ports of entry detailed questions about their specific Islamic beliefs and practices." *Id.* ¶ 50. Such questions, according to plaintiffs, include: "Which mosque do you go to? How many times a day do you pray? Who is your religious leader? Do you perform your morning prayer at the mosque?" *Id.* ¶ 52.[4] Plaintiffs allege "[u]pon information and belief" that there is no such policy or course of conduct with respect to "American travelers of other faiths." *Id.* ¶ 51.

Plaintiffs attach three documents to their amended complaint. The first purports to be an internal memorandum within DHS's Office for Civil Rights and Civil Liberties, dated October 1, 2010, examining existing case law as it pertains to the permissible bounds of law enforcement questioning about religion at the border and within the United States. *See* Dkt. 21-1; Am. Compl. ¶¶ 54–55. There is no indication on this memorandum what prompted the inquiry or whether any action was subsequently taken on the basis of the memorandum. The second exhibit purports to

---

[3] Somewhat inconsistent with the allegation that they "continue to be subjected" to such alleged treatment, all plaintiffs except Mr. Ali also allege that they "no longer cross[] the United States–Canada border in order to avoid being subjected to the above treatment." *See* Am. Compl. ¶ 25 (Mr. Cherri); *id.* ¶ 34 (Mr. Charafeddine); *id.* ¶ 45 (Mr. Bouzid).

[4] Plaintiffs also make other allegations about the way they allegedly were treated at the ports of entry, including handcuffing, body searches, officers drawing their weapons, and fingerprinting. *See, e.g.*, Am. Compl. ¶¶ 16–17, 27, 29, 36, 40–41. But the causes of action, operative allegations, and requested relief following each Count make clear that plaintiffs' claims focus solely on the alleged questioning about their religion and religious practices, rather than these other allegations.

be a letter from the same DHS civil rights office to the Council on American-Islamic Relations (CAIR), addressed to one of plaintiffs' counsel in this case. Dated May 3, 2011, the purported letter acknowledges a complaint submitted by CAIR on behalf of plaintiffs and other Muslim Americans alleging inappropriate questioning regarding religious beliefs and practices by CBP personnel at the border. *See* Dkt. 21-2; Am. Compl. ¶¶ 56–58. The third exhibit, also dated May 3, 2011, purports to be a memorandum from the same DHS civil rights office to CBP, notifying CBP that it had received the CAIR complaint and that it was initiating an investigation into those allegations. *See* Dkt. 21-3; Am. Compl. ¶¶ 59–61.

Plaintiffs filed their original complaint in this case on April 13, 2012. After defendants moved to dismiss, plaintiffs amended their complaint on November 16, 2012. *See* Dkt. 21. The amended complaint names as defendants Robert S. Mueller III, Director of the FBI; David V. Aguilar, Acting Commissioner of CBP; and Janet Napolitano, Secretary of DHS, all in their official capacities.[5] Plaintiffs now bring five claims against these defendants. They bring three claims under the First Amendment, contending that the alleged policy or course of conduct of questioning plaintiffs about their religious beliefs and practices burdens their free exercise rights (Count 1), violates the Establishment Clause (Count 2), and constitutes unlawful retaliation against their religious exercise (Count 3). Plaintiffs also bring a claim under the Fifth Amendment, arguing that the alleged policy or course of conduct violates their equal protection rights (Count 4). Finally, plaintiffs bring a claim under

---

[5] Plaintiffs also seek compensatory and punitive damages against certain government officials in their individual capacity, namely Special Agents Thompson and Sokolowski of the FBI. The claims against those individuals, who are represented by different government counsel, are addressed by separate motion.

RFRA, contending that the alleged policy or course of conduct imposes a substantial burden on their religious exercise and does not further a compelling government interest (Count 5). For each count, plaintiffs ask the Court to grant injunctive relief barring "Defendants from engaging in further unconstitutional practices by questioning Plaintiffs about their religious beliefs and practices"; *see also id.*, Prayer for Relief ¶ 2. Plaintiffs also seek a declaration that the alleged policy or course of conduct violates the First and Fifth Amendments and RFRA. *Id.*, Prayer ¶ 1.

## ARGUMENT

### I. Legal Background

#### A. Standard of review

Defendants move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Rule 12(b)(1) permits a defendant to obtain dismissal of a claim over which the Court lacks subject matter jurisdiction. In deciding whether to grant a 12(b)(1) motion, the Court is "empowered to resolve factual disputes" and may consider matters outside the pleadings, such as declarations or other documents, without converting the motion into one for summary judgment. *Ernst v. Rising*, 427 F.3d 351, 372 (6th Cir. 2005).

A Rule 12(b)(6) dismissal is warranted when a complaint fails to "state a claim upon which relief can be granted." As controlling precedent makes clear, courts must dismiss complaints that do not allege sufficient *facts* to demonstrate a plausible entitlement to relief. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.*

---

[6] Consistent with this principle, this brief will treat plaintiffs' concrete factual allegations as true solely for purposes of this motion.

