### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ABDULRAHMAN CHERRI**, *et al.*; | ) | |
| | ) | **Case No. 12-cv-11656** |
| | ) | **Hon. Avern Cohn** |
| Plaintiffs, | ) | **Magistrate: Laurie J. Michaelson** |
| | ) | |
| v. | ) | |
| | ) | |
| **ROBERT S. MUELLER, III**, in his official | ) | |
| capacity as Director of the Federal Bureau | ) | |
| of Investigation, *et al.*; | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

_____/

### PLAINTIFFS' RESPONSE TO MOTION TO DISMISS AMENDED COMPLAINT BY OFFICIAL-CAPACITY DEFENDANTS

Plaintiffs, ABDULRAHMAN CHERRI, WISSAM CHARAFEDDINE, ALI SULEIMAN ALI, and KHEIREDDINE BOUZID, by and through their undersigned counsel, in their Response to Motion to Dismiss Amended Complaint by Official-Capacity Defendants, state as follows:

# TABLE OF CONTENTS

Table of Contents ........................................................................................................................ 2

Table of Authorities .................................................................................................................... 4

Introduction ................................................................................................................................. 7

Procedural History ...................................................................................................................... 8

Factual Background ..................................................................................................................... 9

   I.   Plaintiffs have been subjected to distinctive treatment based on their Islamic faith invasive

   questioning about their Islamic beliefs and religious practices at ports of entry. ................................. 9

   II.   Department of Homeland Security Documentation on Religious Questioning and Profiling at

   the Border ............................................................................................................................... 11

Standard of Review ................................................................................................................... 12

Argument ................................................................................................................................... 14

   I.   Plaintiffs have standing to bring their religious questioning and profiling claims. ................... 14

      A.   Because Plaintiffs have ceased crossing the border to avoid Defendants' unlawful religious

      questioning, they have suffered injuries-in-fact. ................................................................. 15

      B.   Plaintiffs have plausibly alleged a pervasive practice of religious profiling and questioning

      of Muslim travelers that provides a basis for standing. ....................................................... 18

      C.   Plaintiffs have satisfied the more lenient Establishment Clause Injury-in-fact requirement.

      20

      D.   Border authorities are not exempt from First and Fifth Amendment limitations. ................. 22

II.    Plaintiffs have been unconstitutionally targeted for distinctive treatment based on their religion in violation of the Equal Protection Clause..........................................................24

    A.    Because Plaintiffs have alleged direct evidence of an overtly discriminatory government classification, they have pled plausible equal protection claims. ...........................................25

    B.    Plaintiffs' specific religious profiling allegations also plead plausible equal protection claims under a "selective prosecution" standard. ......................................................................27

    C.    Defendants' authority at the border does not diminish Fifth Amendment protections. ......30

III.    Plaintiffs have adequately pled a violation of the Establishment Clause.........................................30

    A.    Defendants' program of religious questioning is subject to strict scrutiny under *Larson*...31

    B.    Defendants' program fails strict scrutiny analysis.................................................................32

IV.    Plaintiffs have adequately pled Free Exercise and RFRA claims for being subjected to questions about their religious beliefs and practices at the border.........................................................33

Conclusion .....................................................................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

## Cases

*Abington School District v. Schempp*, 374 U.S. 203 (1963)................................................................20

*Adland v. Russ*, 307 F.3d 471 (6th Cir. 2002)................................................................21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................13

*Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F. 3d 426 (6th Cir. 2008)................................................................13

*Bennett v. City of Eastpointe*, 410 F.3d 810 (6th Cir. 2005) ................................................................27

*Board of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687 (1994)................................................................31

*Bowman v. United States*, 304 F. App'x 371 (6th Cir. 2008) ................................................................24

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 2000) ................................................................ 25, 26

*Caldwell v. Craighead*, 432 F.2d 213 (6th Cir. 1970) ................................................................20

*Church of Scientology Flag Serv. Org. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993)................................................................20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ................................................................ 33, 34

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ................................................................27

*City of Los Angeles v. Lyons,* 461 U.S. 95 (1983) ................................................................16

*Clapper v. Amnesty International USA*, 2013 U.S. LEXIS 1858 (Feb. 26, 2013)................................................................18

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327

   (1987)................................................................32

*County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989)................................................................31

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) ................................................passim

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167 (2000)................................................ 15, 16, 18

*Heckler v. Mathews*, 465 U.S. 728 (1984) ................................................................21

*Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680 (1989)................................................................31

*House v. Napolitano*, 2012 WL 1038816 (Mass. Dist. Ct. Mar. 28, 2012)................................................................22

*Hunt v. Cromartie*, 526 U.S. 541 (1999)) ........................................................................ 25

*Hunter v. Underwood*, 471 U.S. 222 (1985) ...................................................................... 29

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) .......................................................... 24

*Ley v. Visteon Corp.,* 543 F. 3d 801 (6th Cir. 2008) .......................................................... 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................ 14

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ............................................................................ 31

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) ..................... 34

*Mitchell v. Helms*, 530 U.S. 793 (2000) ............................................................................ 35

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ...................................................... 35

*Nali v. Ekman*, 355 Fed. Appx. 909 (6th Cir. 2009) .......................................................... 29

*Ohio Nat'l Life Ins. Co. v. United States*, 922 F. 2d 320 (6th Cir. 1990) ......................... 13

*Rahman v. Chertoff*, 2010 U.S. Dist. LEXIS 31634 (N.D. Ill. Mar. 31, 2010) ................. 30

*Sareini v. Burnett*, 2011 U.S. Dist. LEXIS 34525 (E.D. Mich. Mar. 31, 2011) ............... 24

*Sherbert v. Verner*, 374 U.S. 398, 402 (U.S. 1963) ........................................................... 34

*Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26 (1976) .......................... 14

*Suhre v. Haywood County*, 131 F.3d 1083 (4th Cir. 1997) ................................................ 21

*Tabbaa v. Chertoff*, 509 F. 3d 89 (2d Cir. 2007) ............................................................... 22

*Thomas v. Review Bd. Ind. Employment Sec. Div.*, 450 U.S. 707 (1981) .......................... 35

*U.S. v. Flores-Montano*, 541 U.S. 149 (2004) ................................................................... 22

*U.S. v. Ritchie*, 15 F. 3d 592 (6th Cir. 1994) .................................................................... 13

*United States v. Armstrong*, 517 U.S. 456 (1996) ................................................... 27, 28, 29

*United States v. Avery*, 137 F.3d 343 (6th Cir. 1997) .............................................. 23, 25, 26

*United States v. Ellison*, 462 F.3d 557 (6th Cir. 2006) ............................................ 23, 24, 30

*United States v. Montoya De Hernandez*, 473 U.S. 531 (1985) ......................................... 30

*United States v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998) ..................................................... 25

*Washington v. Davis*, 426 U.S. 229 (1976) ...................................................................................24

*Wayte v. United States*, 470 U.S. 598 (1985) ...........................................................................25, 26

*Whren v. United States*, 517 U.S. 806 (1996) ..........................................................................23, 24

**Statutes**

Fed. R. Civ. P. 12(b)(6) ...............................................................................................................13

**Rules**

Fed. R. Civ. P. 12(b)(1) ...............................................................................................................13

Fed. R. Civ. P. 12(b)(6) ...............................................................................................................13

## INTRODUCTION

When Plaintiffs cross the border, as a repetitive routine, government agents approach their vehicles with guns drawn, yank them from their cars, and handcuff them.  They are then detained for hours.  While this has happened to Plaintiffs again and again collectively more than 15 times through several years, there is never an explanation—just the same despicable spectacle every time they cross the border.

