UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABDULRAHMAN CHERRI, *et al.*,

     Plaintiffs,

vs.                                                                                          Case No. 12-11656

ROBERT S. MUELLER III, *et al.*,                                    HON. AVERN COHN

     Defendants.

_____/

**MEMORANDUM AND ORDER GRANTING IN PART
AND DENYING IN PART OFFICIAL-CAPACITY
DEFENDANTS' MOTION TO DISMISS (Doc. 32)**

**I.  INTRODUCTION**

This case involves a challenge to what plaintiffs say is a policy, custom and practice of questioning Muslim-American's as they enter the United States regarding their religious beliefs and practices in violation of their First and Fifth Amendment rights.  Plaintiffs Abdulrahman Cherri, Wissam Charafeddine, Ali Suleiman Ali, and Kheireddine Bouzid (collectively, "Plaintiffs"), each being of the Muslim religion, allege that on separate multiple occasions when crossing the United States–Canada border in Detroit for the purposes of reentering the United States, they were profiled and subjected to invasive body searches and prolonged detentions.  They do not challenge these searches or detentions.  Plaintiffs also allege that during these detentions they were questioned at secondary inspections about Islamic religious philosophy and views, practices, and locations where they worship pursuant to an official United States Customs and Border Protection (CBP), Federal Bureau

of Investigation (FBI), and United States Department of Homeland Security (DHS) policy,

custom and practice.  Plaintiffs are challenging the religious questioning.

Plaintiffs are suing:

Robert S. Mueller, the Director of the FBI;

David V. Aguilar, Deputy Commissioner and Acting Commissioner of the CBP;

Janet Napolitano, Secretary of the DHS (collectively, the "Official-Capacity Defendants);

and

Robert B. Thompson, an agent employed by the FBI;

Jeff Sokolowski, an agent employed by the FBI; and

Unidentified FBI and CBP agents (collectively, the "Individual-Capacity Defendants).

The first amended complaint is in five counts, phrased by Plaintiffs as follows:

Count I:      Violation of the First Amendment (Free Exercise of Religion);

Count II:     Violation of the First Amendment (Establishment Clause);

Count III:    Violation of the First Amendment (Retaliation);

Count IV:    Violation of the Fifth Amendment (Equal Protection); and

Count V:     Violation of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, *et seq.*

In an order issued simultaneously with this memorandum and order, the claims

against the Official-Capacity Defendants have been bifurcated from the claims against the

Individual-Capacity Defendants and will be handled separately.  This memorandum and

order relates only to the Official-Capacity Defendants.[1]

---

[1] In this memorandum and order, the Official-Capacity Defendants are referenced as the Defendants.

Plaintiffs seek, in addition to attorneys' fees and costs,

> (1) "[a] declaratory judgment that Defendants' policies, practices, and customs violate the First and Fifth Amendments to the United States Constitution, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*; and (2) "[a]n injunction that: a. bars Defendants from engaging in further unconstitutional practices by questioning Plaintiffs about their religious beliefs and religious practices, and, b. requires Defendants to remedy the constitutional and statutory violations identified above, including, but not limited to, eliminating any existing policy whereby Plaintiffs, other Muslim Americans, and others similarly situated are subject to religious questioning at ports of entry."

(Doc. 21 at 20–21, Pls'. Am. Compl.).[2]

Now before the Court is Defendants' motion to dismiss the amended complaint (Doc. 32). For the reasons that follow, the motion is GRANTED IN PART and DENIED IN PART.

The Court finds that (1) Plaintiffs have standing to sue and the claims in Plaintiffs' first amended complaint are justiciable; (2) Plaintiffs have adequately pled the existence of an official policy, custom and practice; and (3) pursuant to that official policy, custom, and practice, Plaintiffs have sufficiently stated a Fifth Amendment claim (Count IV). Plaintiffs, however, have not stated a claim upon which relief can be granted under the First Amendment or the RFRA.

## II. BACKGROUND

### A.

Because the Court addresses Plaintiffs' claims in response to Defendants' motion to dismiss, the facts as alleged in the first amended complaint (Doc. 21) are accepted as

---

[2] Because of concern about what Plaintiffs expect in the form of relief should they prevail, the Court requested Plaintiffs lodge with the Court the form of the judgment to be entered should they prevail. The proposed judgment is attached as Exhibit A.

3

true and summarized below.

**B.**

Plaintiffs are four Muslim-American citizens residing in Michigan.  On separate occasions, Plaintiffs have individually crossed the United States–Canada border in Detroit for the purposes of reentering the United States.  Each Plaintiff has done so multiple times. The first time one of the Plaintiffs reentered the United States at the border was in late 2008.  Since 2008, Plaintiffs continued to travel from the United States to Canada, reentering the United States at the border, at least through December of 2011.

Each time Plaintiffs reentered the United States at the border, they were subjected to unreasonable searches, detentions, and prolonged questioning about their Islamic practices and beliefs by unidentified CBP and FBI agents.  Plaintiff Ali not only was subject to invasive religious questioning at the United States–Canada border, he was similarly detained and questioned about his Islamic practices and beliefs when returning to the United States at "multiple United States international air ports of entry."

Plaintiffs were repeatedly asked the following questions, among others, by CBP and FBI agents[3] at the border:

Which mosque do you go to?

How many times a day do you pray?

Who is your religious leader?

Do you perform your morning prayer at the mosque?

