FOR OFFICIAL USE ONLY

October 1, 2010


**Homeland Security**

**MEMORANDUM**

| | |
|---|---|
| **MEMORANDUM FOR:** | Margo Schlanger, Officer for Civil Rights and Civil Liberties |
| **FROM:** | (b) (6)<br>Senior Advisor, Office for Civil Rights and Civil Liberties |
| **SUBJECT:** | Law enforcement questioning regarding religion |

You asked me to examine case law regarding the permissible bounds of law-enforcement questioning of individuals regarding their religion, both at the border and within the United States. The query would encompass border inspections as well as consensual and custodial police interrogation, and law on religious profiling would also be relevant. But there is much less law in this area than one would expect. So, notwithstanding the fact that religious questioning and religious profiling implicate First Amendment considerations that questioning or profiling on ethnicity or race do not, there is relatively little to say, other than that courts presume the same limitations on religion-based police activity as on race-cognizant policing.

## At the Border

Unlike race, ethnicity, and specific national origin, U.S. immigration laws do not, and historically have not, called for border personnel to track religious identity or practices. There are two, limited exceptions applicable when persons seek an immigration or customs benefit by virtue of religion: special immigration rules for religious workers, and special customs rules for controlled substances used in religious ceremonies. While one Court of Appeals judge recently suggested that First Amendment rights at the border may attenuate along with Fourth Amendment ones, no court has so held, and there is some law to the contrary.

### Acquisition of Religion Information at the Border

For most of the early history of the United States, arriving aliens were not inspected at all, and there were essentially no grounds for exclusion. *See generally* Richard D. Steel, *Steel on Immigration Law* § 1:1 (2d ed. supp. 2010). The first statutory requirement that data be collected on all aliens seeking admission called for recordation of sex, race, marital status, occupation, literacy, and nationality, but not religion. Act of March 3, 1903, ch. 1012, § 12, 32 Stat. 1213, 1216. When Congress added a limited literacy test for admission in 1917, it curiously styled the requirement as an exclusion of "[a]ll aliens over sixteen years of age, physically capable of reading, who can not read the English language, or some other language or dialect, *including Hebrew or Yiddish*[.]" Pub. L. No. 64-301, § 3, 39 Stat. at 877 (emphasis added).

The early immigration laws also prohibited, in varying terms, entry by polygamists or those promoting polygamy. No distinction was drawn between religious and secular advocates of

FOR OFFICIAL USE ONLY    PRIV 11-0292 - 000001

BQ_000001

**FOR OFFICIAL USE ONLY**

polygamy. *See, e.g.*, Pub. L. No. 64-301, § 3, 39 Stat. at 875 (excluding "polygamists, or persons who practice polygamy or believe in or advocate the practice of polygamy").

The Immigration and Naturalization Act of 1952 and its multiple amendments have not sought religious information or used religion as grounds for exclusion, apart from the special rules for certain ministers and religious workers, discussed below. Religious persecution has, of course, been incorporated as possible grounds for refugee status. 8 U.S.C. § 1101(a)(42). Aliens attempting to establish refugee status at the time of admission may, accordingly, face questioning about religion by an asylum officer.

*Ministers and other religious workers*

When Congress began to create grounds for exclusion in the late 19th century, a general exception from the ban on contract labor was made for "ministers of any religious denomination," among other skilled professionals, Act of March 3, 1891, ch. 551, § 5, 26 Stat. 1084, 1085, an exception that may be constitutionally compelled. *See Holy Trinity Church v. United States*, 143 U.S. 457 (1892). Later law expanded the ministerial exception to "ministers or religious teachers." Pub. L. No. 64-301, § 3, 39 Stat. 874, 876 (1917). Those rules have been expanded, contracted, and refined over time, such that several advantages are available to noncitizen ministers and religious workers relative to other aliens. *See* 8 U.S.C. § 1101(a)(15)(R) & (a)(27)(C); § 1324(a)(1)(C); § 1428 (2010). None of these provisions differentiate among religious denominations.[1]

*Passenger Name Record information*

CBP could potentially come into possession of religion information through the automated acquisition of passenger name record (PNR) data from airlines. Some airline PNR systems contain special meal requests, which would at least suggest, for some individuals, a religious affiliation. It appears, however, that CBP's use, at least of PNR information obtained from European airlines, is scrubbed of all religion information before being ingested into the CBP database; that meal data fields are not ingested; and that free-text fields, while partially ingested, would not routinely convey meal information to the CBP system. *See* Undertakings of the Department of Homeland Security Bureau of Customs and Border Protection Regarding the Handling of Passenger Name Record Data, 69 Fed. Reg. 41,543 (July 9, 2004), *superseded in part by* Agreement Between the United States of America and the European Union on the Processing and Transfer of Passenger Name Record (PNR) Data by Air Carriers to the United States Department of Homeland Security (DHS) (July 26, 2007), *available at* www.dhs.gov/xlibrary/assets/pnr-2007agreement-usversion.pdf.

