**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ABDULRAHMAN CHERRI**, | ) | |
| *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:12-cv-11656 |
| | ) | Hon. Avern Cohn |
| v. | ) | Magistrate: Laurie J. Michaelson |
| | ) | |
| **CHRISTOPHER A. WRAY**, | ) | |
| Director, Federal Bureau | ) | **** HEARING REQUESTED *** |
| of Investigation, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, PERMANENT INJUNCTION AND DECLARATORY RELIEF

## ISSUES PRESENTED

Does Defendants' policy and practice of subjecting certain travelers, including Plaintiffs, to repeated, scripted questioning and investigation about their faith violate the Fifth Amendment's Equal Protection guarantee because it discriminates on the basis of religion?

> Plaintiffs' Answer:  Yes
> Defendants' Answer:  No

Does Defendants' policy and practice of subjecting certain travelers to repeated, scripted questioning about their faith fulfill a compelling governmental interest by the least restrictive means?

> Plaintiffs' Answer:  Yes
> Defendants' Answer:  No

Are Plaintiffs entitled to summary judgment?

> Plaintiffs' Answer:  Yes
> Defendants' Answer:  No

Are Plaintiffs entitled to a permanent injunction?

> Plaintiffs' Answer:  Yes
> Defendants' Answer:  No

## CONTROLLING, OR MOST APPROPRIATE, AUTHORITY

*Muniz-Muniz v. United States Border Patrol*, 869 F.3d 442 (6th Cir. 2017)

*Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656 (6th Cir. 2016)

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012)

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002)

*Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001)

*United States v. Avery*, 137 F.3d 343 (6th Cir. 1997)

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979)

# TABLE OF CONTENTS

ISSUES PRESENTED ................................................................................................ii

CONTROLLING, OR MOST APPROPRIATE, AUTHORITY ...............................iii

TABLE OF CONTENTS .........................................................................................iv

TABLE OF AUTHORITIES .....................................................................................v

INTRODUCTION ....................................................................................................1

STANDARD OF REVIEW .......................................................................................4

ARGUMENT ...........................................................................................................4

   I.   DEFENDANTS' OFFICIAL POLICY AND PRACTICE OF SUBJECTING CERTAIN TRAVELERS TO INTRUSIVE RELIGIOUS QUESTIONING VIOLATES EQUAL PROTECTION ............................................................5

      A.  The Equal Protection Clause prohibits religious discrimination. .......................5

      B.  Defendants' policy and practice of subjecting Muslim travelers to intrusive religious questioning violates Equal Protection. .........................................6

      C.  Defendants' official policy and practice of detailed religious questioning violates Equal Protection, regardless of faith. ...........................................11

      D.  Defendants intrusive religious questioning is not narrowly tailored to fulfill a compelling state interest. ......................................................................13

   II.  THE COURT SHOULD GRANT SUMMARY JUDGMENT AND ISSUE A PERMANENT INJUNCTION AGAINST DEFENDANTS' INTRUSIVE RELIGIOUS QUESTIONING .....................................................................16

CONCLUSION .......................................................................................................19

CERTIFICATE OF SERVICE.................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Alasaad v. Nielsen*,
    No. 17-cv-11730, 2018 WL 2170323 (D. Mass. May 9, 2018)......................................17

*ACLU of Kentucky v. McCreary Cnty.*,
    607 F.3d 439 (6th Cir. 2010) ...........................................................................................4

*ACLU of Michigan v. Livingston Cnty.*,
    796 F.3d 636 (6th Cir. 2015) .........................................................................................18

*Askins v. U.S. Dep't of Homeland Sec.*,
    899 F.3d 1035 (9th Cir. 2018) .......................................................................................14

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) .....................................................................................11

*Barnhart v. Pickrel, Schaeffer, Ebeling Co.*,
    12 F.3d 1382 (6th Cir. 1993) ...........................................................................................4

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
    512 U.S. 687 (1994) .......................................................................................................11

*Bowman v. United States*,
    564 F.3d 765 (6th Cir. 2008) ...........................................................................................5