*Twombly*, 550 U.S. 544, 570 (2007)). This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and it "asks for more than a sheer possibility that the defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Courts should be guided by two "working principles" when reviewing the sufficiency of complaints under Rule 12(b)(6). First, "the general rule that the court must accept as true all allegations in the complaint 'is inapplicable to legal conclusions,'" such that "conclusory recitals of the elements of a claim, including legal conclusions couched as factual allegations, 'do not suffice.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss," and courts should apply a "context-specific inquiry" when assessing the plausibility of the allegations in the complaint. *Id.* (quoting *Iqbal*, 556 U.S. at 679). Accordingly, the court should first identify and set aside "the allegations in the complaint that are not entitled to the assumption of truth," including recitations of elements and legal conclusions, and only then evaluate the remaining factual allegations "to determine if they plausibly suggest an entitlement to relief." *See Iqbal*, 556 U.S. at 680–81.

### B. The Government's authority at the border

"Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Montoya de Hernandez*,

473 U.S. 531, 537 (1985). Accordingly, "searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations." *United States v. Ramsey*, 431 U.S. 606, 619 (1977). Courts have recognized the Government's authority at the border[7] to question travelers at length and to conduct wide-ranging, suspicionless searches of travelers, their vehicles, and their luggage and private effects. *See, e.g.*, *United States v. Flores-Montano*, 541 U.S. 149, 155–56 (2004) (concluding that the removal, disassembly, and reassembly of a vehicle's gas tank as part of a border inspection was routine and required no suspicion); *Tabbaa v. Chertoff*, 509 F.3d 89, 94–95, 99 (2d Cir. 2007). And courts have affirmed that, in light of the Government's authority and paramount interest in protecting its borders, travelers crossing the U.S. border have no right to be free of detentions lasting several hours. *See, e.g.*, *Flores-Montano*, 541 U.S. at 155 & n.3 ("[D]elays of one to two hours at international borders are to be expected."); *Tabbaa*, 509 F.3d at 100 ("'[C]ommon sense and ordinary human experience' suggest that it may take up to six hours for CBP to complete the various steps at issue here, including vehicle searches, questioning, and identity verification, all of which we have already found to be routine."); *Rahman v. Chertoff*, 2010 WL 1335434, *2–4 (N.D. Ill. Mar. 31, 2010) (concluding that numerous detentions of between two and six hours, some of which involved pat downs, restraints (including handcuffs), and displays of armed force, were routine).

Such thorough searches and detentions have consistently been treated as routine and, "pursuant to the long-standing right of the sovereign to protect itself by

---

[7] Searches conducted at a customs checkpoint in a U.S. airport after the arrival of an international flight occur at the functional equivalent of the border. *See United States v. Lawson*, 461 F.3d 697, 700 (6th Cir. 2006).

stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616. And the necessity for the Government's long-standing broad authority at the border has only become more evident in recent years. *See United States v. Yang*, 286 F.3d 940, 944 n.1 (7th Cir. 2002) ("[T]he events of September 11, 2001, only emphasize the heightened need to conduct searches at [the Nation's borders].").

## II. Plaintiffs' Claims Are Nonjusticiable.

This Court should dismiss this action under Rule 12(b)(1) because it lacks jurisdiction over plaintiffs' claims. Plaintiffs lack standing to seek the prospective injunctive and declaratory relief set forth in their Complaint. Even if they could demonstrate standing to seek such relief, the relief they seek would constitute an improper judicial intrusion into the Executive's "plenary" authority to inspect individuals seeking to enter the United States.

### A. Plaintiffs lack standing to seek prospective equitable relief because they fail to allege a "real and immediate threat" of future injury.

"The judicial power of the United States . . . is not an unconditioned authority to determine the constitutionality of legislative or executive acts," but is limited by Article III of the Constitution "to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 475 (1982). The Constitution assigns a duty to defend the Constitution to the executive and legislative branches no less than the judicial branch, and such shared responsibility is inconsistent with the view that the judicial branch has a role in *every* matter in which a constitutional issue is alleged. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011). Courts thus must restrict their participation in such matters to cases or controversies, which also helps to "maintain[] the public's confidence in an unelected but restrained Federal Judiciary."

10

*Id.* Standing is an "essential and unchanging part of the case-or-controversy requirement," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and the standing inquiry must be "especially rigorous when reaching the merits of a dispute would force [a court] to decide whether an action taken by [another] branch[] of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997). As one "irreducible" element of standing, a plaintiff must allege an "injury in fact": the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560.