But this lawsuit is not about the guns the government pointed at Plaintiffs.  It is not about being yanked from one's vehicle and humiliated in front of family and friends.  Nor is it about the handcuffing or not being told why this same thing happens over and over again.

Instead, Plaintiffs bring this lawsuit because Defendants have enacted a program whereby select Muslim travelers are compelled to disclose their religious beliefs and practices at the border.  This is a phenomenon so at odds with not only our law but also our history that there simply is no precedent for it.

Pursuant to this policy of Muslim religious questioning, government agents ask Plaintiffs how often they pray, what mosque they attend, whether they perform the traditional Islamic morning prayer at their house of worship, among other inquiries that compel Plaintiffs to disclose intimate details of their religious beliefs and practices.  This invasive questioning has so terrified two of the plaintiffs in this lawsuit that they no longer cross the border.

And Defendants' agents have directed such religious questioning to Muslim travelers across the country for years, interrogating Muslims about their Islamic beliefs and practices from Seattle to Miami, in Buffalo and Atlanta, and as Defendants' own internal documents suggest in ports of entry throughout the United States.  In short, what Defendants maintain

at the United States – Canada border is a program of interrogating Muslim travelers about their faith.

While the facts alleged—taken from Defendants' own internal documents as well as Plaintiffs' personal experiences—are voluminous, the legal issues presented are simple. The government cannot subject persons to differential treatment based upon the faith that they practice. In doing so, Defendants have violated large chunks of the First Amendment, the Fifth Amendment, and the Religious Freedom and Restoration Act. Thankfully, the law expresses its opposition to Defendants' breath-taking policy of religious questioning redundantly. The religious questioning of selected Muslim travelers is unconstitutional and illegal in many ways, and this Court has the opportunity to finally end this unconstitutional practice.

## PROCEDURAL HISTORY

On April 13, 2012, Plaintiffs Abdulrahman Cherri, Wissam Charafeddine, Ali Suleiman Ali, and Kheireddine Bouzid, filed a Complaint against Defendants Robert S. Mueller, III, David V. Aguilar, and Janet Napolitano, in their official capacities. Dkt. 1. Subsequent to this, the Court extended Defendants' deadline to file an answer or otherwise respond three times, on June 7, July 23, and August 30, 2012, and on September 14, 2012. Dkt. 11, 12, and 13. Plaintiffs then filed an Amended Complaint on November 16, 2012 in which they alleged violations of the Free Exercise, Establishment, and Equal Protection Clauses of the Constitution. Dkt. 21. Additionally Plaintiffs also alleged unlawful retaliation based on their First Amendment activity and violations of the Religious Freedom Restoration Act. *Id.* Defendants re-filed their Motion to Dismiss on January 18, 2013. Dkt. 30.

The Court held two Status Conference hearings, the first on November 13, 2012 and the second on January 24, 2013, to discuss the case.  Dkt. 20 and Dkt. 33.  During the January 24, 2013 hearing, the Court indicated that it would direct Plaintiffs to provide a proposed order that would grant them the relief they seek.  Thus, on January 25, 2013, the Court entered a pre-trial order for Plaintiffs to file a "draft of the form of judgment they will ask the Court to enter should they be successful.  Dkt. 33.  Plaintiffs filed this draft judgment on February 8, 2013.  Now pending before the Court are Defendants Motions' to Dismiss all claims for all Defendants.

## **FACTUAL BACKGROUND**

I. **Plaintiffs have been subjected to distinctive treatment based on their Islamic faith invasive questioning about their Islamic beliefs and religious practices at ports of entry.**

Plaintiffs are four Muslim United States citizens who are subjected to detailed questioning about their religious beliefs every time they cross the United States-Canada border.  Customs and Border Protection ("CBP") and the Federal Bureau of Investigation ("FBI") conduct the religious questioning when Muslim travelers attempt to re-enter the United States by car at the Canadian border.  In each instance, CBP and FBI agents have detained, searched, and interrogated the plaintiffs for several hours.  Dkt. 21 at ¶¶ 15-45, 46-50.  While being subjected to this interrogation and detention, CBP and FBI agents ask all plaintiffs substantially similar questions about their Islamic beliefs and practices, including questions about which mosques they attend, frequency of prayer, names of their religious leaders, and attendance at morning prayers at a mosque.  *Id.* at ¶ 52.  *See also id.* at ¶¶ 18, 22, 27, 36, 42.

Plaintiffs have all repeatedly endured the same pattern of questioning about their Islamic beliefs and practices.  Plaintiff Abdulrahman Cherri has been subjected to CBP and FBI questioning about his Islamic beliefs and practices at the border at least seven times since March 2010.  *Id.* at ¶¶ 16-17.  CBP and FBI agents asked Cherri detailed questions about his place of worship, locations where he worships, and his frequency of mosque attendance. *Id.* at ¶¶ 19-20.  In May 2011, two FBI agents continued the religious questioning at Cherri's home, asking him substantially similar questions about his Islamic practices, places of worship, frequency of mosque attendance, and his sect of Islam.  *Id.* at ¶ 22.

Plaintiff Wissam Charafeddine was also subjected to CBP and FBI questioning about his Islamic practices at least seven times between November 2008 and December 2010.  *Id.* at ¶¶ 26-28.  The detention and interrogation he experienced included the same detailed and invasive questioning regarding his religious beliefs and practices.  *Id.*

Through December 2011, Plaintiff Ali Suleiman Ali has also been subject to repeated border detentions, handcuffing, and questioning by CBP and FBI about his Islamic views, practices, and locations of worship at various ports of entry, including at airports.  *Id.* at ¶ 36.

Plaintiff Kheireddine Bouzid was also detained, searched, and questioned by CBP and FBI about his Islamic practices at least five times between August 24, 2008 and July 2010. *Id.* at ¶¶ 39-41.  CBP agents asked him questions about his place of worship, whether he prays five times a day, his Islamic sect, and whether he performs morning prayers at a mosque.  *Id.* at ¶ 42.