Muslim-American travelers are referred for secondary inspection at the borders more

---

[3] There is no explanation of why an FBI agent was at a border crossing.

frequently than American travelers of other faiths.  In addition, defendants Mueller, Aguilar, and Napolitano, through their respective agencies, "were aware of and implemented a policy or encouraged, permitted, or tolerated a course of conduct or pattern of practice by CBP Agents and FBI Agents, which includes asking Muslim American travelers a substantially similar set of questions about their Islamic beliefs and practices."  This line of questioning "targets, discriminates against, humiliates, substantially burdens, and creates a chilling effect upon Muslim American travelers, including Plaintiffs, and wrongfully stigmatizes them as violent threats based solely on a subjective assessment of their Islamic beliefs and practices."

**C.**

On October 1, 2010, a Senior Advisor for DHS's Office for Civil Rights and Civil Liberties ("CRCL") wrote a legal memorandum to Margo Schlanger, an officer for CRCL, concerning "[l]aw enforcement questioning regarding religion."   The memorandum discussed the constitutionality of religious questioning at the border.  The Senior Advisor's memorandum is summarized in the first paragraph:

> You asked me to examine case law regarding the permissible bounds of law-enforcement questioning of individuals regarding their religion, both at the border and within the United States. The query would encompass border inspections as well as consensual and custodial police interrogation, and law on religious profiling would also be relevant.  But there is much less law in this area than one would expect.   So, notwithstanding the fact that religious questioning and religious profiling implicate First Amendment considerations that questioning or profiling on ethnicity or race do not, there is relatively little to say, other than that courts presume the same limitations on religion-based police activity as on race-cognizant policing.

**D.**

5

On March 24, 2011, Plaintiffs' lawyer, on behalf of Plaintiffs and six others, sent a letter to the CRCL informing the DHS about the "prolonged detentions, invasive and humiliating body searches at the border, and inappropriate questioning that pertains to religion and religious practices by [CBP] personnel."

On May 3, 2011, Schlanger responded to Plaintiffs' lawyer by letter.  Schlanger informed Plaintiffs' lawyer, in pertinent part, that

> CRCL has received a number of complaints like yours, alleging that [CBP] officers have engaged in inappropriate questioning about religious affiliation and practices during border screening.  We will add these complaints to the investigation we are opening on the subject.
>
> . . . .
>
> [O]ur complaint process does not provide individuals with legal or procedural rights or remedies.  Accordingly, this Office is not able to obtain any legal remedies or damages on your behalf or that of the above complainants.  Instead, we use complaints like yours to find and address problems in DHS policy and its implementation.

**E.**

Also on May 3, 2011, Schlanger and CRCL legal counsel Audrey Anderson wrote a memorandum to CBP commissioner Alan Bersin and CBP chief counsel Alfonso Robles informing them of various statements the CRCL received about CBP's questioning of Muslims about their religion at land and air ports of entry.  The memorandum informed Bersin and Robles that CRCL

> has received numerous accounts from American citizens, legal permanent residents, and visitors who are Arab and/or Muslim, alleging that officials from [CBP] repeatedly question them and other members of their communities about their religious practices or other First Amendment protected activities, in violation of their civil rights or civil liberties, or otherwise target

6

them for extra scrutiny, questioning, or inappropriate comment based on their ethnicity or apparent religion.

The statements to CRCL alleged similar religious questioning at:

1.      The Logan International Airport in Boston, Massachusetts;

2.      Numerous ports of entry in Buffalo, New York including the Rainbow Bridge Port of Entry, the Champlain Service Port, and the Lewiston Bridge Complex;

3.      The Fort Lauderdale Airport in Miami, Florida;

4.      The Pacific Highway Crossing in Seattle, Washington;

5.      Numerous ports of entry in Detroit, Michigan including the Ambassador Bridge Passenger Facility, the Detroit-Windsor Tunnel, the Detroit Metropolitan Airport, the Port Huron Port of Entry, and other unknown ports of entry;

6.      The Atlanta Hartsfield/Jackson International Airport in Atlanta, Georgia;

7.      The John F. Kennedy International Airport in New York, New York; and

8.      Unspecified ports of entry.

At these various ports of entry, those who contacted the CRCL alleged that they were asked questions by CBP and/or FBI agents about their religious practices and beliefs. The type of questions included, among others:

What mosque do you attend?

How often do you pray/attend mosque?

Why do you go to the mosque?

Are you an Imam at the mosque?

Are your family members strictly religious?

When did you become a Muslim?

When did you convert?

7

Are you Shi'a or Sunni?

Do you pray five times a day, in the mosque?

Are there any extremists or terrorists at the mosque?

Do you know any extremists?

Do you consider yourself a religious person?

Does anybody at the mosque talk about going back to the motherland?

Do you give donations?

Don't you have to pay a certain amount of your money religiously?

Which Muslim charities have you donated to?

Do you belong to any organizations?

Are you affiliated with any terrorist organizations?

Do you know any terrorists?

Who is the Imam at your mosque?

Who else prays at your mosque?

Which Muslim countries have you traveled to?  During your travel to these countries, have you been approached by anyone suspicious?

Do you know Anwar al-Awlaki?

How much money have you brought to your community?

Do you visit any Islamist extremist websites?

Are you part of any Islamic tribes?

Have you ever been to a "madrassa" or studied Islam full-time?

The memorandum concluded,

> In short, CRCL has received numerous complaints on this topic, with certain obvious commonalities among them.  We

should note that we have every expectation that at least some of the complainants are the subject of look-outs or watchlisting. Our investigation will be sensitive to the security needs served by border questioning of such individuals.

**F.**

Both Defendants' and Plaintiffs' counsel at oral argument stated that they were not aware of any further correspondence after the May 3 letters.

On April 13, 2012, Plaintiffs filed this lawsuit.