---

[1] It is not immediately clear what immigration officials have historically accepted as proof that an entrant presenting for inspection is a religious worker. Current law indicates the alien holds the burden of proof "to the satisfaction of the Attorney General" in this area. *See, e.g.*, 8 U.S.C. § 1428 (allowing certain immigrant religious workers temporary absence from the United States, but requiring, upon return, "pro[of] to the satisfaction of the Attorney General that his absence from the United States has been solely for the purpose of performing the ministerial or priestly functions of such religious denomination, or of serving as a missionary, brother, nun, or sister").

**FOR OFFICIAL USE ONLY** PRIV 11-0292 - 000002

FOR OFFICIAL USE ONLY

*Sacramental controlled substances*

Under the Religious Freedom Restoration Act, religious organizations may be exempted from the Controlled Substances Act for importation of certain controlled substances for religious purposes. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006).[2] Any similar RFRA importation claim (or perhaps immigration claim, as by a polygamist claiming a RFRA right to adjust status for more than one spouse) could require affirmative disclosure of religious information when persons or goods are brought across the border.

**Case law**

It is beyond the scope of this memo to consider what constitutional standards would control efforts to determine the religious affiliation or practice of aliens seeking admission. It is well established that privacy expectations are diminished at the border, and that a balance between those diminished expectations and government interests is struck at a point more favorable to the government than in most other contexts. *See United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) (describing the "qualitatively different" Fourth Amendment analysis that obtains at the border). It is also clear that conduct and communications that would be shielded by First Amendment, as well as Fourth Amendment, protections inside the United States may be subject to state intrusion at the border. *United States v. Ramsey*, 431 U.S. 606 (1977) (approving warrantless inspection of arriving international airmail). And the Supreme Court has strongly suggested, if not precisely held, that the exclusionary rule is not applicable to immigration adjudications, apart perhaps from "egregious" constitutional violations rendering a proceeding "fundamentally unfair," *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050-51 (1984), which would suggest that intrusive border questioning even on sensitive or First Amendment-protected areas is liable to be countenanced by reviewing courts. *See also Reno v. American-Arab Anti-Discrim. Comm.*, 525 U.S. 471 (1999) (noting high bar to selective-prosecution claim in immigration context, requiring "outrageous" improper discrimination to quash enforcement).

It is also clear that nationality and citizenship are legitimate bases for discriminations at the border. *Kandamar v. Gonzales*, 464 F.3d 65, 72 (1st Cir. 2006). Few contemporary claims of discrimination on the grounds of religion are, in the immigration or border context, wholly separable from discrimination concerning nationality.[3] *See Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008). Thus, for example, challenges to the NSEERS program -- on the grounds that it amounts to singling out nationals of predominantly Muslim countries -- have been uniformly rejected by courts recognizing that the basis for the program is a permissible differentiation among countries, rather than a discrimination on the basis of the religion of the nationals of those

---

[2] *O Centro* recognized that RFRA created a statutory right (against federal entities) substantially stronger than the limited First Amendment right to religious exemptions to laws of general applicability recognized by *Employment Division v. Smith*, 494 U.S. 872 (1990).

[3] *Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004), which concerned an alien minister, may be one such exception: Petitioner's claims of religious and national origin discrimination apparently concerned her race, not her country of citizenship.

FOR OFFICIAL USE ONLY            PRIV 11-0292 - 000003

BQ_000003

FOR OFFICIAL USE ONLY

countries. *Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008) (collecting cases upholding NSEERS against equal protection challenges).

The closest a court has come to considering these issues directly is *Tabba v. Chertoff*, 509 F.3d 89 (2d Cir. 2007), a case challenging a CBP program requiring secondary inspection of all persons (including U.S. persons) returning from an Islamic conference in Toronto. Plaintiffs argued that their inspection – which lasted four to six hours, and involved some use of force – went beyond the routine searches that are allowed without individualized suspicion at the border. The Second Circuit approved the program as a routine search, permitted without individualized suspicion, in light of CBP's intelligence suggesting the presence of terrorism-related individuals at the conference in Canada.

The program applied to all persons who had attended the conference – not to all Muslims arriving from Canada, but to non-Muslims (if any) who had attended – and so was not actually a religious classification. Accordingly, the court applied the intermediate scrutiny standard applicable to associational freedom claims under *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), rather than a strict scrutiny analysis that could have followed from a true religious classification claim. Hence while the secondary screening constituted a significant burden on the plaintiffs' associational freedom, the compelling state interest established by the intelligence about the Toronto conference outweighed that burden.

Speaking only for himself, Judge Straub suggested that something less than the *Jaycees* standard could be applicable in border searches and seizures: "It may also be true that the First Amendment's balance of interests is [like the Fourth Amendment's] qualitatively different where, as here, the action being challenged is the government's attempt to exercise its broad authority to control who and what enters the country." 509 F.3d at 102 n.5.