*Center for Bio–Ethical Reform v. Napolitano*,
    648 F.3d 365 (6th Cir. 2011) ...........................................................................................5

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*,
    363 F.3d 427 (6th Cir. 2004) .........................................................................................18

*Cherri v. Mueller*,
    951 F. Supp. 2d 918 (E.D. Mich. 2013)...............................................................2, 3, 13

*City of New Orleans v. Dukes*,
    427 U.S. 297 (1976) .........................................................................................................5

*Davis v. Passman*,
    442 U.S. 228 (1979) .......................................................................................................17

*Dillinger v. Schweiker,*
762 F.2d 506 (6th Cir. 1985) ...........................................................................5

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) .................................................................................. 4, 16

*EEOC v. Kimberly-Clark Corp.,*
511 F.2d 1352 (6th Cir. 1975) ........................................................................18

*Elrod v. Burns,*
427 U.S. 347 (1976) .......................................................................................16

*EEOC v. Stroh Brewery Co,*
83 F.R.D. 17 (ED Mich 1979) ........................................................................18

*Farm Labor Org. Comm. v. Ohio State Highway Patrol,*
308 F.3d 523 (6th Cir. 2002) ...........................................................................6

*FDIC v. Meyer,*
510 U.S. 471 (1994) .......................................................................................18

*Harbin–Bey v. Rutter,*
420 F.3d 571 (6th Cir. 2005) ..................................................................... 5, 13

*Kansas v. Nebraska,*
135 S. Ct. 1042 (2015) ............................................................................. 18, 19

*Michigan State A. Philip Randolph Inst. v. Johnson,*
833 F.3d 656 (6th Cir. 2016) ..........................................................................16

*Mitchell v. Helms,*
530 U.S. 793 (2000) ................................................................................. 11, 12

*Muniz-Muniz v. United States Border Patrol,*
869 F.3d 442 (6th Cir. 2017) ...................................................................... 7, 10

*NLRB v. Catholic Bishop of Chicago,*
440 U.S. 490 (1979) .......................................................................................11

*Porter v. Warner Holding Co.,*
328 U.S. 395 (1946) .......................................................................................19

*Pyke v. Cuomo,*
258 F.3d 107 (2d Cir. 2001).......................................................................6, 10

*Raza v. City of New York*,
  998 F. Supp. 2d 70 (E.D.N.Y. 2013) ..................................................................6

*Speet v. Schuette*,
  726 F.3d 867 (6th Cir. 2013) .........................................................................19

*Thomas v. Cty. of Los Angeles*,
  978 F.2d 504 (9th Cir. 1992) .........................................................................17

*Tuan Anh Nguyen v. INS*,
  533 U.S. 53 (2001)..........................................................................................15

*United States v. Avery*,
  137 F.3d 343 (6th Cir. 1997) .................................................................... 6, 10

*United States v. Windsor*,
  570 U.S. 744 (2013) .................................................................................. 5, 17

*Virginian R. Co. v. Railway Employees*,
  300 U.S. 515 (1937) ........................................................................................19

*Wilwal v. Nielsen*,
  346 F. Supp. 3d 1290 (D. Minn. 2018) ..........................................................17

## INTRODUCTION

This case regards a first-of-its-kind challenge to the federal government's practice of interrogating select Muslim travelers about their religious beliefs. It is a case that strikes at the heart of the Constitution's Equal Protection Clause, and it poses an existential question to this Court and the country: will the Constitution protect the liberty of Muslim Americans, as unpopular a minority as any these days, amidst a rising tide of anti-Muslim sentiment?

Though filed years ago with slow-emerging developments, this case's importance has resonated publicly. Just last year, a writer in The University of Chicago Law Review argued that the policies at issue in this case "raise novel questions about the proper scope and application of the Establishment Clause that have recently gained urgency."[1] A news article in 2017, detailing the abusive border detention of an American who was interrogated about his religious practices, cited to documents that have been attached to various discovery-related motions to provide authoritative context to Defendants' longstanding religious interrogation practices.[2] Simply put, when it comes to abusive practices

---

[1] Allison Hugi, COMMENT: A Borderline Case: The Establishment Clause Implications of Religious Questioning by Government Officials, 85 U. CHI. L. REV. 193, 195 (Jan. 2018).