In particular, when seeking prospective injunctive relief, a plaintiff cannot establish standing based simply on "[p]ast exposure to illegal conduct" because "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). In *Lyons*, the Court concluded that the plaintiff had failed to allege a sufficient likelihood of future injury from a police chokehold in light of the five months that had lapsed between the chokehold incident and the filing of his complaint without any "allegation of further encounters" with the police. *Id.* at 108. Accordingly, as it was "no more than speculation" that the plaintiff would have another police encounter and subjected to another chokehold, the Court dismissed the claim for prospective equitable relief for lack of Article III standing. *Id.*

Plaintiffs lack standing under *Lyons* because they have failed to demonstrate that they face a threat of injury that is "real and immediate, not conjectural or hypothetical." 461 U.S. at 102 (quotation marks and citations omitted). The concrete allegations in the amended complaint—which was filed in November 2012—state that plaintiffs' most recent experiences in which they were allegedly asked religion-

11

based questions occurred, respectively, in December 2010 (Mr. Charafeddine, Am. Compl. ¶ 28); December 2011 (Mr. Ali, *id.* ¶ 37); and July 2010 (Mr. Bouzid, *id.* ¶ 41).[8] The lengths of time between these alleged experiences and the filing of the amended complaint are significantly greater than the five-month span the Court found insufficient in *Lyons.* Moreover, plaintiffs allege no concrete plans to travel internationally and enter the United States at a port of entry in the future, much less any likelihood that they will be subjected to the same alleged treatment at some future date. In fact, they expressly state that they no longer cross the border. Am. Compl. ¶¶ 25, 34, 45. They thus have shown no real and immediate prospect of future harm that would establish Article III standing to seek prospective equitable relief in this case.

The sole allegation in the amended complaint that could be read to allege future injury is plaintiffs' statement that they "no longer cross[] the United States–Canada border in order to avoid being subjected to the above treatment." Am. Compl. ¶¶ 25, 34, 45. (Mr. Ali does not even say that much.) Yet the Sixth Circuit's precedents are clear that this type of subjective "chill" on a plaintiff's choice to travel does not establish standing. *See White v. United States*, 601 F.3d 545, 554 (6th Cir. 2010) ("Our jurisprudence assumes that only the chilling of First Amendment rights may confer standing."). More generally, as the Supreme Court held in *Lyons*, a plaintiff's fear that he will be harmed by a future recurrence of allegedly unlawful past government conduct does not confer standing "absent a real and immediate threat of future injury." 461 U.S. at 107 n.8 ("It is the *reality* of the threat of repeated injury that is

---

[8] Mr. Cherri does not provide any specific factual allegation as to the date of his most recent border crossing or when he last was allegedly subjected to questioning about his religion.

relevant to the standing inquiry, not the plaintiff's subjective apprehensions."); *see Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."). Put simply, plaintiffs have not alleged sufficient factual matter to demonstrate that they are likely to cross the border into the United States again or, more critically, that they are likely to be asked allegedly impermissible religion-based questions if and when they do. Accordingly, plaintiffs have not articulated **any** threat of a future injury sufficient to establish Article III standing, much less a real and immediate one.[9] The Court must dismiss this case for lack of standing.

## B. Plaintiffs do not plausibly allege the existence of an explicit policy or authorized course of conduct of questioning <u>all</u> Muslim-American travelers about their religious beliefs and practices.

The Supreme Court in *Lyons* noted that the plaintiff there could only have established an actual controversy by making "the incredible assertion" that either **all** Los Angeles police officers **always** choked every citizen with whom they have an encounter for whatever purpose, or that the city authorized or directed such officers to do so. 461 U.S. at 105–06. Plaintiffs cannot establish standing on such a theory, because their "incredible assertion" that there is a policy or authorized course of

---

[9] Mr. Charafeddine makes a passing allegation that he "has suffered loss of business interests and income in Canada" due to his alleged treatment at the border. Am. Compl. ¶ 32. Such an unelaborated statement, devoid of any factual enhancement as to how allegedly being stopped and asked religion-based questions when crossing back into the United States from Canada has caused a "loss of business interests and income in Canada," plainly constitutes the sort of conclusory allegation that is not entitled to any presumption of truth. *Twombly*, 550 U.S. at 557. But in any event, such allegation still relates only to **past** injury and thus provides no basis for standing to seek prospective equitable relief.

conduct of asking religion-based questions of all Muslim-American travelers (and only Muslim-American travelers) who cross the border lacks plausibility.

Plaintiffs allege that DHS, CBP, and FBI "implement[ed] a policy or encouraged, permitted, or tolerated a course of conduct or pattern of practice" in which Muslim-American travelers attempting to cross the U.S.–Canada border are asked "detailed questions about their specific Islamic beliefs and practices." Am. Compl. ¶ 50. But plaintiffs have not put forth sufficient concrete factual allegations to give rise to a plausible inference of the existence of a policy or course of conduct requiring that **all** Muslim-American travelers are asked such religion-based questions **every** time they cross the border. The amended complaint "identifies no document, policy directive, or anything else that would constitute" or memorialize such an explicit policy or course of conduct. *Ctr. for Bio-Ethical Reform*, 648 F.3d at 373. Plaintiffs append to their amended complaint a generic legal memorandum, internal to DHS's Office for Civil Rights and Civil Liberties, assessing potential limitations on religion-related questioning at the border. Dkt. 21-1. But contrary to plaintiffs' allegation, that memorandum plainly does not "examine[] a policy of religious questioning," Am. Compl. ¶ 54, mention, or even suggest the existence of any such policy or course of conduct. Plaintiffs attach another memorandum from DHS's civil rights office to CBP that simply notifies CBP that an investigation had been commenced regarding plaintiffs' complaints. Dkt. 21-3. Again, nothing in this memorandum even suggests the existence of any policy or course of conduct involving religious questioning of all Muslim-American travelers.[10]