Plaintiffs have all suffered various consequences from being targeted for religious questioning by CBP and FBI.  All Plaintiffs have been subject to lengthy detentions at the border. *Id.* at ¶¶ 16-17, 23, 27, 29, 31, 36-37, 40-41, 43.  They have faced significant delays

in returning to the United States despite being American citizens. *Id.* at ¶¶ 1-4.  Plaintiff Cherri has also been targeted for follow-up FBI questioning about his religious beliefs and practices as a result of the CBP border detentions and interrogations, as stated by the agents themselves. *Id.* at ¶¶ 20-21.  Plaintiffs Cherri, Charafeddine, and Bouzid stopped traveling to Canada in order to avoid the religious questioning by both CBP and the FBI. *Id.* at ¶¶ 25, 34, 45.  Plaintiff Charafeddine has endured a loss of economic opportunities and income in Canada due to his inability to freely travel across the border without experiencing lengthy delays and intrusive questioning about his religious beliefs and practices. *Id.* at ¶ 32.  Plaintiff Bouzid has been subjected to the trauma of being detained multiple times by agents surrounding his vehicle with their guns drawn.  *Id.* at ¶¶ 40-41.

## II.   <u>Department of Homeland Security Documentation on Religious Questioning and Profiling at the Border</u>

CBP and FBI have asked at least eighteen other American Muslims religious questions substantially similar to those they asked Plaintiffs.  *Id.* at ¶¶ 59-61; Dkt. 21-3 at 2–6.  Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") says that it has received numerous complaints about religious questioning at the border and at airports, and that these complaints have "certain obvious commonalities among them." *Id.* at 6.  According to CRCL, FBI and CBP agents are "repeatedly question[ing] [Muslim travelers] and other members of their communities about their religious practices or other First Amendment protected activities, in violation of their civil rights or civil liberties." *Id.* at 2.  CRCL has been aware of this questioning for years, as recorded by its internal memoranda

and complaints submitted to CRCL.  Dkt. 21 at ¶¶ 54-59; *Id.* Ex. 2. at 1–2; *Id.* Ex. 3 at 2–6; *see also id.* Ex. 1.

CRCL has released a memorandum detailing at least twenty-two different Muslim travelers who have experienced similar questioning about their Islamic beliefs and practices at U.S. ports of entry and airports.  These travelers routinely experience questioning about their preferred mosque, *id.* at 2 ¶¶ 1, 2; *id.* at 3 ¶¶3, 5, 7; *id.* at 4 ¶ 10; *id.* at 5 ¶¶ 16, 17, 18; *id.* at 6 ¶ 21, how often they pray, *id.* at 2 ¶¶ 1,2; *id.* at 3 ¶ 3, how often they attend a mosque, *id.* at 3¶ 5, 7, 8, at 4 ¶ 10, at 5 ¶ 18, whether they are religious, *id.* at 4 ¶ 10, whether their family is religious *id.* at 2 ¶ 1, why they were not fasting, *id.* at 3 ¶ 4, when they converted to Islam, *id.* at 3 ¶ 5, whether they are Sunni or Shi'ite, *id.* at 3 ¶ 7, at 6 ¶ 23, whether they donate to charities under Islam, *id.* at 4 ¶ 10, and whether they are involved with Muslim student organizations *id.* at 5 ¶ 20.

DHS has released an internal document examining the "permissible bounds" of religious questioning at border inspections.  Dkt. 21-1.  This internal document discusses how CBP could learn about a traveler's religion affiliation based on special religious meal requests they submit to airlines.  *Id.* at BQ_000002.  It also contains an extensive exposition on whether case law permits religious profiling at the border, *id.* at BQ_000003-4, or within the United States, *id.* at BQ_000005.  Other CRCL missives state that the agency is investigating numerous complaints about inappropriate religious questioning and profiling.  *Id.* Ex. 2 at 1; Ex. 3 at BQ_000017.

## **STANDARD OF REVIEW**

Defendants seek dismissal of this matter pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).  Under Rule 12(b)(1), the Court may dismiss a complaint for lack of subject

matter jurisdiction.  Fed. R. Civ. P. 12(b)(1); Fed. R. Civ. P. 12(b)(6).  The Sixth Circuit has adopted two standards of dismissal under Rule 12(b)(1), depending on whether the movant makes a facial or factual attack on the plaintiff's complaint.  *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F. 2d 320, 325 (6th Cir. 1990).  Because a facial attack merely questions the sufficiency of the pleadings, the reviewing court applies the same standard applicable under Rule 12(b)(6) motions.  *See U.S. v. Ritchie*, 15 F. 3d 592, 598 (6th Cir. 1994).  Thus, the court must consider all allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Id*. In reviewing a factual attack, however, the court weighs all relevant evidence to determine whether subject matter jurisdiction exists.  *Id*.

To survive Rule 12(b)(6) motion to dismiss, a complaint need only contain sufficient facts that, accepted as true, state a plausible claim for relief on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Accordingly, a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Under 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F. 3d 426, 430 (6th Cir. 2008). In addition to the allegations of the complaint, the Sixth Circuit recognizes that the court "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ley v. Visteon Corp.,* 543 F. 3d 801, 805 (6th Cir. 2008).

## ARGUMENT

### I.  Plaintiffs have standing to bring their religious questioning and profiling claims.

CBP and FBI have pulled aside and asked religious questions of Plaintiffs during each of more than fifteen border crossings.  During these interrogations, CBP and FBI agents asked Plaintiffs how often they pray, their sect of Islam, and how often they attend their houses of worship.  Plaintiffs Charafeddine and Cherri no longer cross the border because of Defendants' interrogations about their Islamic beliefs and practices every single time they cross the border.  They have therefore clearly demonstrated standing under both the *Lujan* and Establishment Clause standing analyses.

In order for a plaintiff to establish standing, they must first have suffered "an injury in fact," a harm that is both "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted). The plaintiff must then show a causal connection between the injury and conduct complained of that is fairly traceable to the challenged action of the defendant and not the result of an independent action of a third party not before the court. *Id.* (citing *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)). Finally, it must be "likely," as opposed to "speculative," that the injury can be redressed by a favorable decision.  *Lujan*, *supra* 504 U.S. at 560 (citing *Simon*, *supra* 426 U.S. at 38, 43).  Because Defendants' motion only objects to the "injury in fact" aspect of standing for Plaintiffs' requests for injunctive and declaratory relief, the analysis below is narrowed accordingly.

**A.  Because Plaintiffs have ceased crossing the border to avoid Defendants'
unlawful religious questioning, they have suffered injuries-in-fact.**

Plaintiffs have alleged several types of facts demonstrating that if they cross the
Canadian border again, they will be detained and subject to religious questioning: (i) they
experienced these harms consistently in the past, (ii) at least eighteen others have
experienced these exact harms, (iii) the harms suffered consist of the exact same type of
detention and specific religion-based questions, and (iv) other documents and persons have
corroborated the certainty of future religious questioning at the border.  Plaintiffs
"curtail[ing] their" border crossings as a result of Defendants' "continuous and pervasive"
policy of religious questioning is "enough for injury in fact."  *Friends of the Earth, Inc. v.
Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167, 184-85 (2000).  In *Laidlaw*, the defendant had
discharged mercury into a river that caused environmental damage to an outdoor area which
individuals had previously used for recreation.  *Id.* at 182. The plaintiffs ceased using the
polluted area "because of [their] concerns" regarding the defendants' polluting actions.  *Id.*
The Supreme Court held that, because the residents' decision "refraining from use" of the
outdoor area was "entirely reasonable," the residents had standing to challenge the polluting
activity.  *Id.* at 184.