### III. LEGAL STANDARDS

### A. Motion to Dismiss

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint. To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir. 2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an

9

entitlement to relief." *Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 678 (internal quotation marks and citation omitted).

## B. Subject Matter Jurisdiction

A Fed. R. Civ. P. 12(b)(1) motion seeks dismissal for a court's lack of subject matter jurisdiction. The motion may be based on either a facial attack or a factual attack on the allegations of the complaint. *Tri-Corp Mgmt. Co. v. Praznik*, 33 F. App'x 742, 745 (6th Cir. 2002). If subject matter jurisdiction is facially attacked, the court must take the material allegations in the complaint as true and construe them in a light most favorable to the nonmoving party. *United States v. A.D. Roe. Co.*, 186 F.3d 717, 721–22 (6th Cir. 1999). If, however, there is a challenge to the factual existence of subject matter jurisdiction, the court is "empowered to weigh the evidence and no presumptions apply as to the truthfulness of the relator's allegations." *Id.*

## IV. DISCUSSION

This case presents an issue of first impression that, to the Court's knowledge, has never been addressed by another court in the nation. In short, the question before the Court is whether the Government has unfettered discretion to question at the border a specific class of individuals about their religious practices and beliefs after being profiled and detained solely because of those religious practices and beliefs.

Defendants first say that the Court need not reach the merits of the dispute because Plaintiffs lack standing and the claims in the first amended complaint are nonjusticiable. Next, Defendants say that Plaintiffs have not sufficiently alleged the existence of an official policy, custom and practice. Finally, Defendants say that Plaintiffs' first amended complaint

cannot withstand scrutiny under Fed. R. Civ. P. 12(b)(6).  The Court discusses these arguments in turn.

### A. Plaintiffs Have Standing and the Claims are Justiciable

Plaintiffs seek prospective relief against Defendants by way of an injunction that would prevent the government from asking Plaintiffs about their specific Islamic practices and beliefs at the border.  Defendants say that Plaintiffs' claims are nonjusticiable for two reasons: (1) Plaintiffs have not sufficiently alleged an injury in fact to satisfy standing requirements; and (2) prospective injunctive relief impermissibly intrudes into Executive authority at the border.  The Court disagrees with both arguments.

### 1. Standing

The United States Constitution "limits federal-court jurisdiction to actual cases or controversies."  *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 828 (6th Cir. 2012).  The party invoking federal jurisdiction bears the burden of establishing standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  A plaintiff is required to satisfy each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at successive stages of the litigation."  *Michigan v. Bay Mills Indian Comm.*, 695 F.3d 406, 411 (6th Cir. 2012) (*quoting Lujan*, 504 U.S. at 561).

As the Sixth Circuit recently explained, "[t]he Supreme Court has stated that 'the irreducible constitutional minimum of standing contains three elements': (1) an 'injury in fact'; (2) 'a causal connection between the injury and the conduct complained of'; and (3) that 'the injury will be redressed by a favorable decision.'" *Rasins Landscape & Assocs., Inc. v. Mich. Dep't of Transp.*, ___ F. App'x ___, 2013 WL 2349274, at *2 (6th Cir. 2013)

11

(quoting *Lujan*, 504 U.S. at 560–61).

In addition to the above requirements, there are three prudential requirements a plaintiff must satisfy. *City of Cleveland v. Ohio*, 508 F.3d 827, 835 (6th Cir. 2007). First, "a plaintiff must assert his own legal rights and interests"; second, "the claim must be more than a generalized grievance"; and third, "in statutory cases, the plaintiff's claim must fall within the zone of interest regulated by the statute in question." *Id.* (citing *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (internal quotations omitted)).

Defendants say that Plaintiffs lack standing to seek prospective relief because they admit that they no longer cross the border. Three of the plaintiffs, Cherri, Charafeddine, and Bouzid specifically allege that they no longer cross the border "to avoid being subjected to the above treatment." (Doc. 21 at 5–8, Pls'. Am. Compl. ¶¶ 25, 34, 45). Plaintiff Ali does not allege that he no longer crosses the border, but he says that the most recent time he crossed the border was in December of 2011. (*Id.* at 7, ¶ 37). Thus, Defendants say that, because a substantial amount of time has passed since Plaintiffs have last crossed the border, and none of them specifically allege that they plan to cross the border in the future, they have not sufficiently alleged an injury in fact. Instead, Defendants contend that Plaintiffs have only asserted an unreasonable probabilistic injury. The Court disagrees.

The Supreme Court has explained that the "injury in fact" element of standing cannot be satisfied if the claimed injury is speculative and hypothetical. In *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), the plaintiff brought a civil rights action against the City of Los Angeles seeking, among other things, injunctive and declaratory relief to prevent the Los Angeles police from using illegal chokeholds in routine traffic stops. *Id.* The plaintiff was stopped by Los Angeles police officers for a traffic or vehicle code violation and, "although

12

Lyons offered no resistance or threat whatsoever, the officers, without provocation or justification, seized Lyons and applied a 'chokehold'–either the 'bar arm control' hold or the 'carotid-artery control' hold or both–rendering him unconscious and causing damage to his larynx." *Id.* at 97–98.

The Supreme Court in *Lyons* held that the plaintiff did not have standing to seek prospective injunctive relief because the threat of future injury was attenuated:

> That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Id.* at 105. In other words, the plaintiff did not have a reasonable basis to assert that the claimed probabilistic injury would occur in the future.