There is at least some authority suggesting Judge Straub's suggestion is wrong, notably *Boyd v. United States*, 116 U.S. 616 (1886), which struck down a statute allowing certain compelled statements from importers regarding goods potentially imported in violation of the customs laws. Though not speaking to the precise point, *Boyd* repeatedly and sharply distinguished between the government's nearly unbounded ability to seize physical contraband, and its limited ability to seize mere documentary information related to it. While *Boyd* is a Fourth and Fifth Amendment case, it at least suggests that the government's power to demand disclosure of First Amendment-protected information at the border is less than its ability to inspect, detain, and seize potential physical contraband.

By and large, however, courts faced with issues of religious questioning or profiling at the border have managed to avoid a holding on the issue. *Kwai Fun Wong v. United States*, 373 F.3d 952, 974 n.29 (9th Cir. 2004) (avoiding determining whether aliens paroled into the United States under the "entry fiction" have non-procedural rights, as against religious profiling, akin to potential entrants at the border, or persons lawfully present); *Tungawara v. United States*, 400 F.Supp. 2d 1213, 1220 n.4 (N.D. Cal. 2005) (avoiding deciding whether level of suspicion required to strip-search non-admitted aliens "need be particular to the individual as opposed to, for example, a category of those traveling from a particular place").

FOR OFFICIAL USE ONLY                                        PRIV 11-0292 - 000004

BQ_000004

FOR OFFICIAL USE ONLY

### Within the United States

While profiling on the basis of religion is frequently mentioned as illegitimate in precisely the same manner racial profiling is, there are essentially no cases discussing religious profiling separately from racial profiling, or religious questioning as such. While there are contexts in which police might discuss religion with suspects, these are not relevant to the question when police may raise religion in interrogation for the purpose of eliciting information about it.

### Religious profiling and questioning

As in the border context, current claims of religious profiling are generally combined with allegations of racial, ethnic, or nationality discrimination: Police are accused of having singled an individual out for treatment due to an appearance that suggests a predominantly-Muslim ethnicity or nationality. Hence *United States v. Quintana*, 585 F.3d 1407 (11th Cir. 2009), concerned a Latino man seeking suppression of his arrest by officers who initiated a consensual encounter in part because they thought he was "Middle Eastern." No court appears to have distinguished religious from racial/ethnic/national origin discrimination in these contexts, where what draws police attention is a perceived ethnic, racial, or national characteristic that allegedly *connotes* a religious affiliation.

There are relatively few other cases involving religious questioning, and none, so far as I can discern, attempt to set forth a comprehensive standard for when police questioning about religion is proper and when it would intrude on First Amendment (free exercise) or Fifth or Fourteenth Amendment (privacy or equal protection) interests. A rare exception is *Ramie v. City of Hedwig Village*, 765 F.2d 490 (5th Cir. 1985), a § 1983 action where plaintiff sought damages for harassing and abusive police questioning concerning her actual and perceived gender and "whether she believed in Jesus Christ." Reversing a judgment for the plaintiff, the Fifth Circuit suggested that police have a general right to "ask the questions they believe will aid them in the investigation," even if "in retrospect some question may be determined to be irrelevant and not within the government's proper sphere of concern," so long as the invasion of privacy does not outweigh the public purpose. *Id.* at 492-93.[4] But it is not clear that *Ramie*'s essentially rational-basis balancing is the appropriate rule when religion is involved.

### Related contexts

#### *Police use of religion to extract confession*

Police interrogators will, not infrequently, reference religious concepts to elicit a suspect's guilt and prompt a confession or other statement. There is clear case law that police may appeal to religion – just as they may make entirely false statements – so long as the suspect's will is not overborne by a religious interrogation that rises to the level of coercion. *See,*

---

[4] A handful of cases involve state investigations of public employees' religion where the employee has been accused or suspected of improperly combining religion with state business. *E.g., Vernon v. City of Los Angeles*, 27 F.3d 1385 (9th Cir. 1994). That circumstance is far removed from state questioning of private persons regarding religion.

FOR OFFICIAL USE ONLY     PRIV 11-0292 - 000005

FOR OFFICIAL USE ONLY

*e.g.*, *State v. Newell*, 132 P.3d 833, 844 (Ariz. 2006) (explaining and applying doctrine); *People v. Adams*, 143 Cal. App. 3d 970 (1983) (same). It does not appear that these appeals to religion are aimed at eliciting information about the suspect's religion. If anything, they presuppose the religious views of the subject of the questioning, in order to obtain nonreligious information. These cases are therefore not helpful.

### *Sacramental controlled substances*

As with importation, persons apprehended for use, possession, sale, or acquisition of controlled substances intended for sacramental use may have a religious defense to arrest or prosecution. It is at least possible police would ask a suspect apprehended with, say, peyote about his religious affiliation prior to effecting an arrest. But no reported cases set forth the permissible bounds of such questioning, and in general, persons capable of making a religious-use claim seem to know their rights and to assert them affirmatively in a police encounter. One court (pre-*Smith* and pre-RFRA, see *supra* note 2) rejected the idea that prearrest adversary process is required to test an individual's immunity from prosecution for possession of controlled substances for religious purposes. *Golden Eagle v. Johnson*, 493 F.2d 1179 (9th Cir. 1974).

FOR OFFICIAL USE ONLY    PRIV 11-0292 - 000006

BQ_000006