[2] Murtaza Hussain, Complaints Describe Border Agents Interrogating Muslim Americans, Asking for Social Media Accounts, THE INTERCEPT (Jan. 14, 2017), available at https://theintercept.com/2017/01/14/complaints-describes-border-agents-interrogating-muslim-americans-asking-for-social-media-accounts/.

against Muslim Americans at the border, this Court's decision will be a seminal judicial analysis of the ever-escalating assaults against Islam.

There is no mystery as to why the Court's prior motion to dismiss decision has been studied and observed so closely.  For more than a decade, official U.S. Government policy has targeted religion – specifically Islam – as a threat.  The U.S. Government refuses to disclose the triggering conditions, but it admits that in certain circumstances agents are required to detain and religiously question travelers, including Plaintiffs and other Muslims.  Defendants guide their agents via a religious interrogation script, having them ask:



These are just a sample of the invasive religious questions the Government wields against Muslims across the nation's ports of entry and in FBI interrogations. Despite media outcry and complaints by the Council on American-Islamic Relations and the American Civil Liberties Union, the Department of Homeland Security has refused to take action or implement changes.  The religious script is still in use today. Eight years later, DHS's internal investigation of the original 23 complaints from Muslims subjected to religious interrogation at 12 different ports of entry remains pending.  Despite promising to do so, DHS has never "inform[ed] Plaintiffs' counsel

how the complaint has been concluded." *Cherri v. Mueller*, 951 F. Supp. 2d 918, 938 (E.D. Mich. 2013). Instead, targeted interrogations of Muslims continues.

No evidence exists to show comparable scripted religious questions being asked of any Christians, Jews, Hindus, Buddhists, or other non-Muslims. Nonetheless, even if other religious adherents are subject to comparable religious scrutiny, the very process of singling out religious individuals for intense inquiry into the details of their faith is itself unconstitutional. Federal discrimination on the basis of religion violates the Fifth Amendment's Equal Protection guarantee unless it is narrowly tailored to serve a compelling government purpose. Here, the Government has not offered any justification, much less a compelling one, for its targeted and intrusive religious questioning of Muslims.

The Government has asserted the law enforcement privilege to block Plaintiffs' every attempt to inquire into the Government's interest in detailed and scripted religious questioning. Even in this case, the Government now seeks to mask its Muslim-targeted policy by clawing back the Religious Questionnaire it filed on the public docket (Dkt. 89-1) four years ago. *See* Dkt. 106-108.

Summary judgment is warranted. This Court should enjoin Defendants' vulgar practice of interrogating Muslim travelers at the border, and later by the FBI in Muslims' homes, about their religious beliefs and practices. Defendants' records should be scrubbed of all data they have aggregated and stored about the religiosity of travelers.

This Court should invoke Equal Protection to strike down the Government's institutionalized Islamophobia.

## STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue as to any material fact, such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *Barnhart v. Pickrel, Schaeffer, Ebeling Co.*, 12 F.3d 1382, 1388 (6th Cir. 1993).  "[A] party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law."  *ACLU of Kentucky v. McCreary Cnty.*, 607 F.3d 439, 445 (6th Cir. 2010).  "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

## ARGUMENT

There is no dispute that Defendants have a policy and practice of subjecting certain Muslim travelers to intrusive and scripted religious questioning.  Because Defendants have offered no compelling, tailored justification for this practice, Defendants' religious questioning must be enjoined as unconstitutional under the Fifth Amendment.

I. **DEFENDANTS' OFFICIAL POLICY AND PRACTICE OF SUBJECTING CERTAIN TRAVELERS TO INTRUSIVE RELIGIOUS QUESTIONING VIOLATES EQUAL PROTECTION**

A. **The Equal Protection Clause prohibits religious discrimination.**

The Fourteenth Amendment prohibits states from denying "any person within its jurisdiction the equal protection of the laws." U.S. CONST. Amend XIV. The federal government must provide equal protection under the Fifth Amendment by reverse incorporation. *United States v. Windsor*, 570 U.S. 744, 774 (2013).