---

[10] Contrary to plaintiff's misleading allegation, the May 3, 2011 Memorandum to CBP did *not* "state[] that FBI and CBP Agents were 'repeatedly question[ing] [Muslim travelers] and other members of their communities about their religious practices or other First (continued…)

Moreover, the existence of any such policy or course of conduct of asking **all** Muslim-American travelers religion-based questions **every** time they cross the border is highly implausible because of serious questions about how such a policy could practically be implemented. The plaintiffs' allegations of hours-long questioning, if true, could only occur during secondary inspection; yet plaintiffs do not allege that all Muslim-American travelers are referred to secondary inspection, only that such referrals happen "more frequently" than to Americans of other faiths. Am. Compl. ¶ 49. More fundamentally, such a policy or course of conduct would suggest, without any support whatsoever, that officers at the border have the ability to determine an individual's religion. Plaintiffs do not explain how it was determined that they are Muslim before allegedly being referred to secondary inspection or asked religion-based questions—nor do they provide any other context regarding the discussions that allegedly took place during these hours-long inspections. Finally, as explained further below, plaintiffs suggest no plausible government motive for asking religion-based questions of all Muslim-American travelers, every time they cross the border into the United States.

Plaintiffs cannot establish standing to seek prospective injunctive relief in this case on the theory that DHS and/or FBI employs a policy or authorized course of conduct of asking **all** Muslim-Americans questions about their religious beliefs and practices **every** time they cross the border. *See Lyons*, 461 U.S. at 105–06. Accordingly, the amended complaint must be dismissed for lack of standing.

---

Amendment protected activities." Am. Compl. ¶ 60 (latter two alterations in amended complaint). The Memorandum stated only that DHS's civil rights office "ha[d] received numerous accounts…**alleging** that officials from U.S. Customs and Border Protection (CBP) repeatedly question them" in the claimed manner. Dkt. 21-3 at 2 (emphasis added).

### C. The relief plaintiffs seek impermissibly intrudes into Executive authority at the border.

The Executive Branch enjoys expansive authority to inspect all persons and items prior to entering the United States, and courts have consistently recognized that such power necessarily encompasses the authority to detain individuals, search their persons and property, and gather information—all without any requirement of reasonable suspicion in all but highly intrusive searches. Because plaintiffs seek to have this Court intrude into that authority and forbid the Executive from carrying out that vital function in a particular way, the Court should decline to consider granting the equitable relief plaintiffs seek and dismiss the case. Plaintiffs seek an injunction prohibiting any government agencies responsible for inspecting individuals seeking to enter the United States from asking questions that touch upon religion. But an injunction barring the Government from asking **any** questions that pertain to religious beliefs and practices, would substantially intrude on that prerogative that is beyond the expertise of the judiciary.[11] *See Alliance to End*

---

[11] CBP officers plainly may have good reason to ask questions that touch upon religion in the course of performing their duties at the border. As merely one example, CBP officers routinely inquire into the "nature of [a traveler's] trip," http://www.cbp.gov/xp/cgov/travel/vacation/kbyg/your_inspection.xml, and if an individual traveled abroad for a purpose related to his religion (such as to attend a religious conference or visit a holy site), such matters would naturally be discussed upon his return to the United States. Regardless of whether some religion-based questioning may be inappropriate, then, plaintiffs' requested relief would plainly interfere with many legitimate circumstances in which the topic of religion may arise during a border inspection. *See Tabaa*, 509 F.3d at 98–99 ("Plaintiffs complain that they were required to answer intrusive questions about their activities at the [Reviving the Islamic Spirit Conference], the content of the lectures they attended, and their reasons for attending. But these questions are not materially different than the types of questions border officers typically ask prospective entrants in an effort to determine the places they have visited and the purpose and duration of their trip.").

*Repression v. Chicago*, 742 F.2d 1007, 1019 (7th Cir. 1984) (en banc) ("Fine-tuning investigative guidelines is the responsibility of the executive branch, not us.").

Importantly, "[t]he rationale behind the border search exception has its origins in national self-protection, and it is a necessary instrument to protect our sovereignty." *United States v. Seljan*, 547 F.3d 993, 1009 (9th Cir. 2008) (en banc). Concerns about judicial intrusion into executive functions are particularly acute in the national security context. *See Rahman v. Chertoff*, 530 F.3d 622, 627–28 (7th Cir. 2008) ("[M]odesty is the best posture for the branch that knows the least about protecting the nation's security and that lacks the full kit of tools possessed by the legislative and executive branches."); *see also id.* at 627 ("How much time returning travelers should spend cooling their heels at the border, while agents try to determine whether they are who they claim to be, and have been where they claim to have been, are legislative or executive questions.").  Courts should accordingly be "reluctant to intrude upon the authority of the Executive" in such matters, *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988), while recognizing the Executive's "shared obligation" to defend the Constitution, *Ariz. Christian Sch. Tuition Org.*, 131 S. Ct. at 1442. In light of the Executive's plenary authority at the border, courts have thus properly refused to "superintend the process of inspecting persons who present themselves at the border for entry," *see Rahman*, 530 F.3d at 625–28, and this Court should similarly decline to consider the broad, categorical relief that plaintiffs seek.