Similarly, Plaintiffs "refrain from use" of the border because of the objectionable
policy to which Defendants subject, and will again, if they travel internationally.  *Id.*  Each
time they have crossed the border in recent years, Defendants have handcuffed, detained,
and interrogated Plaintiffs about their religious beliefs and practices.  To avoid this
"humiliat[ion]" that "stigmatizes them as violent threats based solely on…their Islamic
beliefs and practices," Charafeddine and Cherri no longer cross the border.  Dkt. 21 at ¶ 53.

And just like in *Laidlaw*, in avoiding the border where Defendants' agents wrongfully detain and religiously profile them, Charafeddine and Cherri's choice is "entirely reasonable" and thus "enough for injury in fact." *Laidlaw*, *supra* 528 U.S. at 184–85.

Because Plaintiffs Charafeddine and Cherri's standing is predicated on their avoidance of unconstitutional acts that Defendants' inflict on them every single time they cross the border, Defendants' reliance on *City of Los Angeles v. Lyons* is misplaced. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102–03 (1983). In *Lyons*, the plaintiff did not make any "showing that he is realistically threatened by a repetition" of the unconstitutional acts he was seeking to enjoin. *Id.* At 109. The *Lyons* plaintiff failed to make this showing because the police policy at issue in *Lyons*—authorization to place in chokeholds persons who are "violently resisting the officer or trying to escape"—did not suggest that the plaintiff would once again be subject to such a chokehold "without provocation or justification" in a manner that would render him "unconscious." *Id.* at 97-98. This is what led the Court to conclude that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id.* at 102–03.

But here, Plaintiffs have pled far more than  isolated "past wrongs" inflicted on them; they suffered wrongs every time they crossed the border, others experienced the same wrongs, all 22 of them were subject to the same detention and questions, and FBI agents have confirmed a certainty of future wrongs. These four types of factual allegations demonstrate that Plaintiffs are "realistically threatened by a repetition" of the unconstitutional acts that they now avoid and for which they seek injunctive relief. *Id.* at 109. Plaintiffs have all been asked, collectively over fifteen times, substantially similar questions about their Islamic beliefs and practices each and every time they crossed the

border.  *Id.* ¶¶ 16-18, 22-23, 27, 29, 31, 36-37, 40-43, 52.  A DHS document acknowledges that at least 18 others have experienced substantially similar religious questioning at ports of entry throughout the United States since at least 2004.  *Id.* at ¶¶ 59-61; Dkt. 21-3 at 2–6. Defendants ask Muslim and Arab travelers questions about prayer frequency, mosque attendance, date of conversion to Islam, why the traveler attends a mosque, name of their preferred mosque, whether they are a religious leader, whether they are Sunni of Shi'ite, and whether the traveler considers themselves religious.  *Id.*[1]  And when Defendants Thompson and Sokolowski approached Cherri at his home subsequent to a recent border crossing, the FBI agents indicated that he would face the same religious questioning if he were to cross the border again.  Dkt. 21 at ¶¶ 21-22.  Additionally, a DHS "senior advisor" issued a memorandum analyzing the "permissible bounds of law-enforcement questioning of individuals regarding their religion."  Dkt. 21-1 at ¶ 1.

These "past wrongs" are far beyond the single allegation of a single instance of a chokehold used by one police officer that *Lyons* found insufficient to confer standing.  *Lyons*, *supra* 461 U.S. at 102–03.  The specificity of Plaintiffs' allegations based on Defendants' internal documents, coupled with evidence from Plaintiffs' own recurring experiences at the border, are more than sufficient to demonstrate that Plaintiffs are "realistically threatened by a repetition" of the unconstitutional acts that they now avoid and for which they seek injunctive relief.  *Id.* at 109.  Thus, Plaintiffs have standing.

---

[1] For example, one complainant indicated that "since 2004" he has been subject to religious questioning repeatedly, including being asked "how often  he prays," by Defendants' border agents at Boston's Logan International Airport. *Id.* at 2.  Another complainant reported that, while crossing into Buffalo, New York from Canada in January 2010, an agent inquired whether he "pray[s] five times a day in a mosque. *Id.* at 3.

**B.  Plaintiffs have plausibly alleged a pervasive practice of religious profiling and questioning of Muslim travelers that provides a basis for standing.**

Defendants argue specifically that Plaintiffs have failed to plead the existence of an explicit policy of questioning Muslim-American travelers about their religious beliefs.  This argument is misguided in two ways.

First, standing doctrine does not require Plaintiffs to prove the existence of an explicit religious policy at this or any other stage of the litigation.  Neither *Lyons* nor the Supreme Court's latest pronouncement on standing based on avoidance, *Clapper v. Amnesty International*, impose an "explicit policy" requirement.  Instead, Plaintiffs simply have to show that "the harm [they] seek to avoid" inflicted by Defendants' religious questioning at the border is "certainly impending" were they to again cross the border."  *Clapper v. Amnesty International USA*, 2013 U.S. LEXIS 1858, at *20 (Feb. 26, 2013)*.  Clapper* makes clear that the "pervasive" harms present in *Laidlaw* are sufficient to satisfy the "certainly impending" standard.  *Id.* at *37-38 (quoting *Laidlaw*, 528 U.S. at 184).  Here, Plaintiffs have demonstrated a thoroughly pervasive practice of border profiling and religious questioning that is "certainly impending."

In *Clapper*, journalists, attorneys, and international activists alleged that they feared that the United States would, pursuant to specific statutory authority, intercept their telephone calls with persons affiliated with terrorist groups and defendants in terrorism prosecutions.  *Id.* at *15-16.  Because of this fear, the plaintiffs avoided using the telephone to have conversations they believed the United States may intercept. *Id.*  However, the Clapper plaintiffs "fail[ed] to offer any evidence that their communications have been monitored" and did not allege that they had any "actual knowledge of the Government's"

18

interception practices.  *Id.* at *23.  In short, the critical standing deficiency in Clapper was that the plaintiffs did not allege that what they were avoiding—talking on the telephone with persons they thought were of possible investigative interest to the United States—was "regulate[d], constrain[ed], or compel[led] any action on their part."  *Id.* at *37.

Unlike the plaintiffs in *Clapper*, Plaintiffs' Amended Complaint demonstrates that detention and religious questioning is "certainly impending" because Plaintiffs' allegations demonstrate "actual knowledge" of [Defendants'] religious questioning practices regarding select Muslim travelers, which include themselves.  *See id.* at 23.  Knowledge here is based on multiple allegations by four people, and records of allegations by 22 people total, of religious questioning about Islamic practices at US ports of entry.  Dkt. 21 ¶ 61.  Plaintiffs have alleged specifically that they have been subjected to substantially similar religious questioning more than fifteen times collectively, every time they travel from Canada to the United States, over a span of multiple years.  And because Plaintiffs suffer this detention and religious questioning during every border crossing, collectively numbering over 15 incidents, they have demonstrated "certainly impending" harms.