This case is materially different than *Lyons*. Unlike *Lyons*, Plaintiffs have alleged an injury in fact that is real and immediate, not hypothetical. In other words, Plaintiffs' fear that they will be questioned about their religious practices and beliefs if they cross the border is reasonable based on their past visits at the border. Although three of the plaintiffs say that they no longer cross the border, they say it is only because they do not want to be profiled and questioned about their religious practices and beliefs. Thus, Plaintiffs claim that they are forced to forego a lawful activity– traveling from one country to another– in order to avoid being profiled and questioned about their religious practices and beliefs. Unlike *Lyons*, where the plaintiff would first have to violate the law before he would ever be subjected to the illegal chokehold again, Plaintiffs claim that their lawful movements to and

13

from the United States are hindered because of the real and immediate threat that they will be stopped at the border and questioned about their religious practices and beliefs.

Further, in *Lyons*, the plaintiff was not exposed to the same repeated harm that the Plaintiffs allege to have suffered in this case– he was choked once. Here, the Plaintiffs have crossed the border multiple times and each time were subjected to the same treatment. Plaintiffs' injury is real and immediate because, unlike a one time occurrence, taking Plaintiffs' allegations in the first amended complaint as true, they experienced the same treatment at the border multiple times on a consistent basis.

Defendants misplace their reliance on *Clapper v. Amnesty International USA*, 133 S.Ct. 1138 (2013) to argue that Plaintiffs have not alleged a "certainly impending" injury in fact. In *Clapper*, the Supreme Court clarified that, to adequately allege an injury in fact, the "'threatened injury must be *certainly impending*. . .' and '[a]llegations of *possible* future injury' are not sufficient.'" 133 S.Ct. at 1147 (alterations and emphasis in original). A certainly impending injury, the Supreme Court reasoned, is one which does not rely "on a highly attenuated chain of possibilities." *Id.* at 1148.

*Clapper* involved a challenge to Section 702 of the Foreign Intelligence Surveillance Act (the "FISA") by respondents who were attorneys and human rights, labor, legal and media organizations. *Id.* at 1142, 1145. Section 702 of the FISA "allows the Attorney General and Director of National Intelligence to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not 'United States persons' and are reasonably believed to be located outside the United States." *Id.* at 1142. Respondents claimed that their work "requires them to engage in sensitive international communications with individuals who they believe are likely targets of surveillance under

14

[the FISA]." *Id.* Accordingly, respondents sought a declaration that Section 702 of the FISA is unconstitutional, and an injunction against the surveillance. *Id.*

The Supreme Court rejected respondents' challenge to the FISA on standing grounds. The Supreme Court held that "respondents' theory of *future* injury [wa]s too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Id.* at 1143 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis in original)). The Supreme Court reasoned that it was speculative whether the government would use surveillance under the FISA to target communications involving the respondents. *Id.* at 1148. Indeed, the Supreme Court stated, "Simply put, respondents can only speculate as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target." *Id.* at 1149.

The respondents in *Clapper* also claimed that they were suffering present injury based on the risk of surveillance under the FISA forcing them to expend costs to protect the confidentiality of their international communications. *Id.* at 1151. The Supreme Court concluded, however, that "respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id.* at 1142. The Supreme Court explained,

> Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing– because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. Any ongoing injuries that respondents are suffering are not fairly traceable to [Section 702 of the FICA].
>
> If the law were otherwise, an enterprising plaintiff would be

15

> able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear.

*Id.* at 1151 (internal citations omitted).

*Clapper* is inapposite. Unlike *Clapper*, plaintiffs have alleged a certainly impending injury that is fairly traceable to Defendants' purported conduct at the border. Plaintiffs' decision to stop traveling across the border is based on a reasonable fear that they would be questioned about their religious practices and beliefs. Indeed, Plaintiffs allege that they were stopped and questioned about their religious practices and beliefs each time that they crossed the border on numerous occasions. In *Clapper*, the plaintiffs did not claim that their communications were ever monitored or that the Government had applied to monitor their communications. However, in this case, taking the allegations of the first amended complaint as true, the only reason Plaintiffs do not cross the border is to avoid harm that is real and immediate and that has occurred on numerous past occasions. Plaintiffs' fear, again taking the allegations in the first amended complaint as true, is well-founded and the claimed injury is certainly impending.

Plaintiffs' probabilistic injury is comparable to the injury in fact that the Supreme Court found to be sufficient in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000). In *Laidlaw*, various environmental groups, Friends of the Earth, Inc. ("FOE"), brought suit under the Clean Water Act (the "CWA"), claiming that Laidlaw Environmental Services, (TOC) Inc. ("Laidlaw") discharged toxic pollutants of mercury compounds into the North Tyger River. 528 U.S. at 176–77. Laidlaw asserted that FOE lacked standing to seek injunctive relief "because the plaintiff organizations failed to show that any of their members had sustained or faced the threat of any 'injury in fact'

16

from Laidlaw's activities."  *Id.* at 181.  The plaintiffs submitted affidavits stating that they

would like to fish, hike, picnic, swim, boat, etc., in the river, like they used to do before

Laidlaw discharged mercury into the river, but that they did not continue to do so because

they were concerned about harmful pollutants in the water.  *Id.* at 181–82.  The Supreme

Court reasoned that this was sufficient to allege an injury in fact:

> These sworn statements, as the District Court determined, adequately documented injury in fact.  We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.
>
> . . . .
>
> [T]he affidavits and testimony presented by FOE in this case assert that Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests.
>
> . . . .
>
> [I]t is undisputed that Laidlaw's unlawful conduct–discharging pollutants in excess of permit limits–was occurring at the time the complaint was filed.  Under *Lyons*, then, the only "subjective" issue here is "[t]he reasonableness of [the] fear" that led the affiants to respond to that concededly ongoing conduct by refraining from use of the North Tyger River and surrounding areas.  Unlike the dissent, we see nothing "improbable" about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms.  The proposition is entirely reasonable, the District Court found it was true in this case, and that is enough for injury in fact.