The Equal Protection Clause protects against invidious discrimination among similarly-situated individuals when that discrimination implicates fundamental rights. *Center for Bio–Ethical Reform v. Napolitano,* 648 F.3d 365, 379 (6th Cir. 2011). Equal Protection asks whether Government action adversely affects a "suspect class," such as by drawing distinctions based on race, ethnicity, national origin, or religion. *See, e.g., Harbin–Bey v. Rutter,* 420 F.3d 571, 576 (6th Cir. 2005). Discrimination on the basis of religion is "inherently suspect," *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976), and thus is "subjected to strict scrutiny," *Dillinger v. Schweiker*, 762 F.2d 506, 508 (6th Cir. 1985) (citation omitted). Under strict scrutiny, Government action may only be upheld if it is "narrowly tailored to advance a compelling governmental interest." *Bowman v. United States*, 564 F.3d 765, 772 (6th Cir. 2008).

**B.  Defendants' policy and practice of subjecting Muslim travelers to intrusive religious questioning violates Equal Protection.**

The Equal Protection Clause "prohibits agents from engaging in investigative surveillance of an individual based solely on impermissible factors" such as religion. *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997).  "If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race [or religion], without more, then a violation of the Equal Protection Clause has occurred." *Id.*  Further, a policy or practice need not be *solely* based on racial or religious criteria to be unconstitutional.  Even if a policy rests only in part on impermissible criteria like race or religion, it is equally subject to strict scrutiny under the Equal Protection Clause.  *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 n.4, 538-539 (6th Cir. 2002) ("It is enough to show that the challenged action was taken at least in part because of . . . its adverse effects upon an identifiable group.").

Even a "facially neutral law or policy" will constitute discrimination when it has either "been applied in an unlawfully discriminatory manner, or "has an adverse effect and [] was motivated by discriminatory animus." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001); *see also Raza v. City of New York*, 998 F. Supp. 2d 70, 80-82 (E.D.N.Y. 2013) (applying *Pyke* to religious profiling of Muslims by law enforcement); *Farm Labor*, 308 F.3d at 542.  Thus, showing an "informal policy" of unconstitutional "profiling"—e.g., by improper or "inadequate training or supervision," or by showing the government

- 6 -

"allows agents" to "consider" an improper factor—establishes a constitutional violation. *Muniz-Muniz v. United States Border Patrol*, 869 F.3d 442, 444-45 (6th Cir. 2017). A mere "custom of tolerating" illegal suspect class profiling is sufficient to establish an unconstitutional agency policy. *Muniz-Muniz*, 869 F.3d at 445.

Here, Defendants have an official policy of religious questioning that expressly permits the challenged conduct. As detailed in the Statement of Facts, ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████  *See, e.g.*, SOF ¶¶ 7-14 (ICE Religious Questionnaire); ¶ 16 (FBI Questionnaire) ¶ 21 (CBP officer stating that a traveler might be asked where they pray because "certain inspections require a different line of questioning"). ██

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████  SOF ¶ 10.

The Religious Questionnaire includes the following scripted questions, among others:



SOF ¶ 12.  These religious questioning policies and scripts have existed for more than a decade and are "currently" in use, including at ports of entry.  SOF ¶¶ 10-14.

The evidence also establishes that the Government's informal policy is to apply this religious interrogation disproportionately, if not uniquely, to Muslims.  SOF ¶¶ 31-38 and 67-70. Islam, but no other religion (including Christianity, Judaism, Buddhism, or Hinduism), has been discussed in CBP or ICE training.  SOF ¶ 68.  Although ICE Special Agent Sabo has ███████████████████████████████████████████ ███████████████████████████████ Sabo has never asked a Christian, Jew, Buddhist, or Hindu about how often they pray, where they pray, or which religious sect or subdivision they adhere to.  SOF ¶¶ 14, 69. None of the CBP Officers have asked Christians, Buddhists, Jews, Hindus, Sikhs, or any non-Muslim traveler about their prayer habits, religious leaders, or other religious beliefs and practices.  SOF ¶ 69. The only circumstances in which places of worship might come up is with respect to religious worker visas or in response to a generic inquiry about where the traveler is going; in those circumstances, if the travelers were not Muslim, CBP officers neither documented their location nor asked follow-up questions.  SOF ¶¶ 69-70.  Nor are DHS and CBP aware of any complaints from any faith except Islam regarding religious questioning at the border.  SOF ¶ 67.