## III.  Plaintiffs Fail To State A Claim Under The Constitution Or RFRA.

Even if plaintiffs have articulated a generally justiciable claim, they have failed to demonstrate a plausible entitlement to relief. As an initial matter, as described above in section II.B, plaintiffs have failed to plausibly allege the existence of any policy or course of conduct regarding religious questioning, and their claims should be

dismissed on that basis alone. *See Ctr. for Bio-Ethical Reform*, 648 F.3d at 372–73.
Moreover, they have failed to sufficiently allege that any such purported policy or
course of conduct violates their rights under the First or Fifth Amendments or
RFRA. Accordingly, under whatever legal framework plaintiffs' claims are assessed,
the Complaint should be dismissed for failure to state a claim.

1. **Plaintiffs have not stated a claim for violation of their free exercise rights under the First Amendment or RFRA.**

   a. **Plaintiffs do not sufficiently allege that defendants have infringed upon or substantially burdened the exercise of their religion.**

Plaintiffs fail to state a claim for violations of the First Amendment's Free
Exercise Clause or RFRA because they have not pleaded sufficient facts to allege that
being asked questions about their religious beliefs and practices at the border
infringes upon or burdens the free exercise of their religion. The First Amendment
provides in relevant part that "Congress shall make no law . . . *prohibiting the free
exercise*" of religion. Similarly, RFRA provides that the Government "shall not
substantially burden a person's *exercise of religion*" unless it shows that such burden is
the "least restrictive means" of furthering a "compelling government interest." 42
U.S.C. § 2000bb-1 (emphasis added). Thus, under the plain text of both the Free
Exercise Clause and RFRA, plaintiffs must plead sufficient factual matter to show
that government action directly infringes upon or substantially burdens the "exercise"
of their religion. Plaintiffs fail to meet that standard here.

   i.     Applicable standards

As the Supreme Court has explained, a law is subject to strict scrutiny under the
Free Exercise Clause if it "targets *religious conduct* for distinctive treatment or
advances legitimate governmental interests only against *conduct* with a religious
motivation." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520, 546

18

(1993) (emphasis added). Even if a law targets religion as such, it will still be upheld if it does not significantly interfere with the person's religious **practice** or **beliefs** in a way comparable to "substantial burdens" that the Supreme Court has previously recognized in Free Exercise cases. *See Locke v. Davey*, 540 U.S. 712, 720 (2004) (upholding a law that on its face treated religious study differently from secular study because "the State's disfavor of religion (if it can be called that) is of a far milder kind" than the burdens that the Court had previously recognized as giving rise to Free Exercise violations). Indeed, to obtain even rational basis review of a Free Exercise claim, a plaintiff must show that a neutral and generally applicable law still "has the incidental effect of burdening a particular religious practice." *Church of Lukumi*, 508 U.S. at 531. It is thus plain that a plaintiff must allege some substantial burden on the *exercise of his religion*—i.e., religious conduct or a religious practice—to state a claim under the Free Exercise Clause.

RFRA also requires a showing of a substantial burden on religious conduct. Under RFRA, a "rule of general applicability" that "substantially burden[s] a person's exercise of religion" may be upheld only if it is the least restrictive means of advancing a compelling government interest. *See* 42 U.S.C. § 2000bb-1. A plaintiff must meet two elements to establish a prima facie claim under RFRA: "First, the activities the plaintiff claims are burdened by the government action must be an 'exercise of religion.' Second, the government action must 'substantially burden' the plaintiff's exercise of religion." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc); *see Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2012) (RFRA plaintiff must show that government action substantially burdens a sincerely held religious belief).

19

The Sixth Circuit has described the nature of what qualifies as a substantial burden as "governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion." *Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058, 1066 (6th Cir. 1987); *see also Spencer v. Bailey*, 465 F.2d 797, 799 (6th Cir. 1972) (Clark, J.). In other words, "a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation*, 535 F.3d at 1069–70. "An inconsequential or *de minimis* burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008). Thus, a law that criminalizes animal sacrifice infringes upon Santeria practitioners' free exercise of their faith because such sacrifice is a "central element of the Santeria worship service." *See Church of Lukumi*, 508 U.S. at 534. On the other hand, requiring a student to be exposed to ideas that he finds objectionable on religious grounds does not constitute a burden on the student's free exercise right because he was not required "to affirm or deny a religious belief or to engage or refrain from engaging in any act either required or forbidden by the student's religious convictions." *Mozert*, 827 F.2d at 1065; *see Locke*, 540 U.S. at 720–21 (upholding a law that prohibited the use of state-sponsored scholarship money to pursue a devotional theology degree because the law "imposes neither criminal nor civil sanctions on any type of religious service or rite," "does not deny to ministers the right to participate in the political affairs of the community," and "does not require students to choose between their religious beliefs and receiving a government benefit").