Second, to the extent that Plaintiffs' showing of standing is aided by demonstrating an explicit profiling policy, they have done so through specific factual allegations.  All Plaintiffs have explained that they are repeatedly subjected to substantially similar religious questioning at U.S. ports of entry.  Dkt. 21 ¶¶ 17, 18, 22, 23, 27, 30, 36, 40-42.  There is a significant overlap among the questions asked of all four Plaintiffs, and some of the questions are exactly the same, which is evidence supporting the plausible existence of a CBP and FBI questioning script specific to Muslim travelers.  Dkt. 21-3 at 2–6.  Defendants Thompson and Sokolowski even indicated to Cherri that, were they to cross the border again, he would be

subject to the same type of religious questioning as he had before.  Dkt. 21 at ¶¶21-22.

Therefore, Plaintiffs have specifically and plausibly pled the existence of a Muslim profiling

and religious questioning policy.

### C. Plaintiffs have satisfied the more lenient Establishment Clause Injury-in-fact requirement.

Plaintiffs have clearly satisfied the standing requirement for their Establishment

Clause claims.  Dkt. 21 ¶¶ 71-80.  Under Establishment Clause standing doctrine, plaintiffs

seeking injunctive relief may show more broadly that they are "directly affected by the laws

and practices against which their complaints are directed." *Caldwell v. Craighead*, 432 F.2d

213, 223 (6th Cir. 1970) (quoting *Abington School District v. Schempp*, 374 U.S. 203, 225 n.9

(1963)).  Defendants' policy of subjecting Plaintiffs and other Muslim travelers to religious

questioning does directly and presently affect the plaintiffs.   The battery of religious

questions Defendants have instructed their border agents to perform forces Plaintiffs to

make a choice that persons of no faith or of faiths other than Islam do not confront.  Plaintiffs

must decide whether to cross the border knowing Defendants will compel them to disclose

their religious beliefs and practices or simply refrain from availing themselves of the

privilege that Americans of no faith or other faiths take for granted:  entering their country

from abroad on equal terms.  Defendants place this burden that Plaintiffs bear presently

because of their faith.  This fact alone is sufficient to confer standing, because it violates the

fundamental Establishment Clause principle of neutrality among religions.  *See also Church*

*of Scientology Flag Serv. Org. v. City of Clearwater*, 2 F.3d 1514, 1525 (11th Cir. 1993)

("Religious groups and their members that are singled out for discriminatory government

treatment by official harassment or symbolic conduct analogous to defamation have standing to seek redress in federal courts.").

Indeed, all Plaintiffs suffer official condemnation of their faith as a result of Defendants' policy of interrogating them and other Muslim travelers about their beliefs and the way they practice their faith. By asking Plaintiffs about where they pray, how often, and which sect they follow, Defendants make clear that they view devotion to Islam as a proxy for a propensity to commit crime. By maintaining their policy and pervasive practice, and subjecting Plaintiffs to it, Defendants have communicated this message to Plaintiffs, and they continue to be injured by that message and have standing based on that injury. *See Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) ("[D]iscrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group" (internal quotation marks and citation omitted)).

While Plaintiffs' "personal contact" with Defendants' Establishment Clause violation is enough to "satisfy the injury-in-fact requirement," Plaintiffs avoidance of the religious questioning independently furnishes standing. *Adland v. Russ*, 307 F.3d 471, 478 (6th Cir. 2002). In fact, avoiding conduct that violates the Establishment Clause as Charafeddine and Cherri have done by no longer crossing the border is an "extraordinary showing of injury" which is "sufficient, [but] not necessary to support" Establishment Clause standing." *Suhre v. Haywood County*, 131 F.3d 1083, 1088 (4th Cir. 1997).

**D. Border authorities are not exempt from First and Fifth Amendment limitations.**

The protections of the First and Fifth Amendments are not diminished or eliminated at U.S. border crossings.  First, although CBP has broad powers to conduct searches and seizures at the border under the Fourth Amendment, it is not exempt from the First Amendment.  *U.S. v. Flores-Montano*, 541 U.S. 149, 153 (2004).  Courts have recognized that even in the context of U.S. border searches and security, CBP's actions are restricted by First Amendment requirements.  *Tabbaa v. Chertoff*, 509 F. 3d 89, 102 n. 4 (2d Cir. 2007); *House v. Napolitano*, 2012 WL 1038816, at *13 (Mass. Dist. Ct. Mar. 28, 2012).

In *Tabbaa v. Chertoff*, the Second Circuit Court of Appeals asserted that "distinguishing between incidental and substantial burdens under the First Amendment requires a different analysis, applying different legal standards, than distinguishing what is and is not routine in the Fourth Amendment border context.  *Tabbaa*, *supra* 509 F. 3d at 102 n.4. Similarly, in *House v. Napolitano*, the U.S. District Court of Massachusetts also emphasized that there is a "difference in legal standards that apply to Fourth Amendment and First Amendment claims" within the border context.  *House, supra* 2012 WL 1038816, at *13. The House court established that CBP [agents] may not violate [an individual's] First Amendment rights under the guise of broad Fourth Amendment authority to conduct searches at the border.  *Id.* at 11 (explaining that agents may not "target someone for their political association and seize his electronic devices and review the information pertinent to that association and its members supporters simply because the initial search occurred at the border"). Furthermore, the *House* court concluded "that the initial search and seizure occurred at the border does not strip [Plaintiff] of his First Amendment rights." *Id.*

Therefore, courts recognize the distinction between Fourth and First Amendment challenges to the government's authority at the border.

Second, while courts have not yet addressed whether the Equal Protection Clause limits CBP's authority to conduct searches at the border, courts have consistently held that the right to equal protection of the laws under the Fifth and Fourteenth Amendments is distinct from the right to be free from unreasonable searches and seizures under the Fourth Amendment. Courts have found that the Equal Protection Clause "provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F. 3d 343, 352 (6th Cir. 1997); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").  Similarly, police activity "that does not implicate the Fourth Amendment can violate the Equal Protection Clause" if that activity is motivated by profiling of a protected class. *United States v. Ellison*, 462 F. 3d 557, 572 (6th Cir. 2006). The *Avery* court further asserted that citizens are "cloaked at all times with the right to have the laws applied to them in an equal fashion- undeniably, the right not to be exposed to the unfair application of the laws based on their race." *Id.*  Accordingly, the Avery court concluded that equal protection analysis "does not fit neatly into the various stages of Fourth Amendment search and seizure analysis." *Id.* at 355.  Because CBP does not have unfettered discretion to conduct searches at the border in violation of Plaintiffs' equal protection rights, CBP's broad Fourth Amendment powers do not dictate dismissal of Plaintiffs' claims.