*Id.* at 183–84.

Like *Laidlaw*, where the plaintiffs ceased using the river based on their reasonable

subjective fear that they would be injured, Plaintiffs say that they ceased crossing the border based on a reasonable fear that they would be stopped and questioned about their religious beliefs. Plaintiffs allege that they have crossed the border multiple times. Each time, they say that they were stopped at secondary inspections and questioned about their religious practices and beliefs. Thus, taking the allegations in the first amended complaint as true, Plaintiffs' decision to stop crossing the border was reasonable and is enough to establish an injury in fact.

In *Laidlaw*, it was undisputed that the harm– the discharge of pollutants in the river– was still occurring at the time the complaint was filed. Defendants say that this case is different because it is not undisputed that Plaintiffs would face the same harm if they were to cross the border today. However, unlike *Laidlaw* where the harm was easily identifiable whether or not the plaintiffs used the river, under Defendants' reasoning, Plaintiffs here would be required to subject themselves to the injury that they are challenging just to have standing to sue. That result is not consistent with *Laidlaw*'s holding. It is enough that Plaintiffs stopped crossing the border in order to avoid a "certainly impending" injury.

For these reasons, Plaintiffs have standing.

### 2. Executive Authority at the Border

Next, Defendants say the Court lacks subject matter jurisdiction to interfere with Executive authority at the border. The Supreme Court has recognized, in the context of Fourth Amendment suspicionless inspections at the border, that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Indeed, the Supreme Court explained that "[i]t is axiomatic that the United States, as sovereign, has

18

the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Id.* at 153. Plaintiffs, however, do not challenge the Government's power to detain individuals and conduct suspicionless searches at the border. Rather, Plaintiffs challenge the nature of the inquiry into their specific religious practices and beliefs. Through this line of questioning, Plaintiffs say they are characterized as threats based solely on their religious practices and beliefs.

The closest case resembling the facts alleged in the first amended complaint, which is distinguishable from this case, is *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007). In *Tabbaa*, a group of United States citizens brought suit against the Government alleging that their rights were violated when they were detained and searched by CBP when returning from an Islamic conference in Canada. *Id.* at 92. The U.S. Bureau of Customs and CBP "received intelligence that gave them reason to believe that persons with known terrorist ties would be attending certain Islamic conferences to be held during the year-end holiday season of 2004, including the Reviving the Islamic Spirit Conference at the Skydome in Toronto, Canada." *Id.* The CBP therefore "instituted a special inspection operation pursuant to which all individuals who attended these conferences and sought entry into the United States were subject to the kind of screening procedure normally reserved for suspected terrorists." *Id.* Pursuant to an official policy, CBP officials were instructed to:

> (a) identify and examine all persons associated with any of the Islamic conferences at issue who sought entry into the United States, (b) contact CBP's National Targeting Center upon encountering conference participants "in order to determine whether individuals seeking to enter the United States posed a particular threat," and (c) question conference attendees about their activities during their trip and examine their documentation and person and vehicles for "evidence of terrorist-related activities, such as plans, money, or even

19

weapons." The [policy] also permitted, but did not require, border officials to fingerprint and photograph conference attendees. The purpose of these measures–which were designed to process travelers who are suspected terrorists–was to "confirm each individual's identity and verify that they were not on any watch list of suspected terrorists, or seeking to use the conference as a cover for crossing the U.S. border, or otherwise involved in illegal activity, or carrying any illegal weapons, documents, monetary instruments, or any other prohibited items across the border." Attendance at one of the Islamic conferences at issue was the sole factor that triggered the enhanced processing.

*Id.* at 94.

The Second Circuit in *Tabbaa*, affirming the district court's grant of summary judgment, determined that the searches and detentions of the plaintiffs did not violate the Fourth Amendment because the Government has broad powers to conduct searches at the border. *Id.* at 97. The intrusive questions plaintiffs were asked about their activities at the conference, the content of the lectures they attended, and their reasons for attending, the Second Circuit reasoned, were questions typically asked to "prospective entrants in an effort to determine the places they have visited and the purpose and duration of their trip." *Id.* at 98–99 (citations omitted). Likewise, the Second Circuit did not find the fingerprinting and photographing of plaintiffs to be invasive, "especially considering that the photographs and fingerprints were used solely to verify plaintiffs' identities and then were discarded from the government's databases." *Id.* at 99 (citing *Davis v. Mississippi*, 394 U.S. 721, 727 (1969)).

Having determined that the searches and detentions were permissible under the Fourth Amendment, the *Tabbaa* court of appeals next turned to whether and to what extent the Government's actions burdened the plaintiffs' First Amendment right of freedom of

expression.  *Id.* at 101.  The court of appeals determined that "plaintiffs suffered a significant penalty, or disability, solely by virtue of associating at the RIS Conference: they were detained for a lengthy period of time, interrogated, fingerprinted, and photographed when others, who had not attended the conference, did not have to endure these measures."  *Id.* at 102.  Notwithstanding, however, the court of appeals found that the Government's compelling interest in protecting the nation from terrorism outweighed the burden on plaintiffs' right of freedom of expression.  *Id.* at 103.  Indeed, the court of appeals explained that "'[i]nterception and detection at the international border crossings is likely the most effective way to protect the United States from terrorists and instruments of terrorism.'"  *Id.* (citations omitted).