The evidence further establishes that agency officials have ratified the religious questioning practices of their line-level officers.  No DHS, ICE, or CBP policy, custom, regulation, or practice forbids government agents from engaging in religious profiling

- 8 -

or asking religious questions at ports of entry.   SOF ¶ 8. CBP Officers are "not prohibited from asking questions about a traveler's religious practices."  SOF ¶ 9.  CBP Officer Perry, responsible for all Michigan borders, testified that in his view, legitimate law enforcement interests exist for CBP officers to ask Muslims about morning prayers, praying five times a day, what mosque they pray at, who else prays at their mosque, who their imam is, what Muslim countries they've traveled to, what Muslim charities they've donated to, and what Muslim organizations they're affiliated with.  SOF ¶ 24.  No CBP officer has ever been reprimanded for religious questioning.  SOF ¶ 66.  And rather than finish its investigation or propose policy changes, DHS's Office of Civil Rights and Civil Liberties chose to halt its internal inquiry into religious questioning in 2012. SOF ¶ 6.  That investigation has never resumed, and religious questioning continues.

Although DHS, ICE, and CBP articulated some isolated examples of experiences with asking religiously-tinged questions to non-Muslim travelers, those examples were categorically different.  In one category, the Government asked narrow questions with the purpose of determining specific admissibility criteria for *non*-citizens related to religious worker visa and religious asylum claims.   In the other, the Government engaged in one-off conversational follow-up or offered religious accommodations, based on information the traveler had volunteered.  SOF ¶ 70. There is no evidence Defendants have ever repetitively deployed any of their scripted lines of mandatory religious questioning against non-Muslims.  *See id.* at ¶¶ 69-70.   In short, the Government has not met its burden of articulating a neutral reason for the obvious

statistical disparity in its religious inquiry against Muslims. *Avery*, 137 F.3d at 356 (Government's burden to explain disparity once Plaintiff shows prima facie case of disparate impact). Instead, the evidence establishes that the Government has applied its supposedly facially-neutral religious-questioning policy in a discriminatory manner and that this discrimination was intentional, as a result of training targeted at Islam. *See Pyke*, 258 F.3d at 110; SOF ¶¶ 31-38.

This evidence here is thus quite different than the facts in *Muniz-Muniz*, which found that the Border Patrol did not have a policy of racial profiling. In *Muniz-Muniz*, the undisputed evidence showed that the Government trained its border employees not to racially profile. 869 F.3d at 444. Here, the Government's training does the opposite; Defendants train individuals like Officer Miller on how to religiously profile Muslims. SOF ¶¶ 31-38. The Government taught Officer Miller to make religious assumptions, ask prying religious questions, and then document notes on the religiosity of Plaintiff Cherri's then-girlfriend, all based on the style she wore hijab. SOF ¶¶ 34-37, 52-54.

Particularly when coupled with Muslim-only cultural training sessions, Defendants' mandatory questionnaire ███████████████████████ ███████████████████████████████ demonstrates an official written policy of targeting Muslims. At a minimum, Defendants maintain at least an unofficial policy of unconstitutional profiling and religious interrogation, as seen by the testimony regarding the disparate treatment, training, and ratification of lines of questioning the Government has applied to Muslims and not other faiths.

- 10 -

### C.   Defendants' official policy and practice of detailed religious questioning violates Equal Protection, regardless of faith.