20

    ii. Plaintiffs' insufficient allegations of burden or infringement on religious conduct

Plaintiffs have failed to adequately plead that defendants' alleged policy or course of conduct of questioning them about their religious beliefs at the border directly infringes upon their religious conduct or imposes a substantial burden on their free exercise of Islam. Plaintiffs have not alleged that such questioning requires them to affirm or deny a belief that is contrary to their faith, or to choose between following tenets of their faith and receiving an important government benefit. Nor have plaintiffs alleged that the Government has sought to impose civil or criminal sanctions on religiously motivated conduct. Plaintiffs' only allegations in the amended complaint attempting to assert any burden on their religious exercise are conclusory, circular, and devoid of concrete factual content. *See, e.g.*, Am. Compl. ¶ 65 ("Defendants' actions described above directly infringe upon or substantially burden Plaintiff's First Amendment rights to free exercise of religion…because Defendants have continued to repeatedly discriminate against, target, and detain Plaintiffs for the purpose of questioning Plaintiffs invasive questions about their religious beliefs and practices."); *id.* ¶ 66 ("Defendants' above-described actions…constitute a substantial burden on Plaintiffs' First Amendment rights…, an adverse action against Plaintiffs…, and an action that targets religious conduct."); *id.* ¶ 67 ("Repeated…invasive interrogations based on Plaintiffs' religious practices constitute harassment and retaliation that have caused psychological harm to Plaintiffs."); *id.* ¶ 103 ("Plaintiffs' harm includes, but is not limited to, a chilling effect on Plaintiffs' and other Muslim Americans' right to free exercise of religion."); *see also id.* ¶ 53 (conclusory allegations of laundry list of types of First Amendment harms without any factual enhancement).

These conclusory statements are plainly insufficient under *Iqbal*, as they provide no factual elaboration as to how plaintiffs' exercise of their faith is burdened by being asked questions about it. *See Ctr. for Bio-Ethical Reform*, 648 F.3d at 374–75 (declining to afford presumption of truth to "conclusory and bare allegations" that defendants' conduct "had the effect of chilling Plaintiffs' speech," finding such allegations to be "not well-pleaded"). Again, the amended complaint *never explains* in concrete factual terms what burden the alleged policy or authorized course of conduct imposes on plaintiffs' exercise of Islam. Plaintiffs have thus failed to allege any free exercise violation under the First Amendment or RFRA.

At most, plaintiffs' factual allegations suggest a burden on their ability to cross the border quickly, not their ability to practice Islam.[12] Plaintiffs have made no allegation that delays and questioning while crossing the border have anything to do with plaintiffs' exercise of their religion. Such matters relate directly to the Government's broad, sovereign authority to inspect individuals attempting to enter the United States. Plaintiffs' dissatisfaction with that process does not mean that they have incurred a substantial burden on their religious exercise for purposes of the Free Exercise Clause or RFRA. *See Bowen v. Roy*, 476 U.S. 693, 700 (1986) ("The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures."); *Kaemmerling*, 553 F.3d at 678 (noting that "a burden on activity unimportant to the adherent's religious scheme" does not constitute a substantial burden for purposes of RFRA). And in light of the

---

[12] *E.g.*, Am. Compl. ¶ 32 ("Due to Charafeddine's repeated detentions and religious questioning, Charafeddine has suffered lost of business interests and income in Canada.").

Government's plenary authority to inspect individuals at the border in furtherance of its interest as sovereign, plaintiffs cannot claim that they have been deprived of the ability to cross the border without being detained, searched, or questioned, because they have no entitlement to do so.

Without concrete factual allegations showing that defendants' alleged policy of questioning plaintiffs about their religious beliefs and practices directly infringes upon plaintiffs' religious conduct or substantially burdens the exercise of their faith, plaintiffs cannot state a claim under the Free Exercise Clause or RFRA. These claims should be dismissed.

### b. Plaintiffs' First Amendment retaliation claim also fails.

In count 3, while repeating verbatim most of the same conclusory allegations contained in counts 1 and 2, plaintiffs allege that the purported policy or authorized course of conduct of questioning Muslim-Americans about their religious practices constitutes unlawful retaliation against First Amendment-protected activity. To state such a claim under the First Amendment, plaintiffs must allege facts sufficient to show that (1) they were participating in constitutionally protected activity; (2) defendants' actions injured plaintiffs in a way likely to deter a person of ordinary firmness from further participation in that activity; and (3) the adverse action was motivated at least in part by plaintiffs' protected conduct. *Ctr. for Bio-Ethical Reform*, 648 F.3d at 371. First and foremost, the only "activity" plaintiffs allege in the amended complaint is that they crossed the border, and they have provided no basis for any assertion that crossing the border is a protected religious activity.