**II.**     **Plaintiffs have been unconstitutionally targeted for distinctive treatment based on their religion in violation of the Equal Protection Clause.**

The "central purpose" of the Fifth Amendment's equal protection clause is "prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  The equal protection clause forbids the government from making "distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis."[2] *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010).  If a plaintiff can show that he was "subjected to unequal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop, that would be sufficient to demonstrate a violation of the Equal Protection Clause."  *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002).   Additionally, a violation of equal protection occurs where the government improperly relies on a protected group affiliation to apply the law.  *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Law enforcement activity that does not violate the Fourth Amendment can still violate equal protection where the activity is motivated by profiling of a protected class.  *See United States v. Ellison*, 462 F.3d 557, 572 (6th Cir. 2006)  ("Police crime-detection activity that does not implicate the Fourth Amendment can violate the Equal Protection Clause of the Fourteenth Amendment if that activity is motivated by race.").  *See also United States v. Avery*,

---

[2] The Sixth Circuit includes religion as a suspect class subject to strict scrutiny.  *Sareini v. Burnett*, 2011 U.S. Dist. LEXIS 34525 (E.D. Mich. Mar. 31, 2011) (citing *Bowman v. United States*, 304 F. App'x 371, 378 (6th Cir. 2008) (unpublished)).

137 F.3d 343, 355 (6th Cir. 1997) (explaining that equal protection analysis "does not fit neatly" into Fourth Amendment analysis).

### A. Because Plaintiffs have alleged direct evidence of an overtly discriminatory government classification, they have pled plausible equal protection claims.

A plaintiff can successfully plead an equal protection clause claim where there is direct evidence that the government agency explicitly uses inappropriate criteria for classification. *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997). Direct evidence "seldom exists." *Id.* But where it does, and the equal protection claim is "based on an overtly discriminatory classification," the plaintiff is not required to show discriminatory intent. *Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985); *Farm Labor, supra* 308 F.3d at 534 n.4 (citing *Wayte*, 470 U.S. at 610 n.10; *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). Additionally, "[i]t is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification." *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000); *see also Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) (explaining that evidence of "explicit racial criteria or admi[ssion] to racially-motivated decision making" eliminates requirement to establish different treatment of similarly situated class) (quoting *Brown, supra* 221 F.3d at 337).[3]

Plaintiffs have clearly pled plausible equal protection claims through direct evidence. First, the questions CBP and FBI agents ask Muslim travelers at the border constitute direct

---

[3] Similarly, in the context of jury selection equal protection challenges, where there is "no doubt that racial factors were the primary reason" for juror exclusion, "a court could simply look to the direct evidence of exclusion based on race." *United States v. Ovalle*, 136 F.3d 1092, 1104 (6th Cir. 1998).

evidence that Defendants use explicit religious classifications for travelers who are subjected to secondary screening.   Only such religious classifications can explain why Defendants routinely ask 22 travelers with Muslim and Arab-sounding names, including Plaintiffs, nearly identical questions about Islamic religious philosophy and views, locations of worship, whether the subject prays five times daily, whether he prays early morning prayer at a mosque, identification with Sunni or Shi'ite Islam, and frequency of mosque attendance.   Dkt. 21 at ¶¶ 17, 18, 22, 23, 27, 30, 36, 40-42, 48-53, 61.   This is direct evidence of the pervasiveness of this practice and therefore the existence of an express religion-based classification.  *Id.* ¶ 61.  Plaintiffs have thus pled equal protection clause claims through direct evidence and do not need to demonstrate either discriminatory intent or differential treatment of similarly situated persons.   *Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985); *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997); *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000).

Moreover, Defendants' religious questioning of Muslims also constitutes direct evidence that these travelers were selected for secondary questioning because of their apparent religion.   The fact that Defendants have asked these religious questions of at least 22 Muslim travelers supports the reasonable inference that these travelers were selected for secondary screening in order to allow Defendants to ask those questions.   *Id.* ¶ 61. Defendants can identify Muslim travelers for secondary questioning based on their physical appearance and their Muslim and Arab names.   Therefore, in detailing the religious questions Defendants ask Muslim travelers, the Amended Complaint states plausible equal protection

claims based on both the selection of Muslims for secondary questioning and for the treatment Muslims receive after referral to secondary questioning.[4]

### B. Plaintiffs' specific religious profiling allegations also plead plausible equal protection claims under a "selective prosecution" standard.

Defendants ignore the weight of the direct evidence of improper religious classifications in the Amended Complaint, instead trying to cast this matter as a typical "selective prosecution" case. *See United States v. Armstrong*, 517 U.S. 456, 466 (1996). In a "selective prosecution" case, a plaintiff alleges that a facially neutral law is being administered differently based on protected characteristics. *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002). This is not the proper standard here, for Plaintiffs are not alleging unfair application of a facially neutral law, but rather an explicit policy and practice of profiling Muslims.

Regardless, Plaintiffs have adequately pled equal protection claims, even under a "selective prosecution" standard. Selective enforcement is shown where the plaintiff was "subjected to unequal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop." *Farm Labor, supra* 308 F.3d at 533. The plaintiff must plead that the challenged action was motivated by a discriminatory purpose and that it had a discriminatory effect. *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005). A plaintiff can demonstrate discriminatory effect by showing that "similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456,

---

[4] Because Plaintiffs have pled a plausible equal protection claim, Defendants are required to satisfy strict scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Under strict scrutiny, the religious questioning policy can be "sustained only if [it is] suitably tailored to serve a compelling [governmental] interest." *Id.* Defendants have not made any such showing.

465 (1996).  If the plaintiff was not free to leave during the stop, then once he has demonstrated evidence of targeting for additional questioning based solely on religion, the government has the burden of articulating a religion-neutral reason for the additional questioning.  *Farm Labor, supra*, 308 F.3d at 538.[5]  This is generally a factual dispute suitable for resolution at trial.  *Id.*

Plaintiffs' specific evidence of religious profiling satisfies "selective enforcement" requirements.  During border stops, CBP and FBI subjected Plaintiffs to unequal treatment based on their religion by asking questions about their Islamic beliefs and practices.  Dkt. 21 at ¶¶ 17, 18, 22, 23, 27, 30, 36, 40-42, 48-53, 61.  These questions are specific to Muslim religious practices such as praying five times a day, attending a mosque, and adhering to Sunnism or Shia'ism, and thus cannot be asked of similarly situated non-Muslims.  *Cf. Armstrong*, 517 U.S. at 465.  Thus, Plaintiffs have made a showing that they were subjected to unequal treatment during a stop based on their religion.  *Farm Labor, supra*, 308 F.3d at 533.  Furthermore, the content of the religious questioning is itself evidence that Plaintiffs were targeted for extra questioning because of their religion. This is supported by DHS's documented evidence of at least 18 other Muslim travelers who were selected for extra screening that consisted of questions about their Islamic beliefs and practices.  Dkt. 21-3 at 2–6.