This case, however, is different than *Tabbaa*.  Plaintiffs do not challenge detentions at the border.  Plaintiffs assert a narrow challenge to Defendants' inquiry about Plaintiffs' religious practices and beliefs.  In simple terms, Plaintiffs allege religious profiling at the border.  Unlike *Tabbaa*, where the case reached the court of appeals on summary judgment, this case is presently before the Court on Defendants' motion to dismiss.  The Court is not in a position to determine whether Defendants religiously profiled and questioned Plaintiffs at the border; the Court must, for purposes of Plaintiffs' motion to dismiss, assume that Defendants did.  At this stage in the case, taking Plaintiffs' allegations in the first amended complaint as true, read together with the letters attached as exhibits to the first amended complaint, they have sufficiently alleged a constitutional violation, explained *infra*.  The Court bears in mind the significant differences between a motion to dismiss and one for summary judgment.  Thus, restricted to the allegations in Plaintiffs' first amended complaint, the Court cannot assess at this stage in the case the legality and

21

propriety of Defendants' conduct.

### B. Plaintiffs Have Sufficiently Pled Existence Of An Official Practice, Policy Or Custom

Defendants say that, even if the Court has subject matter jurisdiction, Plaintiffs have not sufficiently pled the existence of an official policy. Defendants are mistaken.

The Sixth Circuit recently dismissed a complaint in which the plaintiffs challenged a claimed Government "policy, practice, procedure, and/or custom of [the Government] that targets for disfavored treatment those individuals and groups that [the Government] deem to be 'rightwing extremists.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 367 (6th Cir. 2011). The complaint, the Sixth Circuit reasoned, did not "plausibly allege the existence of the claimed . . . policy pursuant to which [plaintiffs] allege constitutional violations." *Id.* at 372. In fact, the Sixth Circuit noted that "it is altogether unclear what constitutes the . . . [p]olicy in light of [p]laintiffs' vague and conclusory allegations and arguments on appeal. . . The Amended Complaint identified no document, policy directive, or anything else that would constitute the . . . [p]olicy" *Id.* at 372–73.

Defendants misplace their reliance on *Center for Bio-Ethical Reform* in arguing that Plaintiffs have not sufficiently alleged the existence of an official policy, custom and practice. This case is not like *Center for Bio-Ethical Reform.* First, Plaintiffs allege that each time they cross the border, they are asked the same type of questions inquiring about their religious practices and beliefs. Second, the CRCL wrote an internal memorandum the subject of which was the constitutionality of law enforcement questioning regarding religion at the border. The CRCL memorandum is attached to the first amended complaint and referenced in paragraph 54. Third, in response to a letter sent by Plaintiffs' counsel

22

informing the CRCL about the treatment of Muslim-American's at the border, the CRCL informed Plaintiffs' counsel that it "has received a number of complaints like yours, alleging that [CBP] officers have engaged in inappropriate questioning about religious affiliation and practices during border screening."   Finally, the CRCL wrote a memorandum to CBP personnel informing them of twenty-five complaints from Muslim-American's that upon entry into the United States at various ports of entry, they were subjected to similar religious questioning.   In sum, Plaintiffs have alleged sufficient facts to show that their alleged treatment at the border was pursuant to an official policy, custom and practice.

### C. The Claims

Having determined that the claims set forth in Plaintiffs' first amended complaint are justiciable, and that Plaintiffs have sufficiently pled the existence of an official policy, custom and practice, the Court turns to Defendants' next argument for dismissal: Plaintiffs' first amended complaint fails to state a claim upon which relief can be granted.   The Court discusses separately each count contained in Plaintiffs' first amended complaint.

### 1. Freedom of Expression (Counts I and V)

Counts I and V of the first amended complaint are brought under the free exercise clause of the First Amendment and the Religious Freedom Restoration Act.   In essence, plaintiffs claim that, by detaining them at secondary inspections and asking them intrusive questions about their religious practices and beliefs, Defendants have deterred them from freely exercising their religious beliefs.   Plaintiffs' claims are fatally flawed.

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."   U.S. Const. amend I.   Relatedly, the RFRA provides that the "Government shall not substantially burden a

23

person's exercise of religion even if the burden results from a rule of general applicability, except . . . if it demonstrates that application of the burden to the person– (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. §§ 2000bb-1(a)–(b).  Like the RFRA, the First Amendment freedom of expression guarantee allows "public authorities [to] enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process," so long as such rules "'advance[] interests of the highest order and [are] narrowly tailored in pursuit of those interests.'"  *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

Defendants say that Counts I and V of the first amended complaint must be dismissed because Plaintiffs have not established that being queried about their religious practices and beliefs at the border infringes or burdens their ability to freely exercise their religion.  Their position is well-taken.

The first amended complaint is devoid of any factual allegation that, based on Defendants' questioning of Plaintiffs at the border, they are burdened in their ability to freely exercise their religious beliefs.  Indeed, Plaintiffs do not allege that they are unable to attend their respective places of worship or otherwise freely exercise their Islamic practices and beliefs.  As Defendants note,

> Plaintiffs have not alleged that such questioning requires them to affirm or deny a belief that is contrary to their faith, or to choose between following tenets of their faith and receiving an important government benefit.  Nor have plaintiffs alleged that the Government has sought to impose civil or criminal sanctions on religiously motivated conduct.  Plaintiffs' only allegations in the amended complaint attempting to assert any

24

> burden on their religious exercise are conclusory, circular, and
> devoid of concrete factual content.

(Doc. 32 at 21, Official-Capacity Defs. Mot. to Dismiss).  Indeed, "[a]t most, plaintiffs' factual allegations suggest a burden on their ability to cross the border quickly, not their ability to practice Islam."  (*Id.* at 22).  Accordingly, Plaintiffs fail to state a claim under the First Amendment's Free Exercise Clause or the RFRA.