Even if Defendants deployed these religiosity questions against all travelers and all faiths (and they are not, *see* SOF ¶¶ 67-70), the fact that official government policy requires *any* intrusive religious questioning, except perhaps as necessary to determine if noncitizens are admissible as religious workers or refugees, *see* 8 U.S.C. §§ 1101(a)(27)(c) and (42), SOF ¶ 70, offends Equal Protection.

The First Amendment forbids the Government "from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion).  This is because, "[i]t is not only the conclusions that may be reached by the [Government] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979).[3]

Conduct which violates the rights of religious people under the First Amendment necessarily also violates their rights under the Equal Protection Clause, as "the Free Exercise Clause, the Establishment Clause … and the Equal Protection Clause as applied to religion—all speak with one voice." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring); *see also Awad v. Ziriax*, 670

---

[3] Plaintiffs' First Amendment and Religious Freedom Restoration Act claims (Counts I – III, V) were previously dismissed.  *See* Dkt. 44. Plaintiffs expressly preserve the right to challenge this dismissal on appeal.

F.3d 1111, 1128 (10th Cir. 2012) (explaining that Establishment Clause jurisprudence is a "counterpart to the Equal Protection Clause" insofar as both remedy religious discrimination and require strict scrutiny).

ICE's Religious Questionnaire is a mandatory "trolling through a person's or institution's religious beliefs" that violates equal protection. *See Mitchell*, 530 U.S. at 828 (plurality opinion).  For its own, undisclosed, investigatory and intelligence-gathering purposes, ███████████████████████████████████████████████
███████████████████████████████████████████ SOF ¶¶ 12-14. DHS, ICE, CBP, and the FBI train agents on cultural factors particular to Islam, including how to identify levels of religious devotion, to assist officers' border responsibilities. SOF ¶¶ 31-38. The Department of Homeland Security ascertains and records whether citizens are Sunni, Shia, a "moderate Muslim," a "radical" or an "extremist."  SOF ¶¶ 41-43, 58, 61, 63. DHS does this despite its own admission that it "has never discovered a situation where asking someone about their religion actually led to having information where that traveler was found to be involved in administrative or criminal violations or other elicit activity because of those religious questions."  SOF ¶ 26.

Here, based on both the content of the questionnaire and the training provided, the Government's inquiry seeks to determine how religious certain travelers are for its own sake, apparently in order to deploy unproven stereotypes about Muslim religiosity as a proxy for risk.  Thus, for instance, Government agents determine threat levels by looking at how Muslim women wear their hijab, to determine how sincere, and thus

threatening, their religious belief might be.  *See* SOF ¶ 35. The Government's ███

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ *See* SOF ¶ 12.

████████████████████████████ religious profiling stereotypes. For example, the FBI

teaches new trainees that Shia Muslims glorify martyrdom and will follow their imam

into an offensive jihad.   PEX 19, FBI Islam Courses at -81-82, -88-89.   The

Government thus stereotypes Muslim travelers based on their buzzword religious

answers.

 Inquiry into how religious an individual is itself violates the Constitution.  The

actual and potential deprivations of liberty the Government imposes based on those

religious answers only heightens the Constitutional violation.

 **D.**   **Defendants intrusive religious questioning is not narrowly tailored to fulfill a compelling state interest.**

 Government action that discriminates on the basis of religion can only be

sustained if it is narrowly tailored to serve a compelling state interest.  *See, e.g., Harbin–*

*Bey v. Rutter,* 420 F.3d 571, 576 (6th Cir. 2005).  Here, the Government has repeatedly

refused to disclose its interests in border religious questioning like that imposed on

Plaintiffs.  The Court previously recognized that Defendants *might* be able to "come

forward with a permissible reason for profiling Plaintiffs for secondary inspection and

questioning them extensively about their religious practices and beliefs."  *Cherri v.*

*Mueller*, 951 F. Supp. 2d 918, 938 (E.D. Mich. 2013).  Discovery has concluded (except

for a lingering motion to compel), but no such explanation has been forthcoming. During discovery, the Government blocked every question regarding *why* the Religious Questionnaire existed, *why* Islam was the sole religious focus of DHS and FBI trainings, and *why* Plaintiffs were asked about their Sunni versus Shia affiliations, prayer habits, mosque attendance, religious leaders, and charitable affiliations. *See* SOF ¶ 28. Moreover, the Religious Questionnaire, CBP Musters related to Islamic holidays, DHS and CBP investigatory memoranda, and other official materials are redacted so as to obscure any context for and purpose behind religious questioning. SOF ¶ 29. Thus, Plaintiffs lack information to determine the specific circumstances that trigger application of Defendants' religious questioning policy, or if they will be subjected to it the next time they cross a port of entry. What they *do* know is religious questioning policies exist, are currently in use, and are applied uniquely to Muslims.