Second, plaintiffs have not alleged an "adverse action" sufficient to state a claim of unlawful retaliation. When such adverse action is properly considered "inconsequential" and causes a "de minimis injury," the court should dismiss the

23

claim as a matter of law. *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). Plaintiffs state that questioning regarding their religious beliefs and practices "constitute[s]… an adverse action against Plaintiffs motivated by Plaintiffs' religious beliefs and practices," Am. Compl. ¶ 85, but that is a conclusory allegation that merely restates an element of the claim and thus must be disregarded. *See Twombly*, 550 U.S. at 555. Plaintiffs then allege that the purported policy "constitute[s] harassment and retaliation that have caused psychological harm to Plaintiffs." Am. Compl. ¶ 86. Again, these are conclusory assertions, and the Sixth Circuit has recognized that conclusory allegations of "emotional distress, harassment, personal humiliation, and embarrassment" are "too generalized to withstand judgment on the pleadings" as to a showing of an adverse action in the First Amendment retaliation context. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012).

Third, plaintiffs have failed to sufficiently allege that defendants' actions would deter a Muslim-American traveler of ordinary firmness from continuing to practice his Islamic faith. Plaintiffs again restate this element of the claim verbatim, *see* Am. Compl. ¶ 86, but such recitation in the absence of supporting factual allegations must be disregarded under *Twombly* and *Iqbal*. Moreover, when determining whether any such adverse action would deter a person of "ordinary firmness" from continuing to engage in the protected activity, courts should consider the specific circumstances under which the alleged adverse action occurred. *See Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005) (considering a prisoner's retaliation claim and noting that "[s]ince prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness"). As explained above, *see supra* section I.B, courts have repeatedly reaffirmed the Government's broad authority to inspect, detain, and

24

question travelers at the border, and travelers correspondingly must abide such processes when crossing into U.S. territory. The types of searches and detentions that plaintiffs complain of here have been consistently treated by courts as reasonable and routine, requiring no degree of suspicion whatsoever.[13]  Properly considered in light of the "greater intrusion to privacy and dignity that attends the routine border search," *Lawson*, 461 F.3d at 701, plaintiffs cannot show that being asked questions about their religious beliefs and practices during a secondary examination at a port of entry constitutes an "adverse action" that would deter a person of ordinary firmness from continuing to practice his or her religion.

Finally, plaintiffs fail to adequately plead that the alleged government policy of questioning Muslim Americans was "motivated at least in part as a response to the exercise of [their] constitutional rights." *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010). Plaintiffs' sole (new) allegation in this regard is, again, entirely conclusory. *See* Am. Compl. ¶ 83 ("Defendants' above-described actions…were substantially prompted by Plaintiffs' religious exercise."). While plaintiffs identify themselves in the amended complaint as Muslim, they allege no facts demonstrating that they were somehow exercising or outwardly practicing their faith in front of the officers who allegedly detained and questioned them. Indeed, none of plaintiffs' allegations demonstrate how or why officers would actually have known plaintiffs (or every other Muslim-American traveler who would allegedly be subjected to this policy) are

---

[13] *See, e.g.*, *Tabbaa*, 509 F.3d at 98–101 (holding that a stop involving fingerprinting, taking photographs, "intrusive question[s]," pat-downs involving the forcible movement of individuals' feet, and a six-hour detention was "routine"); *Rahman*, 2010 WL 1335434, *2–3 (concluding that searches involving up to six-hour detentions, handcuffing, and armed officers surrounding a vehicle were "routine").

Muslim. Officers plainly cannot retaliate against First Amendment activity of which they are not aware. *See Allen v. Inranon*, 283 F.3d 1070, 1076 (9th Cir. 2002) ("In order to retaliate against an employee for his speech, an employer must be aware of that speech."); *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 604 (5th Cir. 2001); *Campbell v. Johns*, 1997 WL 259396, *5 (6th Cir. May 16, 1997). Nor do plaintiffs allege that any defendant took any official actions as a result of their responses to the alleged questions regarding their religious beliefs and practices. Accordingly, plaintiffs have not plausibly alleged that defendants questioned plaintiffs in retaliation against their exercise of their religion.

Plaintiffs' bare assertions of retaliation amount to "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim," and they are thus "not entitled to be assumed true." *See Iqbal*, 556 U.S. at 681; *see also Shearson v. Holder*, 865 F. Supp. 2d 850, 864 (N.D. Ohio 2011). The amended complaint fails to plausibly allege unlawful retaliation, and Count 3 thus should be dismissed for failure to state a claim.[14]

---

[14] Puzzlingly, plaintiffs have now added to their amended complaint a count under the First Amendment's Establishment Clause, stating that the alleged policy or authorized course of conduct "suggests or amounts to a preference of a religion over another." Am. Compl. ¶ 75, and otherwise reciting verbatim most of the same conclusory allegations contained in the Free Exercise count. Plaintiffs do not specify which religion they believe the Government is allegedly favoring, and they do not explain how the alleged policy or course of conduct violates the "separation of church and state" that the Establishment Clause commands, *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). Even read most liberally, plaintiffs' amended complaint contains no plausible allegation of an advancement or inhibition of all religion, nor any "excessive government entanglement with religion," *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971) (quotation marks and citation omitted). Count 2 should be dismissed.