Though Plaintiffs are U.S. citizens, failure to comply with CBP and FBI's questions would prevent their return to the United States.  Dkt. 21 at ¶¶ 46–48.  Thus, Plaintiffs have

---

[5] In short, the plaintiff does not have the burden of demonstrating that there was no religion-neutral reason for his additional questioning. *Id.* After the plaintiff meets his burden, law enforcement has the burden of demonstrating that race-neutral reasons would have prompted the additional questioning independently of the presence of any improper discriminatory motive. *Id.* at 539.

alleged that the questioning occurred pursuant to a nonconsensual encounter, and Defendants have failed to demonstrate any permissible reason for the additional questioning. *See Farm Labor*, 308 F.3d at 538. Therefore, Plaintiffs have pled adequate equal protection claims, even under a selective prosecution analysis.

Lastly, Defendants' cited case law highlights the differences between typical "selective prosecution" cases and Plaintiffs' claims here, which are based on direct evidence of discriminatory classifications. *Armstrong* explained that a selective prosecution plaintiff must show that similarly situated persons were not prosecuted under a criminal law. *United States v. Armstrong, supra* 517 U.S. at 466. In *Armstrong*, there was no evidence that the facially neutral criminal laws in that case were not applied to similarly situated persons of other races. *Id.* at 466-68. But here, Plaintiffs have clearly alleged, through specific and direct evidence, a broad and pervasive practice of detaining Muslim Americans at the border and asking them questions about Islam. Therefore, in contrast with *Armstrong*, Plaintiffs here are challenging a non-neutral policy and pervasive practice that affects them every single time they cross the border. Thus, this case is more akin to *Hunter v. Underwood*, 471 U.S. 222 (1985), where there was direct evidence that the state had enacted a disenfranchisement law for the purpose of targeting African Americans. *Id.* at 229-31.[6]

---

[6] In addition, other case law cited by the government is inapposite for not including a single specific fact indicating impermissible classifications. The government relies on *Nali v. Ekman*, 355 Fed. Appx. 909, 913 (6th Cir. 2009) (unpublished disposition), a claim brought by a prisoner alleging equal protection clause violations for being ticketed for being in the chow hall at the wrong time. *Id.* The plaintiff did not allege that others who were not ticketed were of a different race than him, and the plaintiff alleged no other facts that the defendants referred to his race or any other protected characteristic when they were punishing him.

### C. Defendants' authority at the border does not diminish Fifth Amendment protections.

Furthermore, Defendants' arguments on their authority at the border are a red herring.  Defendants argue essentially that the equal protection clause does not apply at the border.  Dkt. 16 at 28. But no court has held that equal protection clause requirements are relaxed at the border.  And no court has addressed border questioning that distinguishes among travelers based on protected characteristics.  The case law cited by Defendants here relates only to border authorities' ability to stretch Fourth Amendment standards.  *See United States v. Montoya De Hernandez*, 473 U.S. 531, 538 (1985) (discussing Fourth Amendment); *Rahman v. Chertoff*, 2010 U.S. Dist. LEXIS 31634, at *14 (N.D. Ill. Mar. 31, 2010). These cases are inapposite. "Police crime-detection activity that does not implicate the Fourth Amendment can violate the Equal Protection Clause of the Fourteenth Amendment if that activity is motivated by race." *United States v. Ellison*, 462 F.3d 557, 572 (6th Cir. 2006).

Thus, contrary to the government's assertions, the Plaintiffs have met their pleading burden.  The content of the questions themselves show the intent of CBP to discriminate against travelers.  For these reasons, Plaintiffs have alleged sufficient facts demonstrating an equal protection claim.

### III.  Plaintiffs have adequately pled a violation of the Establishment Clause.

Although occasionally framed in different terms, the various strands of Establishment Clause jurisprudence aim to protect certain basic notions of religious freedom. To protect this religious freedom, Establishment Clause jurisprudence carries in each application its most basic restraint that government "generally may not treat people differently based on

the Gods or gods they worship, or do not worship." *Board of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 714 (1994) (O'Connor, J., concurring).  This directive of neutrality and equality has been a consistent and guiding feature of Establishment Clause jurisprudence. As the Supreme Court explained in *County of Allegheny*: "Whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential problem remains the same. *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989)  The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Id.* at 593-94 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring).  By failing to maintain neutrality regarding religious denominations without justification, Defendants program of religious questioning violates the Establishment Clause.

## A. Defendants' program of religious questioning is subject to strict scrutiny under *Larson*.

Because the requirement of government neutrality so central to religious liberty, the Supreme Court in *Larson v. Valente* made clear that strict scrutiny is the appropriate standard when adjudicating governmental action that blatantly discriminates among faiths. *Larson v. Valente,* 456 U.S. 228 (1982).  The *Larson* Court explained that when presented with a "denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Larson*, 456 U.S. at 246.  *See also, e.g.*, *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680 (1989) ("*Larson* teaches that, when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions."); *Corporation of Presiding Bishop of*

31

*Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) ("*Larson* indicates that laws discriminating among religions are subject to strict scrutiny."); *Colorado Christian University*, 534 F.3d at 1256 (*Larson* applies to government acts that "expressly discriminate[] *among* religions").

Defendants' program of religious questioning expresses a denominational preference subject to *Larson.*  As Plaintiffs have explained above, the questions Defendants' agents ask pertain to Islam exclusively.  This is evident because the questions include references to specific Islamic practices—whether Plaintiffs perform the morning prayer found only in Islam at their mosque—as well as specific Islamic beliefs, such as whether they identify as Sunni or Shi'ite.  Dkt. 21 at ¶¶ 18, 22, 27, 36, 42, 52 and 61.  And because the questions are specific to Islam, Defendants' program of religious questioning contains a denominational preference and is subject to strict scrutiny under *Larson.*

**B.  Defendants' program fails strict scrutiny analysis.**

Because it contains a denominational preference, Defendants' program of religious questioning "must be invalidated unless it is justified by a compelling governmental interest, and unless it is closely fitted to further that interest." *Larson*, *supra* 456 U.S. at 247. Defendants do not even attempt to make this showing.  Presumably, Defendants do not address strict scrutiny, because it is clear Defendants' religious questioning lacks justification.  There is no plausible—let alone compelling—interest in forcing Plaintiffs and other selected Muslim travelers to disclose how often they pray, to what sect of Islam they belong, which mosque they attend, among other aspects of their religious beliefs and practices.  In a single footnote, Defendants do suggest that their agents "may have good

reason to ask questions that touch upon religion," but the program of religious questioning

is not comprised of inquiries that "touch upon religion."  Dkt. 32 at 16, n. 11.  The program of

religious questioning from which Plaintiffs seek relief is calibrated to extract information

about things that are purely Plaintiffs' beliefs or regard the innocuous practice of their faith.