### 2. Establishment Clause (Count II)

Next, Plaintiffs say that the policy, custom and practice implemented by Defendants amounts to an impermissible government entanglement with religion.  Plaintiffs' allegations in the first amended complaint fall short of stating an Establishment Clause claim.

The Establishment Clause of the First Amendment states, "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I, cl. 1.  "The Establishment Clause, unlike the Free Exercise Clause, does not depend on any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not."  *Engel v. Vitale*, 370 U.S. 421, 430 (1962).  In the context of statutes, the Supreme Court has required proof of three elements to uphold their constitutionality: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'"  403 U.S. at 612–13 (internal citations omitted). *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

Under the first prong of *Lemon*, the "purpose prong," the Government's purpose must be secular, "and not merely secondary to a religious objective."  *ACLU of Ohio*

*Found., Inc. v. DeWeese*, 633 F.3d 424, 431 (6th Cir. 2011) (citation and internal quotation mark omitted).  Here, Plaintiffs do not claim that Defendants' actions at the border were undertaken in pursuit of a religious objective.  Rather, the crux of Plaintiffs' complaint is that they are being profiled and subjected to religious questioning because of a claimed association between their Islamic beliefs and terrorist activities.  Plaintiffs, however, have not sufficiently alleged that Defendants had a religious objective.

The second prong, the "endorsement test," "asks whether the [G]overnment action has the purpose or effect of endorsing religion."  *DeWeese*, 633 F.3d at 431 (citation omitted).  As explained by the Sixth Circuit, "[u]nder the endorsement test, the [G]overnment violates the Establishment Clause when it acts in a manner that a reasonable person would view as an endorsement of religion."  *Id.* at 434 (quoting *ACLU of Ky. v. Mercer Cnty., Ky.*, 432 F.3d 624, 636 (6th Cir. 2005)).  "This is an objective standard," and the "inquiry here is whether the reasonable person would conclude that" Defendants' actions at the border "have the effect of endorsing religion."  *Id.* (quoting *Mercer*, 432 F.3d at 636).  A reasonable person would not draw such a conclusion.  Whatever reason Defendants have for questioning Plaintiffs about their religious practices and beliefs, it does not have the effect of endorsing religion.  It has the effect of burdening Plaintiffs' ability to cross the border in a timely fashion.

The final *Lemon* prong, the "entanglement prong," asks "[whether] the [Government] action fosters an excessive entanglement with religion."  *Id.* at 431 (internal quotation marks omitted).  Plaintiffs have not alleged in their first amended complaint facts which establish that Defendants' actions amount to an excessive entanglement with religion.  All Plaintiffs have pled is that they were treated differently based on their religious beliefs.  The

26

allegations in the first amended complaint do not state a claim under the Establishment Clause and are better suited for Plaintiffs' Fifth Amendment claim.

### 3. First Amendment Retaliation (Count III)

In Count III of the first amended complaint, Plaintiffs say that they were retaliated against for "choosing to exercise their religion." Specifically, Plaintiffs say that Defendants' "actions have deprived and continue to deprive Plaintiff[s] First Amendment rights to free exercise of religion and to be free from religious discrimination in violation of the Free Exercise Clause and Establishment Clause." (Doc. 21 at 16, Pls'. First Am. Compl.). As explained above, however, Plaintiffs fail to state a claim under the Free Exercise or Establishment Clauses of the First Amendment. Plaintiffs' retaliation claim, therefore, fails to state a claim upon which relief can be granted.

"It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999). To establish a First Amendment retaliation claim, plaintiffs must show: (1) they were "participating in a constitutionally protected activity"; (2) the defendants' actions "injured the plaintiff[s] in a way likely to deter a person of ordinary firmness from further participation in that activity"; and (3) "the adverse action was motivated at least in part by the plaintiff[s]' protected conduct." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 371 (6th Cir. 2011) (citations omitted). Once the plaintiffs "raise the inference that the defendant[s]' conduct was motivated in part by the plaintiff[s]' protected activity, the burden shifts to the defendant[s] to 'demonstrate that [they] would have taken the same action in the absence of the protected activity." *Id.* at

27

371–72 (citation omitted).

Assuming without deciding that Plaintiffs were participating in a constitutionally protected activity and that Defendants' conduct was motivated by Plaintiffs' exercising such activity, Plaintiffs have not established that they were injured in a way "likely to deter a person of ordinary firmness from further participation in that activity."  Indeed, Plaintiffs themselves have not alleged that they no longer participate in Islamic practices and beliefs because of Defendants' actions.  That Plaintiffs do not cross the border anymore so that they can avoid religious questioning is not the equivalent of ceasing their participation in the tenets of their religion.  Accordingly, Plaintiffs fail to state a claim of retaliation under the First Amendment.

### 4. Fifth Amendment Equal Protection (Count IV)

In Count IV of the amended complaint, Plaintiffs claim that Defendants violated the Fifth Amendment's equal protection guarantee encompassed in the Due Process Clause.

The Fifth Amendment contains the concept of equal protection under the laws.  *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ("But the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive.").  Indeed, "if the federal government acts in a manner that would violate the Fourteenth Amendments' Equal Protection Clause, such action will be deemed a violation of the 'implied equal protection guarantee' of the Fifth Amendment's due process clause." *Olympic Arms v. Magaw*, 91 F. Supp. 2d 1061, 1069 (E.D. Mich. 2000).

Under the Equal Protection Clause of the Fourteenth Amendment, "No State shall make or enforce any law which . . . den[ies] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1.  As the Sixth Circuit has recently

28

explained, "[t]o state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379 (citing *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)).