While the Government has consistently invoked the law enforcement privilege to block inquiry into its policies and practices of religious questioning, invoking the privilege does nothing to establish that the Government's actual law enforcement interests rise to the level of compelling. "The devil lies in the details: Even at the border, [courts] have rejected an 'anything goes' approach." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1045 (9th Cir. 2018). "It is the government's burden to prove that these specific restrictions are the least restrictive means available to further its compelling interest. [It] cannot do so through general assertions of national security[.]" *Id.* As DHS's civil liberties officer conceded, she "has never discovered a

- 14 -

situation where asking someone about their religion actually led to having information where that traveler was found to be involved in administrative or criminal violations or other elicit activity because of those religious questions." SOF ¶ 26.

When pressed, the only interests the Government asserted in specific religious questions related to its broad discretion to ask limited follow-up and clarification questions in order to assess traveler admissibility, identity and veracity.    SOF ¶ 68. Plaintiffs, however, are all United States citizens who, once their *identity* is verified, *cannot* be deemed inadmissible or denied entry.  SOF ¶ 39; *see, e.g., Tuan Anh Nguyen v. INS*, 533 U.S. 53, 67 (2001) (recognizing citizens' "absolute right to enter [America's] borders").  Nor have Plaintiffs been subjected to one-off follow-up questions.  Rather, Defendants have marched them through unprompted, repetitive, and scripted religious questionnaires about the details of their Muslim practice.  *See* SOF ¶¶ 48-65.

CBP Field Officer Perry conceded these questions serve no useful appropriate purpose and "probably" should not be asked. SOF ¶ 30. Plaintiffs are hard-pressed to conceive of a compelling law enforcement need for a scripted religious questionnaire that CBP's Director of Field Operations in Michigan disavowed any interest in using. Defendants certainly have not proved one.

The Government has chosen to not provide evidence in support of its law enforcement interests and is thus bereft of the proof necessary to meet its burden on strict scrutiny.

- 15 -

## II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT AND ISSUE A PERMANENT INJUNCTION AGAINST DEFENDANTS' INTRUSIVE RELIGIOUS QUESTIONING

Federal courts have jurisdiction to issue broad equitable relief under Federal Rule of Civil Procedure 65.  The Supreme Court has established a four-factor test which a plaintiff must satisfy in seeking a permanent injunction.  "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391.  "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."  *Id.*   Each of these factors favor issuance of an injunction against Defendants' religious questioning.

*Irreparable Injury*.  The Supreme Court has long recognized that the "loss of First Amendment freedoms, for even minimal amounts of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  The Sixth Circuit has applied the same principle to find irreparable injury whenever constitutional rights are violated.  *See, e.g., Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("When constitutional rights are threatened or impaired, irreparable injury is presumed").

The "Fifth Amendment confers on [Plaintiffs] a constitutional right to be free from illegal discrimination." *Davis v. Passman*, 442 U.S. 228, 236 (1979); *accord Windsor*, 133 S. Ct. at 2695.  As detailed above, Plaintiffs have shown the existence of official governmental policy and practice to subject Plaintiffs and other Muslim travelers to intrusive inquiry on the basis of religion.  *See* § I, above.  This policy and practice has repeatedly and adversely affected Plaintiffs at ports of entry and later in a home, and is still in use nationwide.  *See* SOF ¶¶ 7 and 40-58. This proves irreparable harm.