### 2.        Plaintiffs fail to state a claim under the Fifth Amendment.

Plaintiffs also fail to allege sufficient factual matter to state an equal protection claim under the Fifth Amendment. "Fundamentally, the [Equal Protection] Clause protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarborough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).[15] To state an equal protection claim, plaintiffs must plausibly allege that defendants' alleged action had a discriminatory effect and that defendants acted with a discriminatory purpose. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Plaintiffs fail to plausibly allege either element.

First, plaintiffs have not alleged sufficient factual matter that would plausibly show disparate treatment. A showing of discriminatory effect requires a plausible allegation that similarly situated individuals of a different religion were not subjected to the same alleged treatment. *Ctr. for Bio-Ethical Reform*, 648 F.3d at 379. Plaintiffs effectively state this element verbatim, *see* Am. Compl. ¶ 92 ("persons of other faiths similarly situated as Plaintiffs are not asked similar questions about their religion and religious practices"); *see also id.* ¶ 51 (alleging that, "[u]pon information and belief," defendants have not implemented a similar policy or authorized course of conduct with respect to "American travelers of other faiths"), but these allegations are conclusory and amount to no more than formulaic recitations of an element of an equal protection claim. *See Iqbal*, 556 U.S. at 681; *Ctr. for Bio-Ethical Reform*, 648 F.3d

---

[15] To the extent plaintiffs allege that defendants' alleged policy violates their equal protection rights because it infringes upon their fundamental right to exercise their religion, that claim fails for the same reasons explained above: they cannot show that the alleged policy burdens their religious practice.

at 379. And even if these statements were considered at all, such allegations alone are insufficient to allege disparate treatment. *See United States v. Armstrong*, 517 U.S. 456, 466 (1996) (citing *Ah Sin v. Wittman*, 198 U.S. 500, 507–08 (1905)); *Nali v. Ekman*, 355 Fed. Appx. 909, 913 (6th Cir. 2009) (bare allegation that "no one else was ticketed" for similar conduct insufficient to allege disparate treatment "unless accompanied by some evidence that the people *not* disciplined were similarly situated and of a different race"). "[B]ald accusations and irrelevant generalized statistics do not even come close to constituting what is necessary to establish a *prima facie* case of an equal protection violation." *Shearson*, 865 F. Supp. 2d at 865 (quoting *United States v. Nichols*, 512 F.3d 789, 795 (6th Cir. 2008)).

Nor have plaintiffs sufficiently alleged that defendants acted with a discriminatory purpose. As explained above, searches of the person and property of an individual crossing the border (with attendant detention and questioning) are not subject to "any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538. Accordingly, a traveler can be subjected to such a search for "a good reason, a bad reason, or no reason at all." *Rahman*, 2010 WL 1335434, at *3. A sufficient allegation of discriminatory purpose "requires more than intent as volition or intent as awareness of consequences"—"[i]t instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 676–77 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

To survive a motion to dismiss, plaintiffs must "plead sufficient factual matter to show that" defendants adopted the alleged policy "for the purpose of discriminating on account of" plaintiffs' religion. *Id.* Plaintiffs have failed to do so. The amended complaint only attempts to address defendants' alleged motive in Count 1, the free

28

exercise claim, and even then it states only that "Defendants' motive in targeting Plaintiffs for a specific line of invasive religious questioning at the border is both discriminatory and retaliatory." Am. Compl. ¶ 70. That conclusory allegation is plainly insufficient to allege discriminatory purpose under *Iqbal* and Sixth Circuit precedent. *See Iqbal*, 556 U.S. at 680–81 (concluding that mere allegations that officials subjected a detainee to harsh conditions "solely on account of [his] religion, race, and/or national origin and for no legitimate or penological interest" were "conclusory and not entitled to be assumed true"); *Ctr. for Bio-Ethical Reform*, 648 F.3d at 377 (disregarding "unadorned allegations concerning Defendants' intent and motivation" and concluding that a "bald allegation of impermissible motive…, standing alone, is conclusory and is therefore not entitled to an assumption of truth").

As plaintiffs have failed to allege sufficient factual matter showing that they were treated differently from similarly situated individuals or that defendants acted with discriminatory purpose, they have failed to state an equal protection claim.

## CONCLUSION

For the foregoing reasons, plaintiffs' amended complaint should be dismissed for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

Respectfully submitted.

Date: January 18, 2013          STUART F. DELERY
                                  Principal Deputy Assistant Attorney General

                                BARBARA L. McQUADE
                                  United States Attorney

                                DIANE KELLEHER
                                  Assistant Branch Director

29

_/s/ Judson O. Littleton_
JUDSON O. LITTLETON
 TX Bar 24065635
 Trial Attorney
 United States Department of Justice
 Civil Division, Federal Programs Branch
 20 Massachusetts Ave., N.W.
 Washington, DC  20530
 Email:  judson.o.littleton@usdoj.gov
 Tel:   (202) 305-8714
 Fax:   (202) 616-8470

_Counsel for Official-Capacity Defendants_

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the Court and all parties.

*/s/ Judson O. Littleton*
JUDSON O. LITTLETON

31