Plaintiffs' Amended Complaint demonstrates that the religious questioning is not, as

Defendants suggest contrary to Plaintiffs' own allegations and without providing evidence

to the contrary, that Defendants' agents ask general questions that incidentally solicit

information regarding Plaintiffs' faith.  Because Defendants' religious questioning is aimed

at and accomplishes a compelled disclosure of Plaintiffs' religious beliefs and practices and

there is no conceivable interest thus served, the program fails strict scrutiny.

## IV.   **Plaintiffs have adequately pled Free Exercise and RFRA claims for being subjected to questions about their religious beliefs and practices at the border.**

A government action 'burdening religious practice that is not neutral or not of general

application' gives rise to a violation of the Free Exercise Clause that 'must undergo the

strictest of scrutiny.' *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520,

546 (1993). If the program's objective is to 'infringe upon or restrict practices because of

their religious motivation' it is not neutral.  *Id*. at 533.  And if the 'interests [the program]

seeks to advance" are "selective" to a particular religious practice the program is not

generally applicable. *Id.* at 543.  While direct regulations of religious exercise constitute a

burden under the First Amendment, a burden on religious practice does not have to be an

'outright prohibition' but also can be an 'indirect coercion or penalty'. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988).[7]

The content of the questions Defendants' agents direct to selected Muslim travelers demonstrates that the program of religious questioning is neither general nor neutral. Defendants' program of religious questioning includes inquiries into whether they belong to the Sunni or Shi'ite sect, what mosque they go to, how many times a day they pray, among other questions that pertain specifically to Islamic belief and practice. Because the questions themselves regard only Islam, Plaintiffs have met their burden to demonstrate that Defendants' program of religious questioning is neither general nor neutral. Defendants direct the religious questioning to selected Muslim travelers "because of their religious motivation" and tailor their questioning "selective[ly]" to circumscribe only Islamic beliefs and practices. *Lukumi, supra* at 533, 543.

Furthermore, Plaintiffs have demonstrated that Defendants' program of Muslim religious questioning constitutes an impermissible burden of Plaintiffs' free exercise. Because the compelled disclosure concerns their beliefs, such as the number of times a Muslim prays or with what sect of their faith they identify, the religious questioning regards Plaintiffs' religious beliefs. While the Free Exercise Clause protects religious practice when certain conditions are met, the "door of the Free Exercise Clause stands tightly closed against any government regulation of religious beliefs as such." *Sherbert v. Verner*, 374 U.S. 398, 402 (1963). By compelling the disclosure of Islamic religious beliefs, Defendants' program of

---

[7] Because the Free Exercise Clause standard is more difficult to meet than the standard for claims under the Religious Freedom and Restoration Act (RFRA), the analysis in this section also demonstrates a violation of RFRA. Likewise, the reasons why Defendants' program of religious questioning is a burden under the Free Exercise Clause also demonstrate that Defendants' actions constitute unlawful retaliation based on Plaintiffs' First Amendment activity: practicing their faith.

religious questioning applies a regulation to Plaintiffs' beliefs "as such," a government transgression condemned by the core of the Free Exercise Clause and for which Plaintiffs know of no precedent forbidden by the Free Exercise Clause. *See also Mitchell v. Helms*, 530 U.S. 793 (2000) ("[I]nquiry into religious views is not only unnecessary but offensive.  It is well established, in numerous other contexts, that the government should refrain from trolling through a person's or institution's religious beliefs."); *Thomas v. Review Bd. Ind. Employment Sec. Div.*, 450 U.S. 707, 716 (1981) ("the government is not permitted to second-guess the ecclesiology espoused by our citizens").

Furthermore, to the extent that the religious questioning concerns Plaintiffs' religious practice, the "compelled disclosure" of those practices amounts to an impermissible burden, because such a disclosure "may constitute as effective a restraint" as direct regulation. *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958).  In *NAACP*, the State of Alabama sought to compel the disclosure of the NAACP's membership lists.  *Id.* at 458.  The government act at issue was this compelled disclosure of information alone.  *Id.* In assessing the effect of such a disclosure, the United States Supreme Court forbade Alabama from directing this "compelled disclosure" of organizational membership as the NAACP's control of such information was "indispensable to [the] preservation" of a First Amendment freedom.  *Id.* at 462.

Similarly, the religious questioning Defendants' agents direct to Plaintiffs and other selected Muslim travelers compel them to disclose their religious leaders, what those leaders discuss in their sermons, whether they perform their prayers at a house of worship, which mosques Plaintiffs attend, among other innocuous aspects of Islamic religious practice.  Dkt. 21 at ¶¶ 52, 61.  This information is associational in nature and, by compelling its disclosure

at the border, Defendants deter the associations and practices about which they ask.  Indeed, the content of such questions communicates to Plaintiffs that Defendants believe that whether Plaintiffs perform their "morning prayer at the mosque" is somehow related to whether they can enter the United States or have violated any laws.  *Id.* at ¶ 52.  In so doing, Defendants "wrongfully stigmatiz[e] them as violent threats based solely" on their answers to questions about the practice of their faith.  *Id.* at ¶ 53. Thus, just as in *NAACP v. Alabama,* the "compelled disclosure" of Plaintiffs' religious associations and practices amounts to a burden on their free exercise insofar as Defendants' program of religious questioning "may constitute as effective a restraint" as direct regulation.  *NAACP v. Ala. ex rel. Patterson,* 357 U.S. at 462.

<u>**CONCLUSION**</u>

WHEREFORE, for the above-mentioned reasons, Plaintiffs respectfully request this Honorable Court deny the Motion to Dismiss Amended Complaint by Official-Capacity Defendants.

Respectfully submitted,

AKEEL & VALENTINE, PLLC

*/s/ Shereef Akeel*
SHEREEF H. AKEEL (P54345)
SYED H. AKBAR (P67967)
Attorneys for Plaintiffs
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, MICHIGAN

*/s/ Lena Masri*
LENA F. MASRI (P73461)
Attorney for Plaintiffs
21700 Northwestern Hwy, Ste. 815
Southfield, MI 48075
Phone:  (248) 559-2247
lmasri@cair.com

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS

*/s/ Gadeir Abbas*
GADEIR I. ABBAS (VA #: 81161)
Attorney for Plaintiffs
453 New Jersey Avenue, SE
Washington, DC 20003
Phone:  (202) 742-6410
gabbas@cair.com

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, OHIO

*/s/ Jennifer Nimer*
JENNIFER NIMER (OH#: 0079475)
Attorney for Plaintiffs
1505 Bethel Road, Ste. 200
Columbus, OH 43220
Phone:  (614) 783-7953
jnimer@cair.com

Dated:  March 22, 2013

37

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 22, 2013, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:

**Judson O. Littleton**
judson.o.littleton@usdoj.gov

**Brant Levine**
brant.levine@usdoj.gov

s/  LENA F. MASRI (P73461)
Attorney for Plaintiffs
21700 Northwestern Hwy, Ste. 815
Southfield, MI 48075
Phone:  (248) 559-2247
Fax:      (248) 559-2250