In their Fifth Amendment claim, Plaintiffs specifically allege that "Defendants' above-described actions, policies, course of conduct, or pattern of practice that mandate or permit the above-described treatment have had a discriminatory effect upon and have disparately impacted Muslim American travelers, and not travelers of other faiths." Indeed, central to Plaintiffs' first amended complaint is that the policy, custom and practice is only applied against Muslims, and not travelers of other faiths.

Plaintiffs have adequately pled that Defendants have a policy, custom and practice of questioning only Muslim-American's at the border about their religious practices and beliefs. Moreover, Plaintiffs have sufficiently alleged that such policy, practice and custom targets a suspect class and has no rational basis. At this stage in the case, Plaintiffs' allegations are sufficient. The Fifth Amendment claim, therefore, will not be dismissed.

## V. CONCLUSION

### A. Summary

For the reasons stated above, Defendants' motion to dismiss was granted in part and denied in part. Plaintiffs have standing, the Court has subject matter jurisdiction, and Plaintiffs have sufficiently pled the existence of an official policy, custom and practice. Nevertheless, Plaintiffs fail to state a claim upon which relief can be granted under the First

Amendment and the RFRA.  Accordingly, Counts I, II, III, and V were dismissed.  The only remaining count in Plaintiffs' first amended complaint against Defendants is Count IV (Fifth Amendment).

It may well be the case that Defendants will come forward with a permissible reason for profiling Plaintiffs for secondary inspection and questioning them extensively about their religious practices and beliefs.  That is not the question before the Court on Defendants' motion to dismiss.  Indeed, at this stage, the Court must take all allegations in Plaintiffs' first amended complaint as true.  The legality and propriety of Defendants' conduct is better suited, at a minimum, for a motion for summary judgment after an appropriate period of discovery.

## B. CODA

The Court in denying the motion to dismiss has clearly said only that the first amended complaint claims more than a speculative and hypothetical injury.  What the Court has said is that the allegations cross the threshold set in the precedents for a case to go forward.  In the letter of May 3, 2011 from the officer for Civil Rights and Civil Liberties of the U.S. Department of Homeland Security referenced *supra* at Section II.D, the writer said

> We thank you for your complaint; inquiries like yours help the Department of Homeland Security meet its obligation to protect civil rights and civil liberties.  You can expect to receive a letter from us informing you how we have concluded this matter.

To date, there has been no letter informing Plaintiffs' counsel how the complaint has been concluded.

SO ORDERED.

30

12-11656 Abdulrahman Cherri, et al., v.
Robert S. Mueller III, et al.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  June 11, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, June 11, 2013, by electronic and/or ordinary mail.

S/Sakne Chami
Case Manager, (313) 234-5160

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ABDULRAHMAN CHERRI**, | ) | |
| **WISSAM CHARAFEDDINE**, | ) | |
| **ALI SULEIMAN ALI**, and, | ) | |
| **KHEIREDDINE BOUZID**, | ) | **Case No. 12-cv-11656** |
| | ) | **Hon. Avern Cohn** |
| Plaintiffs, | ) | **Magistrate: Laurie J. Michaelson** |
| | ) | |
| v. | ) | |
| | ) | |
| **ROBERT S. MUELLER, III**, in his official | ) | |
| capacity as Director of the Federal Bureau | ) | |
| of Investigation; | ) | |
| | ) | |
| **DAVID V. AGUILAR**, in his official capacity | ) | |
| as Acting Commissioner of the United States | ) | |
| Customs and Border Protection; | ) | |
| | ) | |
| **JANET NAPOLITANO**, in her official capacity | ) | |
| as Secretary of the United States Department | ) | |
| of Homeland Security; | ) | |
| | ) | |
| **ROBERT B.    THOMPSON**, in his individual | ) | |
| capacity; | ) | |
| | ) | |
| **JEFF    SOKOLOWSKI**, in his individual | ) | |
| capacity; | ) | |
| | ) | |
| **UNIDENTIFIED FBI AGENTS**, in their | ) | |
| individual capacities; | ) | |
| | ) | |
| **UNIDENTIFIED CBP AGENTS**, in their | ) | |
| individual capacities; and, | ) | |
| | ) | |
| Defendants. | ) | |

_____/

## [PROPOSED] ORDER GRANTING
## PERMANENT INJUNCTION AND DECLARATORY RELIEF

Based upon the pleadings, motions, and evidence received by the Court, and the Court

being hereby otherwise fully advised in the premises;

IT IS ORDERED, as follows:

1.  A permanent injunction is hereby entered enjoining Defendants from maintaining a policy, or tolerating a course of conduct, pattern, or practice of questioning Plaintiffs and other Muslims about their specific Islamic beliefs and/or practices.  While this injunction bars Defendants from asking questions about the specific beliefs and/or practices of Muslims pursuant to a policy or a known and tolerated course of conduct, pattern or practice, this Order does not prohibit Defendants from asking questions pursuant to their law enforcement authority that incidentally elicits responses revealing a person's religious beliefs and/or practices (i.e. where are you coming from?); so long as such questions are not asked pursuant to a policy, or a known and tolerated course of conduct, pattern or practice that applies or targets only Muslims alone.

2.  Defendants shall, within thirty (30) days of the date of this order, eliminate all existing policies or procedures that encourage, permit or tolerate a course of conduct or pattern of practice under which Customs and Border Protection (CBP) agents and Federal Bureau of Investigation (FBI) agents question Muslims, whether at ports of entry or otherwise, about their specific Islamic beliefs and/or practices.


IT IS SO ORDERED.


Hon. _____

Dated: _____

2