There is no requirement that Plaintiffs must show any specific future travel that will result in the same religious questioning, pursuant to a policy that Defendants admit is still in effect.  As explained in one recent opinion, citing cases from circuits throughout the country, "Courts do not require plaintiffs to engage in international travel when they have experienced difficulties at the border and reasonably expect the same difficulties when returning to the United States from future travel."  *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1302 (D. Minn. 2018) (citations omitted); *see also Alasaad v. Nielsen*, No. 17-cv-11730, 2018 WL 2170323, at *10 (D. Mass. May 9, 2018) ("the 'possibility of recurring injury ceases to be speculative when actual repeated incidents are documented'") (citing *Thomas v. Cty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992)). Plaintiffs have offered abundant evidence that Muslims travelers around the country continue to be subjected to this religious script (*see* SOF ¶¶ 59-66) because Defendants' official policy is to still use it.  SOF ¶¶ 7, 10.

*Inadequate Legal Remedies.*  The only remedies sought by and available to Plaintiffs here is injunctive and declaratory relief against Defendants' discriminatory religious-profiling policies.  Federal sovereign immunity bars litigation against official-capacity agency defendants for money damages.  *See, e.g., FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); 5 U.S.C. § 702 (Administrative Procedure Act waiver of immunity for claims for injunctive relief against federal agencies).

*Balance of Hardships.*  Defendants can experience no cognizable hardship by forced compliance with the Constitution.  "[N]o substantial harm can be shown in the enjoinment of an unconstitutional policy."  *See, e.g., Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004).

*Public Interest.*  "The public interest is served by preventing the violation of constitutional rights."  *Chabad*, 363 F.3d at 436; *accord ACLU of Michigan v. Livingston Cnty.*, 796 F.3d 636, 649 (6th Cir. 2015).  "[T]he eradication of discrimination by race and sex" – and religion – "promotes public interests and transcends private interests."  *See EEOC v. Stroh Brewery Co.*, 83 F.R.D. 17, 25 (E.D. Mich. 1979) (citing *EEOC v. Kimberly-Clark Corp.*, 511 F.2d 1352, 1359 (6th Cir. 1975)).

\* \* \*

"When federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'"  *Kansas v. Nebraska*, 135 S. Ct. 1042, 1053 (2015)

(quoting *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 (1946). "Courts of equity may, and frequently do, go much farther" to give "relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian R. Co. v. Railway Employees,* 300 U.S. 515, 552 (1937). "In exercising [its] jurisdiction, [a court] may "mold each decree to the necessities of the particular case" and "accord full justice" to all parties. *Kansas*, 135 S. Ct. at 1053 (quoting *Porter*, 328 U.S. at 398). Facial invalidation of law and policy is proper for constitutional violations. *See, e.g., Speet v. Schuette*, 726 F.3d 867, 879 (6th Cir. 2013).

## CONCLUSION

The Court should grant Plaintiffs' Motion for Summary Judgment, Permanent Injunction and Declaratory Relief in the form of the attached Proposed Order. The Court should then allow Plaintiffs to seek, through separate briefing, costs as a prevailing party as well as attorneys' fees and other expenses under 28 U.S.C. §§ 2412(a)(1) and (d)(1).

Respectfully submitted,

CAIR LEGAL DEFENSE FUND

BY:    */s/ Lena Masri*
LENA F. MASRI (P73461)
GADEIR I. ABBAS (VA # 81161)*
CAROLYN M. HOMER (DC # 1049145)
JUSTIN SADOWSKY (DC # 977642) €
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787
  lmasri@cair.com

- 19 -

AKEEL & VALENTINE, PLLC
SHEREEF H. AKEEL (P54345)
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
   shereef@akeelvalentine.com

*Licensed in VA, not in D.C.*
*Practice limited to federal matters*

€ *EDMI admission forthcoming*

*Attorneys for Plaintiffs*

Date:  May 28, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2019, I electronically filed the foregoing

document with the Clerk of the Court for the Eastern District of Michigan using the

ECF System which will send automatic notification to the registered participants of

the ECF System as listed on the Court's Notice of Electronic Filing.


/s/ *Lena F. Masri*